MARC E. MAYER (SBN 190969)
   mem@msk.com
MARK C. HUMPHREY (SBN 291718)
   mxh@msk.com
GENEVIEVE L. JAVIDZAD (SBN 336138)
   glj@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., a Delaware corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ENGINEOWNING UG, a German corporation, CMM HOLDINGS S.A., a German corporation, GARNATZ ENTERPRISE LTD, a Belize Corporation, VALENTIN RICK, LEONARD BUGLA, LEON FRISCH, IGNACIO GAYDUCHENKO, MARC-ALEXANDER RICHTS, ALEXANDER KLEEMAN, LEON SCHLENDER, ERICK PFEIFER, BENNET HUCH, ZAIN JONDAH, RICKY SZAMEITAT, MARCEL BINDEMANN, ALEXANDER KLEEMANN, REMO LÖFFLER, MARVIN BAOTIC NEUMEYER, HENDRIK SMAAL, CHARLIE WIEST, DENNIS REISSLEICH, TYLER BYRD, SIMON MASIAS, NICHOLAS JAMES BALDWIN, ANTONIO MEDIAN, REMY CARTIGNY, PASCAL CLASSEN, MANUEL T. SANTIAGO, AND KATERINA DISDLE, and DOES 1-50, inclusive,<br><br>　　　　　Defendants. | CASE NO. 2:22-cv-00051-MWF (JCx)<br><br>[Assigned to Judge Michael W. Fitzgerald]<br><br>**AMENDED COMPLAINT FOR:**<br><br>**(1) TRAFFICKING IN CIRCUMVENTION DEVICES;**<br><br>**(2) FALSE DESIGNATION OF ORIGIN;**<br><br>**(3) VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT;**<br><br>**(4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**<br><br>**(5) UNFAIR COMPETITION;**<br><br>**(6) VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C);**<br><br>**(7) VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(D)**<br><br>**Demand For Jury Trial** |

Activision Publishing, Inc. ("Activision" or "Plaintiff") alleges as follows:

**PRELIMINARY STATEMENT**

1.     Activision is the owner and publisher of the *Call of Duty* series of video games (the "COD Games").  By this lawsuit, Activision seeks to put a stop to unlawful conduct by a multi-national business enterprise that is distributing and selling for profit numerous malicious software products designed to enable members of the public to gain unfair competitive advantages (*i.e.*, to cheat) in the COD Games.  These ongoing activities damage Activision's games, its overall business, and the experience of the COD player community.

2.     EngineOwning ("EO" or the "Enterprise") is a commercial enterprise consisting of a German business entity and more than a dozen individuals (collectively, "Defendants").  Defendants collectively and jointly are engaged in the development, sale, distribution, marketing, and exploitation of a portfolio of malicious cheats and hacks for popular online multiplayer games, most prominently the COD Games.  Via their official website (www.engineowning.to) (the "EO Website") and other related websites and social media accounts, EO and numerous affiliated individuals and resellers sell cheats for numerous COD Games, including without limitation *Call of Duty: Warzone*, *Call of Duty: Modern Warfare (2019)*, *Call of Duty World War II*, *Call of Duty: Modern Warfare III*; *Call of Duty Black Ops*, *Call of Duty Black Ops II*, and *Call of Duty Black Ops III* (collectively, the "Cheating Software").  EO has also recently released new cheating software for the popular multiplayer game *Overwatch*, which is published by Activision's affiliate, Blizzard Entertainment, Inc.  The Cheating Software enables players to manipulate the COD Games to their personal advantage, such as by automatically aiming weapons, revealing the locations of opponents, and allowing the player to see information that is not normally available to players because it would give them an unfair advantage within the game.

3.      The COD Games are designed to be enjoyed by and fair for all players.  When players use exploits like the Cheating Software, such conduct disturbs game balance and in many cases leads non-cheating players to quit matches in frustration.  Widespread cheating also can lead to negative social media posts and headlines in the press, which can impact consumer confidence.  Accordingly, Activision has spent and continues to spend an enormous amount of resources to combat cheating in its games.  Notwithstanding those efforts, Defendants' sale and distribution of the Cheating Software has caused Activision to suffer massive and irreparable damage to its goodwill and reputation and to lose substantial revenue.

4.      In creating, marketing, selling, servicing, and distributing the Cheating Software, Defendants have engaged in numerous unlawful acts under United States and California law.  Defendants have violated Section 1201 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(b)(1), by selling, importing, offering, providing, and otherwise trafficking in technologies that circumvent or evade anti-cheat technologies used by Activision to protect the integrity of the COD Games.  Moreover, by selling (or including with their products) so-called "hardware ID" ("HWID") spoofers, Defendants enable members of the public to access restricted services for which they have previously been denied access.  Defendants also have knowingly, intentionally, and maliciously interfered with and disrupted the contracts Activision has with its customers in the United States, which explicitly prohibit the exact type of cheating that Defendants enable, encourage, and solicit by marketing and selling their Cheating Software.  Defendants have engaged in unfair competition pursuant to California Business & Professions Code § 17200 *et seq*. and under California common law, by operating an unlawful, unfair, and/or fraudulent business.  Finally, Defendants have committed violations of the Racketeering Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d) by conducting and participating in an enterprise engaged in racketeering activity.

5.     Defendants not only know that their conduct is unlawful, but they engage in that conduct with the deliberate intent to harm Activision, its businesses, and its player community.  This Court must put a stop to Defendants' misconduct, and Activision is entitled to monetary damages, injunctive and other equitable relief, and punitive damages against Defendants.

## JURISDICTION AND VENUE

6.     This is a civil action seeking damages, injunctive relief, and other equitable relief under the anti-circumvention provisions of the DMCA, 17 U.S.C. § 1201, and the laws of the State of California.

7.     This Court has subject matter jurisdiction over Activision's claims for violating the anti-circumvention provisions of the DMCA pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Activision's state law claims for intentional interference with contract and unfair competition, which are so related to Activision's federal claims as to be part of the same case or controversy.

8.     This Court has personal jurisdiction over each of the Defendants, and over the Enterprise as a whole, because Defendants and the Enterprise have purposefully directed their activities at the United States, and at California in particular, have purposefully availed themselves of the benefits of doing business in California, and have established a continued presence in California.  Activision is informed and believes, and on that basis alleges, that, without limitation:

(a)     The *only* purpose of the Cheating Software is to harm a video game developed and published by Activision in the State of California.  Thus, the Cheating Software was developed and designed to target Activision and its products, to devalue the massive investment Activision has made in the COD

1   Games, and to degrade the work of developers, programmers, artists, game

2   designers, software engineers, online security experts, and others who worked on

3   the COD Games.  Indeed, the Cheating Software is parasitic in nature, in that it

4   derives value only from the COD Games and its very existence relies on

5   Activision's continued support for the COD Games, which were created in

6   California and published by a California company.

7          (b)     Defendants conduct extensive and ongoing business with users

8   in the State of California and the United States.  Among the customers of the

9   Cheating Software are high-profile streamers of the COD Games who reside in the

10  United States.

11         (c)     Defendants target the Cheating Software to users in the United

12  States, including in the State of California, knowing that a substantial market exists

13  for their Cheating Software in the United States.  For example, Defendants display

14  all of the text of their website in "English (US)," offer special sales around U.S.

15  holidays (such as Halloween and Black Friday), and provide customer service in

16  English.  Defendants know that the COD Games have an enormous audience in the

17  United States, and thus have taken steps to ensure that the Cheating Software is

18  readily available and accessible to U.S. users.

19         (d)     Defendants distribute the Cheating Software in the State of

20  California, advertise and market the Cheating Software in the United States and the

21  State of California, and communicate directly with users in the United States and

22  in the State of California, including for the purposes of soliciting purchases of the

23  Cheating Software by such users and providing technical support for the Cheating

24  Software;

25         (e)     Defendants recruit individuals in the United States to distribute

26  the Cheating Software in (and from) the United States, and specifically, California,

27  by reselling it to consumers located there, resulting in revenue for EO in an amount

28  to be determined at trial;

Mitchell
Silberberg &
Knupp LLP

14793462.1

5

(f)     Defendants have entered into, and continue to enter into, contracts with individuals in the State of California, including contracts pursuant to which these individuals license from Defendants the right to install and use the Cheating Software.  In return for such licenses, Defendants receive ongoing recurring daily, weekly, or monthly payments from individuals in the United States and the State of California;

(g)     Defendants create online "groups" or "chat rooms" using services and platforms based in the United States, such as California-based Discord and Seattle-based Valve Corporation.  Activision is informed and believes, and on that basis alleges, that these groups and chat rooms conduct conversations in English and are comprised of a large number of users located in the United States.

(h)     Defendants contract with entities located in the State of California in connection with their businesses.  This includes, for example, domain name registries, hosting or content delivery services, as well as credit card processors and merchant banks.  In fact, Defendants boast on their website that they maintain at least two servers in the United States, including one in Los Angeles, California and another in New Jersey:



Mitchell
Silberberg &
Knupp LLP

14793462.1

These servers are necessary for Defendants' customers to activate and use the Cheating Software.

(i)     Defendants engage in conduct that they know is likely to cause harm to Activision in the State of California, including in this District, where Activision is located and has its principal place of business.  In fact, Defendants have engaged in a pattern of online "trolling" of Activision and its counsel, such as by creating fake accounts in the name of Activision's counsel, posting fake messages that purport to be from Activision's counsel, or using the names of Activision's counsel in their advertising.

9.     In undertaking the conduct described herein, each of the Defendants has acted as an agent or representative of the EO Enterprise.  All of the Defendants have worked jointly and in cooperation with each other to effectuate the purposes and aims of the EO Enterprise.  Accordingly, the conduct of each agent of the Enterprise should be imputed to all of the other agents and representatives, and Defendants are jointly and severally liable for the conduct alleged herein.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this is a judicial district in which a substantial part of the events giving rise to the claims occurred, and/or in which Activision's injuries were suffered.

## THE PARTIES

11.     Activision is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Santa Monica, California.

12.     Activision is informed and believes, and on that basis alleges, that the Defendants in this action have worked or currently are working in concert as an organization or enterprise called "EngineOwning" ("EO" or the "Enterprise").  The purpose of the Enterprise is to develop, promote, distribute, sell, traffic in, and/or maintain or offer support for Cheating Software, which allows users to circumvent

anti-cheating measures and gain authorized access to Activision's servers even if they have been previously banned for cheating.  The Defendants work jointly and collectively towards this common goal and purpose.

13.     Activision is informed and believes, and on that basis alleges, that the Defendants function in a number of different roles in furtherance of the Enterprise. For example, some defendants manage and oversee the Enterprise, while others provide and supply the necessary software technology to be sold by the Enterprise. Others act as sales or customer support agents, who support and facilitate the common Enterprise by helping to distribute the product or ensuring that customers are able to successfully use the product.  Accordingly, Activision has grouped the defendants into categories, as set forth below.

### Corporate Defendants

14.     Activision is informed and believes, and on that basis alleges, that Defendants CMM Holdings S.A. and EngineOwning Software UG are German business entities headquartered in Pfaffenhofen an der Ilm, and that Defendant Garnatz Enterprise Ltd is a business entity registered in the country of Belize. (collectively, CMM Holdings S.A., EngineOwning Software UG, and Garnatz Enterprise Ltd. are referred to as the "Corporate Defendants").  Activision is informed and believes, and on that basis alleges, that the individual defendants purport to engage in many of the activities described herein (including development, maintenance, marketing, distribution, sale, and support for the Cheating Software) through one or more of the Corporate Defendants.

15.     Activision is informed and believes, and on that basis alleges, that the Corporate Defendants are not independent corporate entities, but instead are shell companies created to shield the activities of the individual defendants, including Defendants Valentin Rick, Leon Schlender, and "Crotle."  There exists a unity of interest and ownership between the Corporate Defendants and the aforementioned individual defendants, such that no separateness between these entities exists and

they are alter egos of one another.  Adherence to the fiction of the separate existence of the Corporate Defendants would sanction a fraud or promote injustice, including by enabling certain of the individual defendants to hide behind corporate shell companies, divert assets from such companies, or raise jurisdictional defenses based on the existence of such companies.  As a result, the Court should pierce the corporate veil and find the individual defendants jointly and severally liable for acts of infringement undertaken in the name of the Corporate Defendants.

### **Owners, Founders, and Leadership**

16.     Activision is informed and believes, and on that basis alleges, that EO was founded by, and currently is owned, run, overseen, managed, and primarily operated by, a group of individuals, including those set forth below:

17.     Activision is informed and believes, and on that basis alleges, that Defendant Valentin Rick a/k/a Skyfail ("Valentin") is an individual residing in Germany who founded and created the Corporate Defendants, is the sole managing director and shareholder of the Corporate Defendants, and historically has been the primary administrator of the EO Website.  Activision is further informed and believes, and on that basis alleges, that Valentin has been and continues to be the de facto leader of EO, and in that capacity has directed and/or been responsible for developing, maintaining, marketing, distributing, and selling the Cheating Software.  Activision previously contacted Valentin in 2018 and 2020 regarding his involvement with EO and the EO Website, and in response he claimed to have sold the EO Website to an unknown purchaser.  Valentin has never provided any evidence that such a sale took place, and Activision is informed and believes, and on that basis alleges, that Valentin has continued to manage and operate EO and the EO Website at all times relevant to this lawsuit.

18.     Activision is informed and believes, and on that basis alleges, that Defendant Leon Schlender a/k/a Balkan, Lion, x7ion, LionV1, lionz0r, moneyskyy, bcrypt, and s14 ("Schlender") is an individual residing in Germany

1   who is a co-creator/co-founder of EO along with Valentin.  Activision is further

2   informed and believes, and on that basis alleges, that Schlender has directed and/or

3   been responsible for developing, maintaining, marketing, distributing, and selling

4   the Cheating Software.

5          19.    Activision is informed and believes, and on that basis alleges, that

6   Defendant Erick Pfeifer, a/k/a Speedi13, Speedi, Spdy, and Speedy0407 ("Pfeifer")

7   is an individual residing in Germany.  Pfeifer is one of the founders and original

8   members of the Enterprise, and has acted as a coder and developer of the Cheating

9   Software since at least 2014 or 2015.

10         20.    Activision is informed and believes, and on that basis alleges, that

11  Defendant Bennet Huch, a/k/a TheBigBen, thebigben123, tbb123, tazzthebigben,

12  Benno, Benno1308, B3nn0, and vb2010helper ("Huch"), is an individual residing

13  in Germany.  Huch at one time purported to be the owner of the EO website and

14  has acted as one of the primary administrators of the EO Website.  Activision is

15  further informed and believes, and on that basis alleges, that Huch was among the

16  people primarily responsible for the development, maintenance, distribution, and

17  sale of the Cheating Software.

18         21.    Activision is informed and believes, and on that basis alleges, that

19  Defendant Leonard Bugla, a/k/a Reganmian and Noodleman ("Bugla"), is an

20  individual residing in Germany who is listed as, and appeared to act as, an

21  operations administrator of the EO Website in 2019 and 2020.  Activision is

22  further informed and believes, and on that basis alleges, that in this role Bugla

23  enabled the development, maintenance, distribution, and sale of the Cheating

24  Software.  Activision is further informed and believes, and on that basis alleges,

25  that Valentin and Bugla have a long-standing personal relationship dating back to

26  before EO and the EO Website were created (*i.e.*, before 2012) and for many years

27  worked together to ensure the continued operation and profitability of EO and the

28  EO Website.

22.   Activision is informed and believes, and on that basis alleges, that Defendant Marc-Alexander Richts a/k/a x0000x and Twenty ("Richts") is an individual residing in Germany who has been involved with distributing and selling the Cheating Software through EO and the EO Website, and has acted as one of the primary moderators on the EO Website forums.  In that role, Richts ensured the continuing operation of the EO Website and regularly communicated with both the developers and the purchasers of the Cheating Software.

## Software Developers

23.   Certain of the individual defendants were and are responsible for creating and developing the Cheating Software, as well as updating and modifying the Cheating Software to overcome Activision's efforts to detect the Cheating Software.

24.   Activision is informed and believes, and on that basis alleges, that Defendant Ignacio Gayduchenko, a/k/a Weather and Kokole ("Gayduchenko"), is an individual residing in Spain who has acted as a coder and developer of the Cheating Software, and who has provided technical support for the Cheating Software through, among other venues, the EO Website.

25.   Activision is informed and believes, and on that basis alleges, that Defendant Zain Jondah, a/k/a Zain, Reciate, zinbrownman, superzainny, and DepressedToenail ("Jondah") is an individual residing in the United Kingdom who has acted as a coder and developer of the Cheating Software.

26.   Activision is informed and believes, and on that basis alleges, that Defendant Ricky Szameitat a/k/a Requi, requi_dev, RequiDev, and Requiii ("Szameitat") is an individual residing in Germany who has acted as a coder and developer of the Cheating Software.

27.   Activision is informed and believes, and on that basis alleges, that Defendant Marcel Bindemann, a/k/a Kifferking, kifferking951, kifferking hacks,

1   kifferking1337, and 1337fameboy ("Bindemann") is an individual residing in

2   Germany who has acted as a coder and developer of the Cheating Software.

3   **Moderators, Administrators, and Support Representatives**

4        28.    Certain of the individual defendants knowingly facilitated and enabled

5   the operation of EO by maintaining, administering, updating, and otherwise

6   supporting various online message boards, chat rooms, or other online locations

7   relating to the Cheating Software.  These online locations include the EO Website

8   and the EO "official" Discord server, both of which serve as the primary location

9   for members of the public (including those in the United States) to learn about,

10   purchase, discuss, and obtain the Cheating Software.  These individuals facilitated,

11   enabled, induced and otherwise supported the marketing, sale, and use of the

12   Cheating Software by providing customer support, payment support, and technical

13   support for the Cheating Software.  These individuals also worked to market and

14   advertise the Cheating Software and to encourage and assist members of the

15   public, including individuals located in the United States, in purchasing and using

16   the Cheating Software.

17        29.    Activision is informed and believes, and on that basis alleges, that

18   Defendant Leon Frisch a/k/a Kraisie ("Frisch") is an individual residing in

19   Germany who has acted as a lead moderator on the EO Website forums.

20   Activision is further informed and believes, and on that basis alleges, that in this

21   role Frisch assists with the sale of the Cheating Software, including without

22   limitation by providing technical support for cheats and communicating with

23   customers regarding payment for the Cheating Software.

24        30.    Activision is informed and believes, and on that basis alleges, that

25   Defendant Alexander Kleemann a/k/a A200k ("Kleemann") is an individual

26   residing in Veitshöchheim, Germany, who has been involved in distributing the

27   Cheating Software and providing various administrative functions with regard to

28   the EO Website, including by acting as a moderator on the EO Website forums.

31.     Activision is informed and believes, and on that basis alleges, that Defendant Remo Löffler a/k/a AimBRoT, KE xAimBRoT, KE AimBRoT, EO Aimbrot, _AimBRoT, xAimBRoTHDx, Pappenpeter, and MrTimeWarpxxx ("Löffler"), is an individual residing in Germany who has been involved in providing various administrative functions with regard to the EO Website, including by acting as a moderator on the EO Website forums.

32.     Activision is informed and believes, and on that basis alleges, that Defendant Marvin Baotic Neumeyer a/k/a Bonser, m0t0rb3s1tz3n, Bonsai, DieKakao, Austriaball, AustriaballÖ, xlRaizzerz, and Zhaviaa ("Neumeyer") is an individual residing in Germany who has acted as an administrator for EO's Discord account, and in that capacity has been responsible for assisting in the development, updating, marketing, distribution, and sale of the Cheating Software, and has provided support for the Cheating Software.  Activision is further informed and believes, and based thereon alleges, that Neumeyer also has acted as a Lead Moderator for the EO Website forums.

33.     Activision is informed and believes, and on that basis alleges, that Defendant Hendrik Smaal a/k/a logixx, Sniker, sniker_de, SnikerDE, and Snikerberry21 ("Smaal") is an individual residing in Germany who has provided technical support for the Cheating Software through, among other venues, the EO Website.  Activision is further informed and believes, and on that basis alleges, that Smaal also has acted as a moderator for the EO Website forums.

34.     Activision is informed and believes, and on that basis alleges, that Defendant Charlie Wiest a/k/a Apollo, n0t_apollo, notapollo, and ApolloEO ("Wiest") is an individual residing in Germany who has provided technical support for the Cheating Software through, among other venues, the EO Website. Activision is further informed and believes, and on that basis alleges, that Chronos also has acted as a moderator for the EO Website forums.

35.     Activision is informed and believes, and on that basis alleges, that Defendant Dennis Reissleich a/k/a Koyz, KOYZRk, and koyz420 ("Reissleich") is an individual residing in Germany who has provided technical support for the Cheating Software through, among other venues, the EO Website. Activision is further informed and believes, and on that basis alleges, that Chronos also has acted as a moderator for the EO Website forums.

36.     Activision is informed and believes, and on that basis alleges, that the foregoing defendants overtly display and communicate a deep knowledge of the COD Games and the Cheating Software that could only be the result of their extensive play of the COD Games. Accordingly, each of these defendants necessarily created online accounts with Activision and assented to Activision's Terms of Service and other related agreements. Only by doing so were they able to access and download the COD Games, join multiplayer servers, and play the COD Games.

**Sellers and Resellers**

37.     Certain of the individual defendants are engaged in selling the Cheating Software on behalf of the Enterprise. These defendants processed purchase orders made via the EO Website and sold the Cheating Software on behalf of the other Defendants. Activision is informed and believes, and on that basis alleges, that the following individuals intended to and did distribute and sell the Cheating Software to users in the United States as agents or representatives of the Enterprise.

38.     Activision is informed and believes, and on that basis alleges, that Defendant Tyler Byrd a/k/a ByrdGaming, ECGx Byrd, tylerbyrd2000, thereal_ghostd, and lGhostdl ("Byrd") is an individual residing in North Carolina who has been involved in direct sales of the Cheating Software, including via the EO Website and the EO Discord, using the payment platform known as Stripe.

1  Activision is further informed and believes, and on that basis alleges, that Byrd has

2  acted as a moderator for the EO Website forums.

3        39.    Activision is informed and believes, and on that basis alleges, that

4  Defendant Simon Masias a/k/a Jagr034, jagr0399, _obeysimon, and masiassimon

5  ("Masias") is an individual residing in New Jersey who has acted as a reseller for

6  the EO Cheating Software.

7        40.    Activision is informed and believes, and on that basis alleges, that

8  Defendant Nicholas James Baldwin a/k/a Kamay, getclonedbyfeds, and

9  clonedbyfeds ("Baldwin") is an individual residing in Florida who has acted as a

10  reseller for the EO Cheating Software.

11        41.    Activision is informed and believes, and on that basis alleges, that

12  Defendant Antonio Median a/k/a DiscountDash, realdiscountdash, RappiFood, and

13  Berlin ("Median") is an individual residing in Massachusetts who has acted as a

14  reseller for the EO Cheating Software.

15        42.    Activision is informed and believes, and on that basis alleges, that

16  Defendant Remy Cartigny a/k/a remzziecodservices, remzzie, Deez Nuts,

17  Frikandel, and TwistlinesZ ("Cartigny") is an individual residing in the

18  Netherlands who has acted as a reseller for the EO Cheating Software.

19        43.    Activision is informed and believes, and on that basis alleges, that

20  Defendant Pascal Classen, a/k/a Proton, Proton1001, P1001, Proton909, and

21  Proton007 ("Classen") is an individual residing in Germany who has acted as a

22  reseller for the EO Cheating Software.

23        44.    Activision is informed and believes, and on that basis alleges, that

24  Defendant Manuel T. Santiago a/k/a Hoodie, EOHoodie, hoodie1337, Hoodieee,

25  teamxcbs, xCantBeStopped, stendoh617, stendoh, and oSpahzy ("Santiago") is an

26  individual residing in Massachusetts who has acted as a reseller for the EO

27  Cheating Software.

28

45.     Activision is informed and believes, and on that basis alleges, that Defendant Katerina Disdle a/k/a sweetkatato and _sweetkatato ("Disdle") is an individual residing in the United Kingdom who has acted as a reseller for the EO Cheating Software.

## Doe Defendants

46.     Activision is informed and believes, and on that basis alleges, that the following individuals, whose true names are yet unknown, are developers of the Cheating Software, administrators of the EO Website, resellers and distributors of the Cheating Software, and/or otherwise involved in the creation, marketing, and distribution of the Cheating Software.  Among the Doe defendants are the individuals set forth below:

47.     Activision is informed and believes, and on that basis alleges, that Defendant "Crotle" (referred to as "Boss" on the EO Website forums) is a high-level member of EO whose location is unknown, who has a leadership role within the organization, through which he or she participates and/or assists in the development, maintenance, distribution and sale of the Cheating Software, including as an administrator of the EO Website.

48.     Activision is informed and believes, and on that basis alleges, that Defendant "Ben Garnatz" is an individual whose location is unknown.  "Ben Garnatz" may be an alias for one or more individuals actively engaged in the creation and distribution of the Cheating Software, and the administration of the EO Website.

49.     Activision is informed and believes, and on that basis alleges, that Defendant "Enceladus" is an individual whose location is unknown, and who has acted as an administrator of the EO Website.  Activision is further informed and believes, and on that basis alleges, that in this role Enceladus has enabled the development, maintenance, distribution, and sale of the Cheating Software.

50.     Activision is informed and believes, and on that basis alleges, that Defendant "Mortyy" is an individual residing in Europe who has acted as an administrator of the EO Website.  Activision is further informed and believes, and on that basis alleges, that in this role Mortyy has enabled the development, maintenance, distribution, and sale of the Cheating Software.

51.     Activision is informed and believes, and on that basis alleges, that Defendant "SlapstiK" a/k/a b1g slap, is an individual residing in France who has acted as an administrator of the EO Website.  Activision is further informed and believes, and on that basis alleges, that in this role SlapstiK has enabled the development, maintenance, distribution, and sale of the Cheating Software.

52.     Activision is informed and believes, and on that basis alleges, that Defendant "Ubervisor" is an individual residing in Europe who has acted as a coder and developer of the Cheating Software, and who has provided technical support for the Cheating Software through, among other venues, the EO Website. Activision is further informed and believes, and on that basis alleges, that Ubervisor also has acted as an administrator of the EO Website.

53.     Activision is informed and believes, and on that basis alleges, that Defendant "Homie123" a/k/a Homie is an individual residing in Germany who has acted as a Lead Moderator on the EO Website forums.

54.     Activision is informed and believes, and on that basis alleges, that Defendant "LuoZheng" is an individual residing in Germany who has acted as a coder and developer of the Cheating Software.

55.     Activision is informed and believes, and on that basis alleges, that Defendant "jeuwifghue," whose location is unknown, has acted as a coder and developer of the Cheating Software.

56.     Activision is informed and believes, and on that basis alleges, that Defendant "WhiteObama" is an individual residing in Europe who has acted as a coder and developer of the Cheating Software.

57.     Activision is informed and believes, and on that basis alleges, that Defendant "Chronos" a/k/a Chronus, and eo_chronos is an individual whose location is unknown, and who has provided technical support for the Cheating Software through, among other venues, the EO Website.  Activision is further informed and believes, and on that basis alleges, that Chronos also has acted as a moderator for the EO Website forums.

58.     Activision is informed and believes, and on that basis alleges, that Defendant "HAM" a/k/a aboutHAM, burrskurr, nytroza, SkirrSkirr, bakaara, Curren$y, spacetime, Arschpollo, and Yayoo ("HAM") is an individual residing in Germany who has provided technical support for the Cheating Software through, among other venues, the EO Website.  Activision is further informed and believes, and on that basis alleges, that Chronos also has acted as a moderator for the EO Website forums.

59.     Activision is informed and believes, and on that basis alleges, that Defendant "Zhavia" is an individual whose location is unknown and who has acted as a reseller for the EO Cheating Software.

60.     Activision is informed and believes, and on that basis alleges, that Defendant "Snafu" a/k/a Snafubar1337 and snafu.alit is an individual residing in Germany who has acted as a reseller for the EO Cheating Software.

61.     Activision is informed and believes, and on that basis alleges, that Defendant ".0" a/k/a .0 0x1337, Not0x1337, NutChamp, PepegaChamp, WZACCBTC is an individual residing in Germany who has acted as a reseller for the EO Cheating Software.  Activision is further informed and believes, and on that basis alleges, that .0 has acted as a Lead Moderator on the EO Website forums.

62.     Activision is informed and believes, and on that basis alleges, that Defendant "Big Pile of Poop" is an individual residing in Europe who has acted as an administrator for EO's Discord account, and in that capacity has been responsible for assisting in the development, updating, marketing, distribution and

sale of the Cheating Software, and also has provided support for the Cheating Software.

63.     Activision is informed and believes, and on that basis alleges, that Defendant Alex a/k/a Alex0r and alexaeo ("Alex") is an individual residing in Europe who has acted as an administrator for EO's Discord account, and in that capacity has been responsible for assisting in the development, updating, marketing, distribution, and sale of the Cheating Software, and also has provided support for the Cheating Software.

64.     In addition to the foregoing, Activision is informed and believes, and on that basis alleges, that individuals using the aliases "Bonsai," "Agriolo," "Deutschlander," "LogicX," and "NOL3X" acted as developers, moderators, or resellers of the Cheating Software.

65.     Activision is informed and believes, and on that basis alleges, that several of the Doe defendants may be aliases of EO staffers, including some of the named Defendants in this case, who have sought to mask their identities after previously being contacted by Activision in connection with their involvement in EO.

66.     The true names and capacities, whether individual, corporate, associate, or otherwise, of the Doe defendants are unknown to Activision, which has therefore sued said defendants by such aliases and fictitious names.  These defendants include individuals whose real identities are not yet known to Activision, but who are acting in concert with one another, often under the guise of Internet aliases, in committing the unlawful acts alleged herein.  Among the Doe defendants are developers, resellers, technical support staff, and other individuals who have participated in the development, sale, and distribution of the Cheating Software.  Activision will seek leave to amend this complaint to state their true names and capacities once said defendants' identities and capacities are ascertained.  Activision is informed and believes, and on that basis alleges, that all

1   defendants sued herein are liable to Activision as a result of their participation in

2   all or some of the acts set forth in this Amended Complaint.  (All of the

3   aforementioned defendants, both the named defendants and the Doe defendants,

4   are referred to herein collectively as "Defendants.")

5        67.    Activision is informed and believes, and on that basis alleges, that at

6   all times mentioned in this Amended Complaint, each of the Defendants was the

7   agent of each of the other Defendants and, in doing the things alleged in this

8   complaint, was acting within the course and scope of such agency.

9

10              **FACTS APPLICABLE TO ALL CLAIMS**

11              **Activision's Intellectual Property Rights**

12       68.    Activision is the publisher and owner of all rights, title, and interest in

13   the copyrights in the COD Games, which consist of over 15 video games released

14   since 2003 on various video game platforms.  Activision's copyrights in the COD

15   Games include, without limitation, rights in and to the COD Games' computer

16   software and the audiovisual works and screen displays that are created when the

17   COD Game software interacts with a user's computer.  Activision's copyrights in

18   the COD Games also include the dynamic non-literal elements created when the

19   COD Game software interacts with the COD online multiplayer game servers.  *See*

20   *MDY Indus. v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010).

21   Activision possesses valid, registered copyrights in each of the COD Games.

22              **The COD Games**

23       69.    The COD Games are released annually, with live operations and with

24   additional downloadable content released regularly, and are consistently among the

25   best-selling games in a given year, having sold hundreds of millions of copies to

26   date.  In December 2020, Activision announced that the COD Games generated

27   over $3 billion in net bookings in the prior 12 months.

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

70.     The COD Games are "first-person shooter" video games that allow players to step into the shoes of soldiers and elite operators in combat throughout history, ranging from World War I to modern day and into the future.  Nearly all of the COD Games include single player campaign story modes which place players within a fictional narrative.  However, all COD Games include the popular competitive online multiplayer modes, where players join online to play together in real-time.  Each of the COD Games offers as many as a dozen or more different online multiplayer game types, all of which are extremely intense as players compete to earn experience points, increase their rankings and statistics, and acquire various rewards for winning matches and achieving certain goals and objectives.

71.     The COD Games' online multiplayer modes are so popular that they have given rise to multiple competitive "esports" leagues and tournaments which attract several million viewers on streaming platforms such as Twitch and YouTube.

### The COD Games' Business Model

72.     Given the popularity and replayability of the COD Games' online multiplayer modes, Activision works very hard to ensure that the COD Games offer consistently compelling player experiences so that customers will remain engaged in the COD Games, continue to play them for sustained periods of time, and be excited about future releases.

73.     In March 2020, Activision released *Call of Duty: Warzone* ("Warzone"), a free standalone multiplayer game that is offered to the public without requiring that the customer purchase a copy of any *Call of Duty* game.  In order to play *Call of Duty: Warzone*, a member of the public must register an account with Activision, download the *Call of Duty: Warzone* software, and connect to Activision's online multiplayer servers.  Accordingly, the revenue Activision generates through *Call of Duty: Warzone* comes exclusively from sales

Mitchell
Silberberg &
Knupp LLP

14793462.1

21

1   of "virtual goods" (*i.e.*, weapons, skins, etc.) or seasonal "battle passes" that enable

2   the player to receive in-game rewards for accomplishments within the game.

3        74.    Revenue generated by the COD Games in turn helps pay for the

4   enormous cost of updating, improving, maintaining, and serving the COD Games

5   and their competitive online modes.  If players perceive that a game is unfair,

6   including because others are cheating or have an unfair advantage, players may

7   grow frustrated with the COD Games, become less interested in playing and

8   supporting them (including by purchasing new games and items) and may even

9   stop playing entirely.  Cheating therefore not only harms (and could even destroy)

10  COD player communities, but also impacts Activision's ability to offer the fast-

11  paced, stable, high-quality online gameplay to which millions of fans have become

12  accustomed.

13            **Activision's Efforts To Protect Against Hackers And Cheaters**

14        75.    Because the COD Games are so popular, unscrupulous individuals

15  and companies such as Defendants frequently seek to exploit the games for their

16  own personal gain and profit by selling cheats, hacks, and other malicious

17  software, knowing full well that they are ruining the experience for other players

18  and harming Activision.  For this reason, Activision undertakes significant efforts

19  to protect the integrity of the COD Games through both technical and contractual

20  means.

21                      Technical Protection

22        76.    One way that Activision seeks to protect the COD Games from

23  cheating or unauthorized exploitation is by developing and employing anti-cheat

24  technologies.  These technologies help detect when players are using third party

25  cheating software, and prevents unauthorized access to the COD Games by those

26  players.  It is not possible to play the COD Games' online multiplayer modes (or to

27  play *Call of Duty: Warzone* at all) without installing Activision's anti-cheat

Mitchell
Silberberg &
Knupp LLP

14793462.1

28

technologies.  Activision has been able to identify and ban hundreds of thousands of accounts using cheating software in the COD Games in just over the past year.

77.     Additionally, when Activision identifies or detects that a player is using cheating software, the player's account may be suspended or "banned," such that the player may no longer access the game and its remote server.  Depending upon the player's conduct, Plaintiffs may also implement a "Hardware ID" ("HWID") ban against players engaged in hacking or cheating.  To implement a HWID ban, Activision obtains configuration data from the offending player's personal computer or other gaming device and denies subsequent access to the game by players using that computer.  This ensures that players who have lost access to the game cannot re-obtain such access merely by creating a new account or using a different email address.  HWID bans can be a very effective ways to prevent those who have lost access to Activision's COD Game servers from fraudulently accessing those servers.

78.     In order for any hack or cheat software to operate, it must be designed to prevent or avoid detection by the anti-cheat software, such as by concealing itself or by disabling the anti-cheat technology.  Otherwise, the cheat will be detected and the user will be denied access to the particular game's online multiplayer community, and may be permanently banned from playing the game at all.

<u>Contractual Protection</u>

79.     In order to access, download, or play the COD Games, users must create and register accounts with Activision.  Upon first playing the COD Games and beginning installation, users must expressly manifest their assent to Activision's Terms of Use (collectively, the "TOU") by clicking through them.  If the user refuses to consent to the TOU, they cannot proceed and play the game.

80.     The TOU includes a limited license agreement between Activision and its users.  Under the TOU, Activision grants to users a "personal, limited, non-

exclusive license" to use its games for "non-commercial use," expressly conditioned upon the user's compliance with the TOU.  Among other provisions, by assenting to the TOU, users expressly agree not to "use, develop, host or distribute cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software" in connection with Activision's games "or engage in any form of cheating, boosting, or booting."

81.     The COD Games' online multiplayer modes (as well as the entire *Call of Duty: Warzone* game) are made available to the public through Activision's proprietary servers and matchmaking systems.  It is not possible for a user to lawfully obtain access to or play the COD Games' online multiplayer modes (or *Call of Duty: Warzone*) without expressly consenting to the TOU.

### **Defendants' Development, Marketing, and Sale of the Cheating Software**

82.     Activision is informed and believes, and on that basis alleges, that Defendants are all participants in the common EO Enterprise.  As such, Defendants are engaged in various activities related to developing, updating, marketing, distributing, selling, and supporting the Cheating Software.  At all times relevant herein, Defendants have developed, updated, marketed, distributed, sold, and supported the Cheating Software.  They have done so, and continue to do so, via the EO Website, email, and other communication platforms such as Discord.

83.     Activision is informed and believes, and on that basis alleges, that EO was founded by Defendants Valentin Rick, Leon Schlender, and "Croatle."  These individuals have acted and continue to act as the masterminds and the driving force behind EO and are responsible for the overall operation of EO, the EO Website, EO's finances, and the development and maintenance of the Cheating Software and the online servers used to authenticate licenses for the Cheating Software.  Additionally, Valentin Rick's mother, Regina Rick, has provided administrative, financial, legal, and other consulting services for the EO Enterprise.

84.     As set forth herein, each of the other individual Defendants played a particular role (or multiple roles) in supporting and furthering the EO Enterprise. For example:

(a)     Some of the Defendants are software developers.  These Defendants were or are engaged in developing, updating, patching, and improving the Cheating Software.  These developers then supply the software to EO for sale of the public and are paid by the EO Enterprise for their work.

(b)     Some of the Defendants are engaged in selling licenses for the Cheating Software.  They do so either by processing payments directly from the EO Website and EO Discord server, or by "reselling" licenses for the Cheating Software.  To become an EO reseller, the individual must submit an application to EO.  Individuals who are selected to become resellers may purchase licenses for the Cheating Software in bulk, and then advertise and sell the Cheating Software via online advertisements or message board posts on websites dedicated to video game cheating, such as "OwnedCore."  Resellers then remit their revenue to EO, while retaining a portion of that revenue for themselves.

(c)     Some of the Defendants act as administrators, moderators, or support representatives.  These individuals operate and maintain the EO Website, oversee the EO Discord server, monitor and review message board postings, provide updates concerning the Cheating Software, communicate with purchasers of the Cheating Software, offer technical support to purchasers of the Cheating Software, create tutorials or instruction manuals, and help promote the Cheating Software.

85.     All of the Defendants work collectively in furtherance of a single goal: namely, to ensure, encourage, enable, or otherwise facilitate the widespread distribution and sale of the Cheating Software.  As such, Defendants are jointly and severally liable for the unlawful conduct engaged in by the EO Enterprise, are active participants in the trafficking of circumvention software, are collectively

1   responsible for the ongoing contractual breaches engaged in by users of the

2   Cheating Software, are collectively responsible for the California unfair

3   competition law violations alleged herein, and are participants in the RICO

4   enterprise described herein.

5        86.    The central vehicle for the marketing and distribution of the Cheating

6   Software is the EO Website.  The EO Website claims to sell "high quality cheats"

7   based on a belief that "everyone should have the ability to win and enjoy online

8   matches."  Currently, the EO Website offers cheats for *Call of Duty: Warzone*;

9   *Call of Duty: Modern Warfare (2019)*; *Call of Duty World War II*; *Call of Duty:*

10  *Modern Warfare 3*; *Call of Duty Black Ops*; *Call of Duty Black Ops II*; and *Call of*

11  *Duty Black Ops III*.  Defendants also have developed and released a cheat for the

12  game *Overwatch*, developed and published by Activision's affiliate Blizzard

13  Entertainment, Inc.

14       87.    Visitors to the EO Website are able to purchase access to the Cheating

15  Software in various bundles for each of the offered COD Games.  Access to the

16  cheats is offered in various increments at prices ranging from 4.49€ for three days

17  of access to 19.99€ for thirty days of access, as well as 39.99€ for a full ninety

18  days of access to cheats for *Call of Duty: Modern Warfare (2019)* and *Call of*

19  *Duty: Warzone*.  The following "features" are offered for each of the cheats:

20       • Various methods and exploits designed to avoid detection by anti-
21         cheat software, as well as the ability to hide cheats from video
22         recording software (*i.e.*, in order to prevent cheats from being
23         discovered by other players recording and reviewing gameplay).

24       • Aimbots, which automatically "snap" the cheating player's aim to an
25         opponent when the opponent is visible onscreen, thereby allowing for
26         quick and precise shots.

27       • Triggerbots, which cause cheating players to automatically fire their
28         weapon when aiming at another player.

- ESP and 2D/3D Radar, which allow the cheating player to visualize opponents within the game in ways that destroy the integrity of the game, such as by allowing the cheater to see other players through walls and other obstacles.

88.     Defendants also either sell or bundle with the Cheating Software a companion product called the "EngineOwning Spoofer" (the "EO Spoofer").  The EO Spoofer is intended to circumvent and overcome HWID bans by generating counterfeit digital computer access devices or "signatures."  Similar to the digital "signatures" generated as part of a counterfeit credit card or other fake account number, counterfeit computer signatures enable users who have been denied access to the COD Game servers to fraudulently obtain unauthorized access to those servers.  As described by Defendants:

> Our HWID (Hardware ID) Spoofer is needed, if your current computer is hardware-banned or you just want to prevent a hardware ban in future. It is the easiest HWID Spoofer on the market to use and due to its seamingless [*sic.*] integration with the EngineOwning Loader, you just need to check a box to have your hardware hidden from anti cheats.

The EO Spoofer is specifically advertised for use with the COD Games.

89.     Defendants also market and advertise the Cheating Software through online social media services such as Twitter.  The "official" Engine Owning Twitter account (@engineowningto) issued no fewer than 500 marketing-related tweets since May 2021, and boasts more than 8,000 followers.  Activision is informed and believes, and on that basis alleges, that many (if not most) of these followers are located in the United States.

90.     Activision is informed and believes, and on that basis alleges, that in addition to marketing and distributing cheats (including but not limited to the Cheating Software), Defendants provide extensive and ongoing customer support

1  and technical assistance, including through the forums on the EO Website, as well

2  as by other means such as email, Telegram, and Discord.

3       91.    Activision is informed and believes, and on that basis alleges, that the

4  Cheating Software has been downloaded and used by players of the COD Games

5  thousands of times by players residing in the United States.  Activision also is

6  informed and believes that Defendants have made hundreds of thousands of

7  dollars, or more, from their distribution and sale of the Cheating Software.

8  **Defendants' Unlawful Activities**

9       92.    Activision is informed and believes, and on that basis alleges, that in

10  order for the Cheating Software to operate with the COD Games, the Cheating

11  Software necessarily includes technology that primarily is designed to avoid,

12  bypass, evade, or otherwise circumvent Activision's anti-cheat technologies.

13  Accordingly, each time Defendants sell a license to the Cheating Software, they

14  are trafficking in technology that controls access to the COD Games.

15       93.    Defendants specifically and aggressively advertise and promote the

16  Cheating Software as having been designed to circumvent Activision's anti-cheat

17  software.  Product listings on the EO Website advertise that the Cheating Software

18  offers "multiple protection layers against anti-cheats."  The listings also include

19  certifications that the cheats will bypass and avoid detection by Activision's anti-

20  cheat software:[1]

21

22  ## Supported Anti Cheats

23

24  - Battle.net - Supported
   - Call of Duty Anti-Cheat - Secure
25  - Warning: You can get manually banned for cheating obvious

26

27

28  [1] *See* https://www.engineowning.to/shop/product/21/engineowning-for-call-of-duty-modern-warfare-2019

Mitchell
Silberberg &
Knupp LLP

14793462.1

94.     Each time a player uses the Cheating Software to cheat in the COD Games, he or she also violates Activision's TOU, including those provisions that specifically prohibit players from "us[ing], develop[ing], host[ing] or distribut[ing] cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software" in connection with Activision's games "or engag[ing] in any form of cheating, boosting, or booting."  Accordingly, Activision is informed and believes, and on that basis alleges, that as a result of Defendants' conduct, at least tens of thousands of breaches of these contracts have occurred.

95.     Activision is informed and believes, and on that basis alleges, that Defendants are fully aware that the use of the Cheating Software violates the TOU.  For example, the EO Website prominently warns users that they can be "manually banned" by Activision for "obvious" cheating.  This is a concern for players seeking to use the Cheating Software, because some advantages conferred by the Cheating Software may make players' characters do things that appear unnatural or even physically impossible within the world of the game, such as quickly "snapping" aim to an opposing player with speed and accuracy beyond what even the most skilled player could achieve.  Consequently, the EO Website stresses that the Cheating Software contains features designed to help avoid detection by the naked eye, including "Smooth Aim," which slows down aim movement to make a player using an Aimbot appear to be moving naturally, and "Fire Delay," which causes a player using a Triggerbot to wait before automatically shooting.

96.     The Cheating Software has no purpose or function other than to enable players to gain unauthorized access to Activision's servers and violate the TOU by using cheats and exploits.  Thus, Defendants' goal is to ensure that their customers continue to receive the benefits of their contracts with Activision while they simultaneously engage in continuing breaches of their obligations under these contracts.

97. On multiple occasions over the past few years, Activision has contacted or sought to contact some of the individuals suspected to be involved with EO and demanded that they cease and desist from any further development, maintenance, marketing, distribution, and sale of the Cheating Software. Activision is informed and believes, and on that basis alleges, that the Defendants in this action are and have been fully aware that their conduct violates Activision's rights but nevertheless have brazenly continued their activities.

98. By their conduct, Defendants have caused and continue to cause serious harm to the COD Games and to Activision. Such harm is immediate, massive and irreparable, and includes (but is not limited to) the following:

(a) Defendants irreparably harm the ability of Activision's legitimate customers to enjoy and participate in the online experiences carefully created by Activision. That, in turn, may cause users to grow dissatisfied with the COD Games, lose interest, and stop playing. As a result, Activision has suffered, and continues to suffer, loss of player revenues as a result.

(b) Defendants' knowing and willful misconduct has forced Activision to expend substantial resources attempting to remediate the damage caused by the Cheating Software. This includes creating and releasing updates to the COD Games that counteract the Cheating Software, responding to player complaints, employing personnel to police the games to detect the use of the Cheating Software, and "banning" users who are using the Cheating Software.

(c) Defendants' conduct harms Activision's reputation and results in the loss of significant customer goodwill.

99. Defendants' conduct has resulted in damage to Activision in an amount to be proven at trial. By Activision's estimation, such damage may amount to millions of dollars. Unless and until Defendants are preliminarily or permanently enjoined, Activision will continue to suffer severe harm from the Cheating Software.

1

2

## COUNT I

3

## Trafficking In Circumvention Devices

4     100.   Activision re-alleges and incorporates by reference the allegations in

5 paragraphs 1 through 99, as if set forth fully herein.

6     101.   The COD Games, including but not limited to their source code and

7 audiovisual game play environments, are copyrighted works.

8     102.   Activision has incorporated into the COD Games technological

9 measures that effectively control access to the COD Games, including access to the

10 dynamic audiovisual elements that comprise the game.

11     103.   The Cheating Software is comprised of or contains technologies,

12 products, services, devices, components, or parts thereof that primarily are

13 designed or produced for the purpose of circumventing technological measures that

14 effectively control access to the COD Games.

15     104.   The Cheating Software (and the portions thereof that circumvent

16 Activision's anti-cheat technologies) have no commercially significant purpose or

17 use other than to circumvent a technological measure that effectively controls

18 access to a copyrighted work and that protects the exclusive rights of a copyright

19 owner.

20     105.   Defendants market the Cheating Software in the United States with

21 knowledge of their use to circumvent Activision's technological access controls.

22     106.   As a result of the foregoing, Defendants are offering to the public,

23 providing, importing, or otherwise trafficking in technology that violates 17 U.S.C.

24 § 1201(a)(2). Alternatively, Defendants are knowingly aiding and abetting or

25 contributing to the trafficking in circumvention technology by other Defendants or

26 by the Enterprise.

27

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

107.   Defendants' acts constituting DMCA violations have been and continue to be performed without the permission, authorization, or consent of Activision.

108.   Defendants have violated Section 1201 of the DMCA willfully and for private commercial gain.

109.   Defendants' conduct has caused damage to Activision and has unjustly enriched Defendants, in an amount to be proven at trial.

110.   As a result of Defendants' acts and conduct, Activision has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Activision is informed and believes, and on that basis alleges, that, unless enjoined and restrained by this Court, Defendants will continue to violate Section 1201 of the DMCA.  Activision is entitled to injunctive relief to restrain and enjoin Defendants' continuing unlawful conduct.

111.   As a direct and proximate result of Defendants' conduct, pursuant to 17 U.S.C. § 1203(c), Activision is entitled to Defendants' profits attributable to their violations of 17 U.S.C § 1201.

112.   Alternatively, Activision is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(A), in the amount of $2,500 with respect to each violation by Defendants.

113.   Activision further is entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 1203(b).

### COUNT II

### False Designation of Origin, 15 U.S.C. § 1125(a)

114.   Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 113, as if set forth fully herein.

115.   By virtue of Activision's continuous and extensive use in commerce of the COD Marks, the COD Marks have acquired secondary meaning in the marketplace in connection with Activision's goods and services.

116.   By using the COD Marks on the EO Website and otherwise in connection with Defendants' Cheating Software, Defendants' actions constitute the use in interstate commerce of a false designation of origin, false or misleading description of fact, or false or misleading representations of fact that are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of Defendants' products and services with Activision, or as to the origin, sponsorship, or approval of the goods and services provided by Defendants in violation of 15 U.S.C. § 1125(a).

117.   Activision is entitled to the relief provided by 15 U.S.C. § 1117(a), including, but not limited to, Defendants' profits, Activision's damages, and the costs of this action.

118.   Defendants knew of Activision's rights, and their infringement has been knowing, willful, and deliberate, such that the Court should award Activision its attorneys' fees pursuant to 15 U.S.C. § 1117.

119.   Defendants' activities have damaged, and threaten to continue damaging, Activision's reputation and goodwill.

120.   Activision has been, and continues to be, damaged by such acts in a manner that cannot be fully measured or compensated in economic terms and therefore has no adequate remedy at law.  Furthermore, upon showing a violation of 15 U.S.C. § 1125(a), Activision is entitled to a rebuttable presumption of irreparable harm from that violation, and seeks permanent injunctive relief pursuant to 15 U.S.C. § 1116.

## COUNT III

### Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*

121.   Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 120, as if set forth fully herein.

122.   Activision's COD Game Servers (the "Game Servers") are computer servers used by Activision to engage in interstate and foreign commerce.  The Game Servers are protected computers under 18 U.S.C. § 1030(e)(2).

123.   By developing, marketing, distributing and encouraging the use of the Cheating Software, and particularly the EO Spoofer, Defendants have knowingly aided and abetted, conspired with, or otherwise caused players of the COD Games to intentionally access the Game Servers without Activision's authorization. Specifically, Defendants have caused the EO Spoofer to be used to obtain access to the Game Servers by players that have been specifically prohibited from accessing the Game Servers.  Such conduct has caused damage and/or loss to the Game Servers.

124.   As a result of Defendants' conduct, Activision has suffered damages in excess of the $5,000 statutory minimum.  Activision has been damaged by Defendants' actions, including in the form of decreased participation by players in the Games, investigative costs and legal fees, and the expenditure of resources to detect players who access the Game Servers without authorization.

125.   Activision has also suffered irreparable and incalculable harm and injuries resulting from Defendants' conduct in the form of damages to their customers' goodwill and trust.

126.   On information and belief, Defendants have continued to conspire to obtain unauthorized access to the Game Servers with the intent of harming Activision and will continue to do so unless enjoined.

Mitchell
Silberberg &
Knupp LLP

14793462.1

**COUNT IV**

**<u>Intentional Interference With Contractual Relations</u>**

127.   Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 126, as if set forth fully herein.

128.   As described herein, in order to install and play the COD Games, licensed users in the United States first must assent to Activision's TOU.

129.   Activision's contracts with its users are valid and enforceable.

130.   Each time a purchaser of the Cheating Software uses the Cheating Software in connection with the COD Games, he or she breaches the TOU. Activision is informed and believes, and on that basis alleges, that thousands of such breaches have taken place by Defendants' customers.

131.   Activision is informed and believes, and on that basis alleges, that Defendants are aware of both the existence and specific relevant terms of contracts between Activision and its users in the United States, including the TOU. Specifically, Defendants are aware that the TOU prohibits players from using the Cheating Software and that players are at risk of being banned from the COD Games should they be caught using the Cheating Software.  Nevertheless, Defendants intentionally encourage and induce users of the COD Games to purchase and use the Cheating Software, knowing that the use of these products by their customers is a breach of these customers' contracts with Activision.

132.   By inducing Activision's users to breach their contracts with Activision, Defendants have intentionally interfered, and continue to interfere, with the contracts between Activision and its users.

133.   As a direct and proximate result of Defendants' actions, Activision has suffered damages in an amount to be proven at trial, including but not limited to a loss of goodwill among users of Activision's games, diversion of Activision's resources to attempt to detect and prevent the use of the Cheating Software,

decreased profits, and a loss of profits from users whose accounts Activision has terminated for violation of the TOU in the United States.

134.   As a further result of Defendants' actions, Defendants have unjustly obtained specifically identifiable property, consisting of all of the proceeds attributable to the sale of the Cheating Software in the United States, and any other products or services that violate any of Activision's rights, and any additional property traceable to those proceeds.  Those proceeds, which are directly attributable to Defendants' manipulation and misuse of the COD Games and intentional interference with Activision's contracts, rightfully and equitably belong to Activision.

135.   Defendants' intentional interference with the contracts between Activision and its licensed users in the United States entitles Activision to injunctive relief and compensatory damages, the imposition of a constructive trust over Defendants' wrongfully obtained proceeds, and other available relief.

136.   Defendants are guilty of oppression, fraud, or malice, and Activision, in addition to its actual damages, by reason thereof, is entitled to recover exemplary and punitive damages against Defendants.

## COUNT V
## <u>Unfair Competition</u>

137.   Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 136, as if set forth fully herein.

138.   The acts and conduct of Defendants constitute unfair competition in the United States under California Business & Professions Code § 17200 *et seq.* and under California common law.

139.   As a direct and proximate result of Defendants' unfair competition in the United States, Activision has been damaged, and Defendants have been unjustly enriched, in an amount to be proven at trial for which damages and/or

Mitchell
Silberberg &
Knupp LLP
14793462.1

restitution and disgorgement is appropriate.  Such damages and/or restitution and disgorgement should include a declaration by this Court that Defendants are constructive trustees for the benefit of Activision, and an order that Defendants convey to Activision the gross receipts received or to be received that are attributable to the sale of the Cheating Software in the United States.

140.   Defendants are guilty of oppression, fraud or malice, and Activision, in addition to its actual damages, by reason thereof, is entitled to recover exemplary and punitive damages against Defendants.

141.   As a result of Defendants' acts and conduct in the United States, Activision has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Activision is informed and believes, and on that basis alleges, that unless enjoined and restrained by this Court, Defendants will continue to engage in unfair competition. Pursuant to California Business & Professions Code § 17203, Activision is entitled to temporary, preliminary and permanent injunctions prohibiting further acts of unfair competition.

## COUNT VI

### FEDERAL CIVIL RICO – Conduct or Participation in an Enterprise
### (18 U.S.C. § 1962(c))

142.   Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 141, as if set forth fully herein.

143.   Each individual or corporate Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

144.   Each Defendant violated 18 U.S.C. § 1962(c) by the acts and conduct described above, and further described below, and Activision was injured as a result.

145.   Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

The Enterprise

146.   Defendants together form an association-in-fact enterprise in the pursuit of a common and continuing purpose, *i.e.*, the development, marketing, sale and distribution of the Cheating Software, which allows users to gain unauthorized access to Activision's game servers in violation of Activision's TOU.

147.   Defendants are members of a sales and trafficking enterprise, *i.e.*, "the Enterprise" as described above and herein, through which the Cheating Software is marketed, sold and distributed.  Defendants coordinate and work together in order to pursue and carry out the Enterprise's purpose.

148.   In order to choreograph and carry out the conduct of the Enterprise, Defendants necessarily must, and do, establish relationships among their group as members of the Enterprise in order to carry out a common course of conduct, *i.e.,* a complex and multi-stage development and sales operation.  Defendants coordinate their efforts to recruit individuals in the United States to market and distribute the Cheating Software.  Defendants create online "groups" or "chat rooms" using services and platforms based in the United States in order to coordinate their promotion and sales of the Cheating Software.  Defendants coordinate efforts to provide consistent and aligned "customer support" and "technical support" in the United States and to U.S. users of the Cheating Software.

149.   The Defendants have operated the enterprise with the longevity sufficient for them to form and pursue a common and consistent purpose of distributing and selling tools to allow scores of banned users to break into Activision's protected servers.  The Defendants have together operated and acted through the Enterprise for at least three years, selling the Cheating Software to many thousands of users during that time.

150.   The Enterprise described herein thus constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4).

151.   The Enterprise has engaged in, and their activities have affected, interstate, and even foreign, commerce.  Defendants include resellers located in across the United States, including in North Carolina, Florida, New Jersey, and Massachusetts who utilize payment platforms to undertake thousands of sales transactions across multiple state lines in order to distribute the Cheating Software to users all over the United States.  These U.S.-located sellers, resellers, marketers, promoters, and providers of customer and technical support coordinate their sales activity with their counterparts located in, *inter alia*, Germany, Spain and the Netherlands.

Pattern of Racketeering Activity

152.   The Enterprise is engaged in the conduct of Defendants' affairs through a continuing pattern of racketeering activity.  Defendants, each of whom are separate persons associated with, or employed by, the Enterprise, have and continue to knowingly, willfully and unlawfully conduct or participate in, directly or indirectly, the affairs of the Enterprise through this racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5) and 1962(c).

153.   The racketeering activity was effectuated, carried out and/or made possible by Defendants' regular and repeated use of the resources of the Enterprise. Those resources include the creation of, and access to, Cheating Software licenses for distribution and sale, a common reseller "application," a trove of marketing and promotional materials, group chat and message board accounts, shared, common instructions and educational materials sufficient to allow resellers and moderators alike to provide uniform technical, customer, and payment support to the many thousands of purchasers of the Cheating Software, both in the U.S. and abroad. The resources of the Enterprise also include multiple U.S.-located servers utilized

by the members of the Enterprise to access and distribute the above-enumerated items.

154.   Defendants' acts of racketeering activity were, and are, related and continuous; the Enterprise is a well-coordinated multi-level marketing machine. Defendants work together to continuously sell Cheating Software licenses directly, as well as recruit reseller Defendants.  A network of seller and reseller Defendants have perpetuated the same steps as across thousands of instances of marketing, sales, distribution, and support regarding the Cheating Software vis-à-vis numerous separate U.S. customers.

155.   Defendants operate according to a common set of norms and rules. Resellers purchase Cheating Software licenses in bulk, and then proliferate Cheating Software marketing and sales through their own advertisements.  After selling their bulk stock, Reseller Defendants follow the same pattern of remitting revenue back to the Enterprise, while retaining a portion of revenue for themselves. As described herein, Defendants carried out numerous, and certainly more than two, instances of Cheating Software distribution and sales with the same or similar purpose and result, participants, and methods of commission.  Indeed, thousands of these instances have occurred in the United States, and thousands more have occurred abroad.

156.   Defendants' repeated conduct has occurred during a period of time beginning at least as early as 2019, and upon information and belief, as far back as 2012, and continuing to the present.  The conduct is ongoing, and there is a continued threat of repetition of such conduct.

<u>Predicate Act of Racketeering Activity</u>

157.   Defendants' conduct constitutes predicate acts of racketeering activity within the meaning of indictable offenses listed within 18 U.S.C. § 1961(1)(B), as more specifically alleged below.  Defendants each committed at least two such acts or assisted, aided and abetted such acts.

**Wire Fraud, 18 U.S.C. § 1343**

158.   Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1343.  They devised a detailed scam to defraud Activision by knowingly and intentionally gaining access to Activision's game servers and licenses under false and fraudulent pretenses, representations, and promises.  Defendants acted with the intention to gain, by fraudulent means, a limited license to use Activision's games and exploit the value of Activision's multiplayer-game server platform for Defendants' own financial gain (and to the detriment and financial injury of Activision).

159.   As alleged herein, these false and fraudulent pretenses, representations and promises include the willful, knowingly and intentionally false representation and promise Defendants made when they signed Activision's TOU.

160.   The TOU includes that Activision will grant the signatory a "personal, limited, non-exclusive license" to use its games for "non-commercial use" *expressly conditioned upon the promise and representation by the signatory* that they will not "use, develop, host or distribute cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software" in connection with Activision's games "or engage in any form of cheating, boosting, or booting."

161.   Upon information and belief, Defendants each signed Activision's TOU under false pretenses in order to gain the benefit of the contract, while already knowing and planning to use those benefits in order to use, develop, host and distribute cheats and otherwise engage in cheating.  Defendants have been operating the Enterprise for many years, in some cases as far back as 2012, and necessarily have assented (and re-assented to updated versions of) Activision's TOU during that time in order to maintain access to the COD game servers. Defendants fraudulently intended to continue the work of the Enterprise in

Mitchell
Silberberg &
Knupp LLP

14793462.1

1  derogation of the false promises and representations they made in assenting to the

2  TOU.

3      162.   Defendants intended to, and did, use the representations and promises

4  contained within the wire transmission of the TOU to fraudulently hold out to

5  Activision they would not misuse the licenses granted to them, and thereafter used

6  wire transmissions to misuse those licenses.

7      163.   Activision has been, and continues to be, damaged as a direct and

8  proximate result of Defendants' participation in such conduct.  Defendants' misuse

9  of game licenses, and provision of counterfeit access devices to banned users, has

10  caused and continues to cause Activision to suffer a reduction in engaged players

11  and game revenues.

12      164.   As alleged herein, Activision has suffered harm, and been injured in,

13  the United States.  Activision's principal place of business is in California, and the

14  realization and receipt of revenues lost by the proliferation of misuse of game

15  licenses would have been realized in California.

16      165.   Activision has also been injured by the loss of COD player activity in

17  the United States specifically, and the loss of game revenue that would have been

18  obtained from U.S. players but for Defendants' fraudulent receipt of licenses to use

19  COD.  Activision has suffered injury to its business reputation and U.S. player

20  market gains, specifically in the United States.

21      **Trafficking in and Use of Counterfeit Access Devices, 18 U.S.C. § 1029**

22      166.   Defendants committed acts constituting indictable offenses under 18

23  U.S.C. § 1029.

24      167.   In violation of section 1029(a)(1), Defendants have knowingly and

25  with intent to defraud Activision, produced, used and trafficked in counterfeit

26  access devices.

27      168.   As alleged herein, the EO Spoofer includes the generation and

28  provision of counterfeit HWID personal computer "signatures," which are

identification numbers, equipment and instrument identifiers, and means of account access – and thus "access devices" – within the meaning of section 1029(e).  Similar to a credit card or other traditional account number or "key" card, these HWID "signatures" can, and do, commonly serve as a digital key in today's virtual marketplace to unlock various online servers restricted by paywalls, memberships, etc.  These HWID "signatures" often dictate whether, and to what extent, individual customers can access goods, services or other things of value hosted by online servers.

169.   The EO Spoofer trafficked by Defendants is used to circumvent Activision's anti-cheating software and, in particular, "spoof" legitimate HWID number signatures with the provision of counterfeits.  Using the counterfeit identification numbers (*i.e.* access devices) trafficked by Defendants, previously banned player accounts can, and do, obtain unauthorized (and valuable) access to Activision's COD game servers – and with it the unauthorized benefit of the gameplay and entertainment services provided therein.

170.   Access to the services and other valuable benefits hosted by Activision's game servers constitutes "goods, services, or any other thing of value" within the meaning of section 1029(e).  Hundreds, if not thousands, of banned players pay substantial sums of money for the valuable consideration of unauthorized access to Activision's game servers every year.

171.   Activision has been, and continues to be, damaged as a direct and proximate result of Defendants' trafficking in, and production and use of, counterfeit access devices.  Defendants' misuse of game licenses, and provision of counterfeit access devices to banned users, has caused and continues to cause a substantial reduction in Activision game revenues.

172.   As alleged herein, Activision has suffered harm, and been injured in, the United States.  Activision's principal place of business is in California, and the realization and receipt of revenues lost by the proliferation of counterfeit access

devices, both worldwide and in the United States, would have been realized in California.

173.   Activision has also been injured by the loss of COD player activity in the United States specifically, and the loss of game revenue that would have been obtained from U.S. players but for Defendants' large-scale trafficking in, and sales of, counterfeit access devices.  Hundreds, if not thousands, of previously banned U.S. players have used counterfeit access devices provided by Defendants to access COD game servers.  And, hundreds, if not thousands, of non-cheating U.S. players have stopped playing (and making in-game purchases) because of the presence of cheating players.  Activision has suffered injury to its business reputation and U.S. player market gains, specifically in the United States.

174.   Activision maintains U.S.-located game servers.  These servers have all been improperly accessed by players using counterfeit access devices trafficked and sold by Defendants.

## COUNT VII

### FEDERAL CIVIL RICO – Conspiracy

### (18 U.S.C. § 1962(d))

175.   Activision incorporates herein by reference the averments of paragraphs 1 through 174, as though fully set forth herein.

176.   In violation of 18 U.S.C § 1962(d), Defendants knowingly, willfully and unlawfully conspired and continue to conspire to facilitate and carry out the above-described Enterprise, which includes the operation of the Enterprise through a pattern of racketeering activity as alleged herein.

177.   The conspiracy commenced at least as early as 2019, and in some instances 2012, and is ongoing.

178.   The purpose of Defendants' conspiracy was, and is, the development, marketing, sale and distribution of the Cheating Software, which allows users to

Mitchell
Silberberg &
Knupp LLP
14793462.1

gain unauthorized access to Activision's game servers in violation of Activision's TOU.

179.   Upon information and belief, each Defendant committed at least one overt act in furtherance of the conspiracy, including *inter alia* recruiting and serving as U.S. resellers of the Cheating Software, providing customer, sales and technical support to U.S. users of the Cheating Software, and marketing and promoting the Cheating Software.

180.   The purpose of Defendants' acts was to advance the overall object of the conspiracy, which in turn was to fraudulently undertake and promote mass-scale misuse of Activision's game licenses, as well as traffic counterfeit access devices.

181.   Activision has been, and continues to be, damaged as a direct and proximate result of Defendants' participation in such conduct.  Defendants' misuse of game licenses, and provision of counterfeit access devices to banned users, has caused and continues to cause damage to Activision's business reputation and a reduction in Activision game revenues.

182.   Activision has also been injured by the loss of COD player activity in the United States specifically, and the loss of game revenue that would have been obtained from U.S. players but for Defendants' large-scale trafficking and sales of counterfeit access devices.  Hundreds, if not thousands, of previously banned U.S. players have used counterfeit access devices provided by Defendants to access COD game serves.  And, hundreds, if not thousands, of non-cheating U.S. players have stopped playing (and making in-game purchases) because of the presence of cheating players.  Activision has suffered injury to its business reputation and U.S. player market gains specifically in the United States.

183.   Activision maintains game servers throughout the United States. These servers have all been improperly accessed by players using counterfeit access devices trafficked and sold by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Activision prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including but not limited to an order:

1.      Preliminarily and permanently enjoining Defendants, their officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and all persons acting in concert or participation with Defendants from: (i) trafficking in circumvention devices in the United States; (ii) improperly accessing Activision's protected servers without authorization; (iii) intentionally interfering with Activision's or its affiliates' contracts with players in the United States; and (iv) engaging in unfair competition in the United States.

2.      Requiring Defendants to shut down the Cheating Software, any forthcoming software that allows players to cheat in any game published by Activision or its affiliates, and any colorable copies thereof, hosted at any domain, address, location, or ISP.

3.      Requiring Defendants to deliver to Activision for impoundment or destruction all copies of materials that infringe or violate any of Activision's rights, as described herein, including, without limitation, the source code for the Cheating Software.

4.      Requiring Defendants to provide Activision with an accounting of any and all sales of products or services in the United States that infringe or violate any of Activision's or affiliates' rights, as described herein.

5.      Awarding Activision actual or maximum statutory damages for violation of Section 1201 of the DMCA, as appropriate, pursuant to 17 U.S.C. § 1203(c).

6.      Awarding Activision exemplary and punitive damages against Defendants on Activision's cause of action for intentional interference with contractual relations.

Mitchell
Silberberg &
Knupp LLP

14793462.1

46

1    7.  Awarding Activision restitution of Defendants' unlawful proceeds,

2 including an accounting of any and all sales of the Cheating Software in the United

3 States, and/or any other products or services that violate any of Activision's rights

4 described herein.

5    8.  Imposing a constructive trust over the proceeds unjustly obtained by

6 Defendants through the sales of the Cheating Software in the United States, and/or

7 any other products or services that violate any of Activision's rights described

8 herein.

9    9.  Awarding such other and further relief as this Court may deem just

10 and appropriate.

11

12 DATED:  September 16, 2022   MARC E. MAYER

13             MARK C. HUMPHREY
              GENEVIEVE L. JAVIDZAD

14             MITCHELL SILBERBERG & KNUPP LLP

15

              By:  */s/ Marc E. Mayer*

16               Marc E. Mayer (SBN 190969)
               Attorneys for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>JURY DEMAND</u>

2

Activision demands a trial by jury on all issues so triable.

3

4    DATED:  September 16, 2022          MARC E. MAYER
                                         MARK C. HUMPHREY
5                                        GENEVIEVE L. JAVIDZAD
                                         MITCHELL SILBERBERG & KNUPP LLP
6

7                                        By:    */s/ Marc E. Mayer*
                                                Marc E. Mayer (SBN 190969)
8                                               Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28