MARC E. MAYER (SBN 190969) mem@msk.com
MARK C. HUMPHREY (SBN 291718) mxh@msk.com
GENEVIEVE L. JAVIDZAD (SBN 336138) glj@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiff Activision Publishing, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>ENGINEOWNING UG, et al.,<br><br>Defendants. | CASE NO. 2:22-cv-00051-MWF (JCx)<br><br>[Assigned to Judge Michael W. Fitzgerald]<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF ACTIVISION PUBLISHING, INC. IN OPPOSITION TO MOTION OF DEFENDANTS TO DISMISS**<br><br>[Declarations of Marc E. Mayer, Phil Terzian, Ignat Efimov Gayduchenko, Stefan Krueger, and Manuel Santiago filed concurrently herewith]<br><br>Hearing Date: March 27, 2023<br>Time: 10:00 a.m.<br>Ctrm: 5A<br><br>Complaint Filed: 1/4/2022<br>Amended Complaint Filed: 9/16/2022 |

15178858.1

# **TABLE OF CONTENTS**

**Page**

Introduction.........................................................................................................1

I.    SUMMARY OF FACTS.................................................................................4

    A.    Activision, *Call of Duty,* And Its Anti-Cheating Efforts .....................4

    B.    EngineOwning and Defendants. .........................................................6

    C.    Defendants Direct Their Activities At The U.S. Market And At
         Activision. .........................................................................................11

II.   THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER
    DEFENDANTS PURSUANT TO RULE 4(k)(2). .......................................15

    A.    The Defendants Purposefully Directed Their Activities At The
         Forum. ...............................................................................................16

         1.    Defendants Engaged In Intentional Acts. ...............................17

         2.    Defendants "Expressly Aimed" Their Activities At The
             U.S. ........................................................................................19

             a.    Defendants Targeted The U.S. Market. .........................19

             b.    Defendants Knowingly Targeted Activision.................21

         3.    The Harm to Activision Was Expected And Intended. ...........23

    B.    The Exercise of Jurisdiction Is Not Unreasonable.............................23

III.  DEFENDANTS CANNOT MEET THEIR BURDEN OF PROVING
    *FORUM NON CONVENIENS* DISMISSAL IS WARRANTED.................24

    A.    Germany Is Not An Adequate Alternative Forum..............................25

    B.    Defendants Have Not Met Their Burden Of Proving The Private
         And Public Interest Factors Support Dismissal. ................................26

         1.    Private Interest Factors ...........................................................28

         2.    Public Interest Factors ............................................................31

i

15178858.1

**TABLE OF CONTENTS**
(continued)

**Page**

IV. NO "EXCEPTIONAL CIRCUMSTANCES" SUPPORT THE
SURRENDER OF JURISDICTION UNDER COMITY PRINCIPLES......32

V. DEFENDANTS' RULE 12(b)(6) ARGUMENTS ARE MERITLESS........34

    A. Activision Did Not Rely On Impermissible "Group Pleading.".........34

    B. Activision Has Stated A RICO Claim. .................................................36

    C. Activision Has Stated A Section 43(a) Claim ....................................37

    D. Activision Has Stated A Claim For Violation of the CFAA. .............38

    E. Defendants' Invocation of Extraterritoriality Is Meritless.................40

        1. The Lanham Act, CFAA, and RICO Apply
Extraterritorially. ........................................................................40

        2. Activision's Claims Involve Permissible Domestic
Applications. ...............................................................................42

VI. ACTIVISION IS, AT MINIMUM, ENTITLED TO JURISDICTIONAL
AND VENUE DISCOVERY........................................................................43

CONCLUSION................................................................................................44

Mitchell
Silberberg &
Knupp LLP

15178858.1

ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*3DO Co. v. Poptop Software, Inc.*,
  1998 WL 962202 (N.D. Cal. Oct. 27, 1998) ....................................................20

*Allstar Mktg. Grp., LLC v. Your Store Online, LLC*,
  666 F. Supp. 2d 1109 (C.D. Cal. 2009) ..........................................................18

*Alpine View Co. v. Atlas Copco AB*,
  205 F.3d 208 (5th Cir. 2000) ..........................................................................26

*AMA Multimedia LLC v. Sagan Ltd.*,
  2016 WL 5946051 (D. Ariz. Oct. 13, 2016) ..............................................23, 24

*Amini Innovation Corp. v. JS Imports, Inc.*,
  497 F. Supp. 2d 1093 (C.D. Cal. 2007)...........................................................22

*Asahi Metal Indus. Co. v. Sup. Ct.*,
  480 U.S. 102 (1987) ........................................................................................19

*Blizzard Ent., Inc., v. Bossland GmbH*,
  2017 WL 412262 (C.D. Cal. Jan. 25, 2017)...............................................21, 22

*Blizzard Ent., Inc. v. Joyfun Inc Co., Ltd.*,
  2020 WL 1972284 (C.D. Cal. Feb. 7, 2020) ..............................................17, 20

*Boston Telecom. Grp. v. Wood*,
  588 F.3d 1201 (9th Cir. 2009) ........................................................2, 24, 25, 31

*Burri Law PA v. Skurla*,
  35 F.4th 1207 (9th Cir. 2022) .....................................................................17, 21

*Cabell v. Zorro Prods.*,
  2017 WL 2335597 (N.D. Cal. May 30, 2017) .................................................27

*Cal Brewing Co. v. 3 Daughters Brewing LLC*,
  2016 WL 1573399 (E.D. Cal. Apr. 19, 2016).................................................21

*Calder v. Jones*,
  465 U.S. 783 (1984) ..................................................................................17, 18

iii

1

## TABLE OF AUTHORITIES
(continued)

2

3

**Page(s)**

*Carijano v. Occidental Petroleum Corp.*,
643 F.3d 1216 (9th Cir. 2011) ................................................................25, 27

*Celgard, LLC v. Shenzhen Senior Tech. Material Co. (US) Rsch. Inst.*,
2021 WL 9763371 (N.D. Cal. Feb. 8, 2021)..........................................34, 36

*Centaur Classic Convertible Arbitrage Fund Ltd. v.*
*Countrywide Fin. Corp.*,
793 F. Supp. 2d 1138 (C.D. Cal. 2011) .......................................................36

*Charisma Brands, LLC v. AMDL Collections, Inc.*,
2019 WL 6331399 (C.D. Cal. Sept. 3, 2019) ...............................................38

*CollegeSource, Inc. v. AcademyOne, Inc.*,
653 F. 3d 1066 (9th Cir. 2011) ....................................................................23

*Colt Studio, Inc. v. Badpuppy Enter.*,
75 F. Supp. 2d 1104 (C.D. Cal. 1999).........................................................21

*Comcast of Illinois X, LLC. v. Hightech Elecs., Inc.*,
2004 WL 1718522 (N.D. Ill. July 29, 2004) ...............................................17

*ConsumerDirect, Inc. v. Pentius, LLC*,
2022 WL 1585702 (C.D. Cal. Apr. 4, 2022)..........................................34, 36

*Cooper v. Tokyo Elec. Power Co.*,
860 F.3d 1193 (9th Cir. 2017) .....................................................................25

*COR Sec. Holdings Inc v. Banc of California, N.A*,
2018 WL 4860032 (C.D. Cal. Feb. 12, 2018) ..............................................39

*CYBERsitter, LLC v. People's Republic of China*,
805 F. Supp. 2d 958 (C.D. Cal. 2011) .........................................................17

*CYBERsitter, LLC v. People's Republic of China ("CYBERsitter I")*,
2010 WL 4909958 (C.D. Cal. Nov. 18, 2010) ...............................28, 29, 30, 32

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
290 F.3d 42 (1st Cir. 2002) ..........................................................................19

1

## TABLE OF AUTHORITIES
### (continued)

2

3
**Page(s)**

4
*DirecTV, Inc. v. Leo*,
   2010 WL 2740072 (C.D. Cal. July 8, 2010) ...................................................... 18

5

6
*Dish Network LLC v. Barnaby*,
   2016 WL 6603202 (E.D. Tenn. Nov. 8, 2016).................................................... 28

7

8
*Doe v. Epic Games, Inc.*,
   435 F.Supp.3d 1024 (N.D. Cal. 2020).................................................................. 30

9

10
*Dole Food Co. v. Watts*,
   303 F.3d 1104 (9th Cir. 2002) ..................................................................... 31, 32

11

12
*eMag Sols., LLC v. Toda Kogyo Corp.*,
   2006 WL 3783548 (N.D. Cal. Dec. 21, 2006) ................................................... 44

13
*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016) ............................................................................ 39

14

15
*Finegan v. Autotransportes Tufesa S.A.*
   2009 WL 331349 (D. Ariz. Feb. 11, 2009) ........................................................ 19

16

17
*Gates Learjet Corp. v. Jensen*,
   743 F.2d 1325 (9th Cir. 1984).............................................................................. 32

18

19
*Good Job Games Bilism Yazilim Ve Pazarlama A.S. v. SayGames, LLC*,
   2021 WL 5861279 (9th Cir. Dec. 10, 2021) ...................................................... 44

20

21
*Guidi v. Inter-Cont'l Hotels Corp.*,
   224 F. 3d 142 (2d Cir. 2000) .............................................................................. 28

22

23
*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947) ............................................................................................ 28

24

25
*Gutierrez v. Advanced Med. Optics, Inc.*,
   640 F.3d 1025 (9th Cir. 2011) ............................................................................ 25

26
*Healthcare Ally Mgmt. of California, LLC v. Med. Mut. of Ohio*,
   2015 WL 12746216 (C.D. Cal. Jan. 26, 2015).................................................... 43

27

28
*Hendricks v. New Video Channel Am., LLC*,
   2015 WL 3616983 (C.D. Cal. June 8, 2015)........................................................ 19

Mitchell
Silberberg &
Knupp LLP

15178858.1

v

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Heriot v. Byrne,*
2008 WL 4874297 (N.D. Ill. July 21, 2008) ......................................... 31

*Imageline, Inc. v. Mintskovsky,*
2009, WL 10672787 (C.D. Cal. June 16, 2009) .................................... 18

*In re Amwest Ins. Grp., Inc.,*
285 B.R. 447 (Bankr. C.D. Cal. 2002) ................................................. 25

*In re Apple Inc. Device Performance Litig.,*
347 F. Supp. 3d 434 (N.D. Cal. 2018) ........................................... 40, 41

*In re Packaged Seafood Prod. Antitrust Litig.,*
242 F. Supp. 3d 1033 (S.D. Cal. 2017) ......................................... 34, 35

*Indiana Plumbing Supply, Inc. v. Standard of Lynn, Inc.,*
880 F. Supp. 743 (C.D. Cal. 1995) ...................................................... 23

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. DE C.V.,*
412 F.3d 418 (2d Cir. 2005) ................................................................ 32

*Lang Van, Inc. v. VNG Corp.,*
40 F.4th 1034 (9th Cir. 2022) ................................ 15, 16, 20, 21, 22, 28

*Lans v. Adduci Mastriani & Schaumberg L.L.P.,*
786 F. Supp. 2d 240 (D.D.C. 2011) .................................................... 26

*Leopard Marine & Trading, Ltd. v. Easy St. Ltd.,*
896 F.3d 174 (2d Cir. 2018) ................................................................ 33

*Litecubes, LLC v. N. Light Prods., Inc.,*
523 F.3d 1353 (Fed. Cir. 2008) .......................................................... 43

*LiveCareer Ltd v. Su Jia Techs. Ltd.,*
2015 WL 1448505 (N.D. Cal. Mar. 31, 2015) .................................... 23

*Mavrix Photo, Inc. v. Brand Techs., Inc.,*
647 F.3d 1218 (9th Cir. 2011) ....................................................... 16, 17

*Metro-Goldwyn-Mayer Studios Inc., v. Grokster, Ltd.,*
243 F. Supp. 2d 1073 (C.D. Cal. 2003) ......................................... 20, 26

vi

Mitchell
Silberberg &
Knupp LLP

15178858.1

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Mintel Learning Tech., Inc. v. Beijing Kaidi Educ. & Tech. Dev. Co..*,
    2007 WL 2403395 (N.D. Cal. Aug. 20, 2007) ...................................................... 29

*Morrison v. Nat'l Austrl. Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................ 42

*Mujica v. AirScan Inc.*,
    771 F.3d 580 (9th Cir. 2014) ........................................................ 34

*Niantic, Inc. v. Global++*,
    2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ........................................................ 39

*Orchid Biosciences, Inc. v. St. Louis Univ.*,
    198 F.R.D. 670 (S.D. Cal. 2001) ........................................................ 43

*Palmer v. Braun*,
    376 F. 3d 1254 (11th Cir. 2004) ........................................................ 42

*Parity Networks, LLC v. Moxa Inc.*,
    2020 WL 6064636 (C.D. Cal. Sept. 11, 2020) ........................................................ 34, 35

*Pepper, N.A. v. Expandi, Inc.*,
    2016 WL 1611039 (N.D. Cal. Apr. 22, 2016) ........................................................ 19

*Piper Aircraft v. Reyno*,
    454 U.S. 235 (1981) ........................................................ 25

*Rio Props., Inc. v. Rio Int'l Interlink*,
    284 F.3d 1007 (9th Cir. 2002) ........................................................ 23

*RJR Nabisco, Inc. v. Eur. Cmty.*,
    579 U.S. 325 (2016) ........................................................ 40, 41

*Ryanair DAC v. Booking Holdings Inc.*,
    2022 WL 13946243 (D. Del. Oct. 24, 2022) ........................................................ 39

*Ryanair DAC v. Expedia Inc.*,
    2018 WL 3727599 (W.D. Wash. Aug. 6, 2018) ........................................................ 41

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ........................................................ 16

Mitchell
Silberberg &
Knupp LLP

15178858.1

vii

1

## TABLE OF AUTHORITIES
(continued)

2

3

**Page(s)**

4

*Shuler v. Walter E. Heller W. Inc.*,
    956 F.2d 1168 (9th Cir. 1992) ................................................................... 37

5

6

*SKWS Enterprises, Inc. v. Levonchuck*,
    2018 WL 11351584 (C.D. Cal. Apr. 2, 2018) ........................................... 38

7

8

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*,
    883 F.3d 904 (D.C. Cir. 2018) ................................................................. 43

9

10

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
    401 F. Supp. 3d 1068 (S.D. Cal. 2019) .............................................. 40, 43

11

12

*Trader Joe's Co. v. Hallatt*,
    835 F.3d 960 (9th Cir. 2016) ................................................................... 41

13

*United States v. Ivanov*,
    175 F. Supp. 2d 367 (D. Conn. 2001) ..................................................... 41

14

15

*United States v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016) ................................................................. 39

16

17

*United States v. Ubaldo*,
    859 F.3d 690 (9th Cir. 2017) ................................................................... 42

18

*Via Techs., Inc. v. Asus Comput. Int'l*,
    2015 WL 3809382 (N.D. Cal. June 18, 2015) ....................................... 29

19

20

*Wolf Designs, Inc. v. DHR Co.*,
    322 F.Supp.2d 1065 (C.D. Cal. 2004) ..................................................... 18

21

22

**STATUTES**

23

17 U.S.C.
    § 1030(b) ................................................................................................. 39
    § 1201(a)(2) ............................................................................................ 42

24

25

18 U.S.C.
    § 1029 ..................................................................................................... 41
    § 1029(a)(1), (2) ..................................................................................... 42
    § 1030 ................................................................................................ 41, 42

26

27

28

Mitchell
Silberberg &
Knupp LLP

15178858.1

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

1

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

§ 1961(1)............................................................................................41
§ 1962(c)............................................................................................36

Computer Fraud and Abuse Act (CFAA)...............................3, 15, 33, 39, 40

The Digital Millenium Copyright Act (DMCA) ...............................42, 43

Lanham Act,
15 U.S.C. § 43(a) .........................................................................37
15 U.S.C. § 1125(a) ......................................................................42

Racketeering and Corrupt Practices Act (RICO) ...............15, 27, 33, 36, 37, 40, 41

### OTHER AUTHORITIES

Fed. R. Civ. P.
Rule 4(k) ....................................................................................2, 15
Rule 8 ............................................................................................34
Rule 12(b)(6) ................................................................................34

Mitchell
Silberberg &
Knupp LLP

15178858.1

ix

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

**Introduction**

Defendants' Motion to Dismiss is a disingenuous effort by the operators of a hugely profitable online business to avoid appearing in a U.S. court for unlawful conduct knowingly aimed at the U.S. market and directly targeting a U.S. company, plaintiff Activision Publishing, Inc. ("Activision").

Defendants' enterprise, known as "EngineOwning" ("EO" or the "Enterprise") is an online business dedicated to creating, marketing and distributing software products that enable members of the public to cheat or otherwise disrupt the online experience of Activision's flagship *Call of Duty* ("COD") video games. Declaration of M. Mayer ("Mayer"), ¶4. Such disruption causes non-cheating players to stop playing the games, harms the games' reputation and player community, and thus causes Activision significant monetary harm. EO boasts more than 400,000 customers (the majority of which are in the U.S.) and has received millions of dollars in revenue from its U.S. customers at the expense of Activision and its player community.

Believing themselves to be anonymous, Defendants have, for years, thumbed their noses at Activision, including by ignoring cease-and-desist letters and cycling through multiple shell companies and ever-changing aliases to avoid detection (Gayduchenko Decl. ("Gayduchenko")) Exs. 4 at 16, 5 at 25 – all while publicly mocking and taunting Activision, its U.S.-based development studios, and even its California counsel. Meanwhile, two former EO participants (a longtime coder and a U.S. reseller) recently disclosed information about EO's behind-the-scenes activities. The disclosures are stunning. In internal EO communications and in private correspondence, Defendants routinely trade detailed instructions on how best to illegally launder their shared EO profits (*id.* Ex. 5 at 21, 22); engage in fraudulent tax-dodging schemes (*id.* Ex. 2 at 12); concoct and corroborate a made-up "story" that EO was sold to unknown buyers in 2018 (*id.* Ex. 5 at 18); and

1

1  destroy documents they believe would incriminate them "in case of discovery";

2  (*id.* Ex. 5 at 27).

3       Now that they have been identified, and knowing that they have no

4  substantive defenses, Defendants assert a litany of procedural arguments, the heart

5  of which are that they are outside the jurisdiction of this Court and traveling for

6  trial here would be an undue burden.  These arguments are unsupported by the law

7  or the evidence.  Defendants do not (and cannot) dispute ***any*** of Activision's

8  detailed factual allegations, opting instead to submit cookie-cutter declarations

9  saying nothing about EO or their role in the Enterprise.  The undisputed

10  allegations, bolstered by extensive documentary evidence and witness testimony,

11  confirm Defendants are the primary participants in EO and (both individually and

12  together) intentionally target (and profit from) the U.S. market, recruit U.S.

13  resellers, solicit and communicate with U.S. customers, direct their conduct at

14  Activision, and cause substantial harm in the U.S.  EO's U.S. customer base is so

15  significant that EO maintains dedicated remote servers located in Los Angeles and

16  New York.  *Id.* ¶16, Ex. 5.  Under binding Ninth Circuit authority, that is more

17  than enough for the exercise of specific jurisdiction under Rule 4(k).

18       As for *forum non conveniens*, Defendants do not come close to meeting their

19  heavy burden of proof.  Their only claim of "inconvenience" is the purported cost

20  of a plane flight and hotel room to attend trial.  That is not "oppression and

21  vexation" that justifies the "exceptional" decision to deprive Activision of its right

22  to litigate in its home forum.  *Boston Telecom. Grp. v. Wood,* 588 F.3d 1201, 1212

23  (9th Cir. 2009).  Moreover, Defendants' own correspondence confirms the

24  argument is insincere.  Defendants received millions of dollars from the U.S.

25  market and knew they would be sued here, but now prefer to save their ill-gotten

26  earnings for (often equally illegal) indulgences.  According to his co-Defendants,

27  Defendant Rick used EO profits to fund far more substantial international travel

28  costs than those contemplated in his declaration, including rental of "a presidential

suite in a hotel in Zurich" for several weeks.  Gayduchenko Ex. 5 at 20, 23.
Elsewhere, Defendant Richts sneeringly ponders whether it is better to spend EO
earnings on "a random lawyer in the US" or "10k cocaine[.]"  *Id.* Ex. 5 at 19.
Defendant Rick admits the real reason he would like to avoid U.S. travel – he
simply does not "plan visiting (sic) that shithole country[.]"  *Id.* Ex. 1 at 6, 8.

Defendants' only other basis for *forum non conveniens* dismissal is the
existence of a pending lawsuit in Germany against **one** Defendant (Rick) and his
alter ego corporation.  Defendants not only misrepresent the nature of that lawsuit;
they intentionally mislead this Court by attaching and relying on a manipulated
***draft*** complaint (revealingly "dated" January 3, ***2023***) that never was filed.  *See*
Reinhart [ECF 68-3], Ex. E.  The ***actual*** complaint (Declaration of S. Krueger
("Krueger"), Ex. A) asserts wholly different claims under German law, by a
***different entity***.  The German lawsuit is focused on the European market, does not
address U.S. distribution or damages, does not assert claims for trafficking in
circumvention technology, does not include most of the defendants in this action,
and will not resolve the issues presented here.

Defendants' other arguments fare no better.  Defendants' claim that
allegations are insufficiently particularized ignores large sections of the complaint.
Multiple other arguments misconstrue and even ignore settled law: the Computer
Fraud and Abuse Act *does* squarely apply to those who aid and abet (or conspire to
commit) such violations; the statutes at issue *do apply* extraterritorially, and/or are
focused upon the *domestic* trafficking conduct alleged in this case; and
international comity rules *do not require* a U.S. court to surrender its jurisdiction
when there is related litigation overseas.

Permitting Defendants to escape this lawsuit would be contrary to basic
jurisdictional principles, unfairly deprive Activision of its right to seek relief in its
home forum, and reward bad actors who deliberately harm U.S. companies from

1  overseas while proclaiming "what do we care for their [U.S.] laws[.]"  *Id.* Ex. 3 at

2  14.

3       Defendants' Motion should be denied.  But if there is any doubt, Activision

4  should be permitted to take jurisdictional and/or venue discovery, and/or given

5  leave to amend.

6  **I.    SUMMARY OF FACTS.**

7       **A.    <u>Activision, *Call of Duty*, And Its Anti-Cheating Efforts</u>**

8       **Activision Publishing, Inc.**  Activision is a prominent U.S. company in the

9  business of producing, marketing, and distributing a catalog of interactive

10 entertainment products.  Declaration of P. Terzian ("Activision") ¶3.  Activision is

11 a wholly-owned subsidiary of Activision Blizzard, Inc. ("ABI"), a publicly traded

12 U.S.-based holding company.  *Id.* ¶4; *see also* RJN, Ex. P.  Activision's global

13 operations are run from its Santa Monica headquarters, which is its principal place

14 of business.  Activision ¶5.  (It also is the principal place of business of ABI. *see*

15 RJN [ECF 69] Ex. N).  Several hundred Activision employees are in the Los

16 Angeles area.  *Id.*  Activision's entire executive team is located in the Los Angeles

17 area, as are Activision's marketing, security, production, and finance teams.[1]  *Id.*

18 None of Activision's executives are in Germany; none of the studios working on

19 COD are in Germany; and no members of the COD security team are in Germany.

20 *Id.* ¶6.  (Thus, no Activision employees with relevant knowledge are in Germany.)

21 *Id.*

22       **The *Call of Duty* Franchise.**  *Call of Duty* is Activision's most popular

23 game franchise.  Activision ¶8*; First Amended Complaint ("FAC") ¶70.  The COD

24 Games were primarily developed by Activision-affiliated studios in the U.S.

25

26

27 ---

[1] Activision does not have any offices in Germany, much less "three offices."  An affiliate operates a logistics center in Burglengenfeld, Bavaria.  Activision's affiliate ***King*** (based in London) has a mobile development studio in Berlin. Activision ¶7.

28

(largely in California).  Activision ¶12.  None of the studios developing the COD Games is located in Germany.  *Id.* ¶¶6, 7.

The COD Games are very popular and reportedly have sold over 400 million units.  Mayer Ex. 85.  The U.S. is the largest market for the COD Games. Activision ¶9 (By contrast, Germany comprises only a small relative proportion of the market for the COD Games.)  *Id.* ¶11.  Activision runs several remote servers for each of the COD Games, the majority of which are in the U.S.  *Id.* ¶10.

**Activision's Efforts To Prevent Cheating.**  The popularity of the COD Games have made them a target for sellers of software that enables players to cheat in those Games (such as being able to see obstructed opponents or enhance weapon aiming.)  FAC ¶75.  Cheaters ruin the game experience for legitimate players, harm the reputation of the game, and cause players to quit the game or turn to competing products.  *Id.* ¶98.

To play the COD Games, players must consent to a Terms of Use ("TOU") that explicitly prohibits the use of cheats.  FAC ¶26.  To fight against rampant cheating in the COD Games, Activision employs a dedicated security and anti-cheat team.  Activision ¶15.  Members of this team have developed (and continue to update and refine) anti-cheat technology, such as the Battle.net anti-cheat system and (more recently) the "RICOCHET" anti-cheat system.  *Id.*  This technology is designed to detect when a player is using cheats and prevent cheaters from playing the game.  *Id.*  Additionally, when a user is caught cheating (and his or her account is "banned" from playing the game), Activision may collect the player's computer hardware ID "signature" ("HWID.")  *Id.* ¶16; FAC ¶77.  Using HWID information, Activision is able to prevent a banned user from improperly accessing Activision servers under a different name or email address.  FAC ¶77.

Activision's anti-cheat and security team consists of programmers and experts in network security, circumvention technology, and other forms of video game exploitation.  Activision ¶17.  Because cheat-sellers such as Defendants are

1    constantly updating and improving their software to defeat Activision's technical

2    protection, Activision is engaged in a never-ending arms race to stay ahead of the

3    cheaters.  The work performed by Activision's anti-cheat and security team takes

4    place primarily in the U.S.  *Id.*

5         **B.     EngineOwning and Defendants.**

6         **EngineOwning and the Cheating Software.**  "EngineOwning" is a

7    sophisticated, for-profit business enterprise controlled and operated by a group of

8    individuals who conduct their activities entirely online using anonymous screen

9    names.  Mayer ¶4.  EO's business is to develop, market, and distribute software

10   cheats for online games, especially the COD Games.  FAC ¶12.  Via the website

11   Engineowning.to (formerly Engineowning.com) (the "Website"), EO markets,

12   sells, distributes, and maintains no fewer than *eight* products dedicated to the COD

13   Games (collectively, the "Cheats"), including a cheat for Activision's new 2022

14   Games.  Mayer ¶¶8, 13, Ex. 2.  EO advertises each of the Cheats with its own

15   product page featuring the Games' official logo, screen captures, and video

16   captures.  *Id.* ¶13.  EO also promotes the Cheats via Twitter and YouTube.  FAC

17   ¶89; Mayer ¶¶6, 22-28.

18        The Cheats offer various features designed to unfairly assist users, including

19   "aimbots," which automatically aim weapons at opponents; "ESP," which allows

20   the cheating player to see hidden opponents; and "triggerbots," which

21   automatically fire the player's weapon.  FAC ¶87.  EO's most recent Cheat allows

22   players to crash Activision's multiplayer servers (prematurely ending the match.)

23   Mayer Ex. 13 (1/31/23 Tweet).  EO also offers a "Spoofer," which falsifies a

24   player's HWID to circumvent account bans (and thereby gain unauthorized access

25   to Activision's servers.)  FAC ¶88.

26        The Cheats were specifically designed to bypass Activision's anti-cheat

27   technology, and EO prominently markets them as such.  Each of the product pages

28   for the Cheats states that Activision's anti-cheat technologies are "Supported" or

Mitchell
Silberberg &
Knupp LLP

15178858.1

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

"Secure" (i.e., the anti-cheat software is unable to detect the Cheat.)  Mayer Ex. 2.
The Website also contains a product "Status" page, which confirms the Cheat is
"undetected."  *Id.* Ex. 5.  Being "undetected" is critical to the value and success of
the Cheats, because EO acknowledges the use of the Cheats is against the TOU and
will result in the player's account being banned.  *Id.* Ex. 6(a).  The Cheats even
include features designed to avoid "manual" detection by other players or
Activision, such as functions hiding the EO software interface while the player is
streaming or make aiming appear more "human."  FAC ¶95.

EO offers extensive customer support and services to purchasers of its
products.  *Id.* ¶148.  For example, EO offers "members-only" Telegram,
Teamspeak, and Discord servers for its customers to discuss their products.  Mayer
¶33(a), Ex. 18(a).  It also offers message boards where customers can post
questions to EO and receive advice about how to use the Cheats, how to avoid
detection by Activision, and what methods of payment are available.  EO
representatives (namely, Defendants) use these platforms to announce new updates
to the EO Cheats and advertise sales or promotions.  *Id.* ¶33(b), Ex. 18(b)

The EO Cheats may be purchased directly from the Website or via a network
of authorized "resellers," many of which are located in the United States.
Declaration of M. Santiago ("Santiago") ¶13.  The average price for the Cheats is
$20 for a 30-day subscription and $40 for a 60-day subscription.  Mayer Ex. 2.
Defendants deliberately did not disclose sales figures for the Cheats, though they
obviously have that information.  However, according to the Website, EO has
***416,229*** "members" (individuals who signed up for an account.)  *Id.* Ex. 6.  If each
"member" used even a ***single*** Cheat for one year, then EO would have received
more than ***$65 million*** in revenue in 2022 alone.  There is no dispute EO is a multi-
million dollar business venture with revenues in the tens of millions of dollars.

**EO's Operations.**  Defendants deliberately avoid disclosing ***any***
information about the Enterprise and their involvement in it.  For example,

Defendants' form declarations (ECF 68-6 through 68-15) say nothing about EO and each Defendants' role in the Enterprise.  Defendants' entire *modus operandi* has been to obfuscate and conceal EO's ownership structure.  Nothing on the Website, Twitter feed, or any other public document identifies a corporate entity responsible for EO.  *See generally*, Mayer ¶¶ 4, 8-9.  The Website provides inconsistent or fake information about EO's "location."  At times, EO has claimed to be located in the Seychelles, in Belize, and (most recently) Dubai.  Mayer ¶¶ 12, 24, 26, 57, Exs. 2, 3, 13, 37.  EO previously purported to be operated by "EngineOwning UG" or "CMM Holding," but internal communications provided by former participants reveal that Defendants are moving money through a Belize entity ("Garnatz Enterprise") and/or a Dubai entity, owned and controlled by Rick, Huch, and other Defendants.  Mayer ¶12, *see also* Gayduchenko Ex. 5 at 25.

Even without discovery, Activision has confirmed that at the core of the Enterprise are Defendants – a close-knit group of individuals including the founders of the company, high-level website administrators, communications liaisons, and a prominent cheat reseller.  Defendants have for years attempted to evade detection (and liability) by swapping online aliases or assuming fake identities.  Mayer ¶38, Exs. 19-21.  Defendants have received millions of dollars in revenue from the Cheats, and have bragged about the vast fortune they have made from the cheat-selling business.  Santiago ¶13.  Some of the Defendants used their earnings from EO to take expensive vacations together, and Rick has purchased sports cars and luxury watches.  Gayduchenko Ex. 5 at 20, 24; Santiago ¶13.  Others admit to "washing" tens of thousands of dollars (Gayduchenko Ex. 5 at 21, 22), and evading taxes by hiding money or pretending their revenue is a family "gift," (*Id.* Ex. 2 at 12).

The Enterprise has both public-facing and back-end components.  The public-facing part of the business is comprised largely of the Website, which (as noted) contains store listings for the EO Cheats, demonstration images and videos,

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

1   purchase pages, and online message boards.  On these message boards, EO
2   "administrators" communicate directly with EO customers/"members," assisting
3   them with technical and payment issues, and providing advice on how to avoid
4   detection by Activision.  Mayer Ex. 6.  EO also markets its Cheats through various
5   social media platforms such as YouTube, Twitter, Discord, and Telegram.  Mayer
6   ¶¶ 6, 22-33, 48, 81, 88; Exs. 12-18(b), 29, 63, 71.  Behind the scenes, certain
7   Defendants create, code, and update the Cheats; manage online servers; secure
8   website hosting and other services; and coordinate and contract with payment
9   processors (and program the Website to work with payment processors).  *Id.* ¶4.
10  EO administrators also approve, supervise, and manage relationships with
11  "resellers" (such as Classen and other defendants) who sell the Cheats on behalf of
12  the enterprise and keep a portion of the revenue.  *Id.* ¶6; Santiago ¶2.  Some
13  Defendants work so closely together they share access to one another's desktops in
14  real time.  Gayduchenko Ex. 2 at 11.

15       Contrary to Defendants' claim they "do not know" what they "personally
16  [are] being accused of," the allegations and supporting evidence establish each
17  plays a critical and central role in producing, marketing, and distributing the
18  Cheats:

19       **Valentin Rick** (a/k/a "Skyfail" and "Crotle") is the founder of EO and the
20  mastermind behind the venture.  FAC ¶17; Mayer ¶¶29, 57.  Rick created and set
21  up the Enterprise and the Website, developed (or participated in developing) the
22  Cheats, and set up shell companies such as **EngineOwning UG** and **Garnatz**
23  **Enterprises, Ltd**. to move money and nominally operate the venture.  FAC ¶¶14-
24  15; Mayer ¶41, Ex. 23; ¶57, Ex. 37.  Rick owns and maintains a Twitter account
25  where he has advertised and promoted the Cheats; created Steam accounts to
26  harass and taunt Activision's California counsel; and operates an "EngineOwning"
27  GitHub code repository.  Mayer ¶49, 54, 56-57; Exs. 30, 34, 36-37.  Rick posted
28  thousands of messages to the Website and regularly communicates with customers.

*Id.* ¶50.  In 2018, Rick purported to sell the website, but in fact just changed his screen name and created a Belize corporation.  Krueger ¶19; Mayer ¶57.  In their private messages, the Moving Defendants confirm the 2018 sale was a false "story" (Gayduchenko Ex. 5 at 18), and in reality Rick (along with his co-venturers) still "has the website," (*Id.* Ex. 5 at 24), "don't have plans to shut down EO," and indeed "won't ever" shut down EO (*Id.* Ex. 1 at 9).

**Leon Schlender ("Balkan" and "Lion"), Bennet Huch ("TheBigBen" and "Benno"), Marc-Alexander Richts ("Lowry" and "Lachsfilet2004"), and Leonard Bugla ("Reganmian" and "Noodleman")** are friends of Rick's, co-founders of EO, and part of the "core" management team.  Mayer ¶¶ 58, 60, 62, 65.  They collaborated with Rick to set up and run the Enterprise, the Website, and related shell companies.  They each have had high-level roles in administering the Website, marketing the EO software, engaging with customers, and overseeing resellers.  FAC ¶¶18, 20-22; Santiago, ¶12, Ex. 2.  All four marketed the Cheats, purported to speak on behalf of the Enterprise, and even, at times, purported to own or control the Website.  Mayer ¶¶58-75, Exs. 38-57.  Huch also tested and refined EO software products.  *Id.* Ex. 41.  Richts assisted customers with purchasing the Cheats, communicated with EO's payment processors to facilitate purchases, and promoted the Cheats via social media platforms, where he posted advertisements and gave away free "sample" subscriptions.  *Id.* ¶¶ 66-71, Exs. 47-52.

**Remo Loffler ("Aimbrot"), Alexander Kleeman ("A200k"),** and **Leon Frisch ("Kraisie")** are moderators and administrators of the Website.  Mayer ¶¶ 76, 77, 79, 91.  They assisted customers with the purchase of the Cheats, provided technical support, and oversaw and administered the online message boards.  *Id.* Loffler authored more than 1,000 messages on topics such as payment, technical issues, and account status and maintenance, and he has control over Cheat subscriptions.  *Id.*  Kleeman did product coding and testing, and oversaw EO's

Discord servers. *Id.* ¶ 92. Frisch authored more than 7,000 messages on the Website and regularly corresponds with U.S. users. *Id.* ¶ 79. Frisch runs Discord servers dedicated to EO, and advertised the Cheats via his YouTube channel. *Id.* ¶¶81-82, Exs. 63-65.

**Pascal Classen ("Proton1001")** is an "authorized market seller" of the Cheats and of COD player accounts (which he sells via his personal websites.) *Id.* ¶ 83. Classen has been an avid promoter of the Cheats, posted more than 2,000 messages on the Website, and created a Teamspeak" chat room for EO customers. *Id.* ¶¶ 84-90, Exs. 18(a), 66-73.

   **C.   Defendants Direct Their Activities At The U.S. Market And At Activision.**

The above-described conduct is overwhelmingly focused on the U.S. EO and Defendants targeted not only U.S. customers but also Activision, its studios, its anti-cheat team, and even its California-based legal counsel. *See*, *e.g.*, Mayer ¶53.

**EO Targets The U.S. Market.** Since every EO customer must create an account, Defendants know who their customers are and where they are located. But they deliberately do not disclose what percentage of their sales are to U.S. residents. Regardless, Defendants do not dispute EO has an enormous U.S. customer base. FAC ¶8, 91. Activision has confirmed the majority of the thousands of accounts banned for using the Cheats are for U.S. users. Activision ¶16. This is consistent with other data. The Website is among the leading cheat-selling websites in the United States (with a Global Alexa Rank of 56,053), with U.S. customers comprising a large (if not the largest) percentage of the website's overall traffic. Mayer ¶7, Ex. 1. The Cheats are so popular in the U.S. that Defendants maintain *two* dedicated U.S.-located servers. FAC ¶8(h).

EO's large U.S. customer base is an intended result of Defendants' activities. Knowing the U.S. market is the largest market in the world for COD, EO deliberately targeted that market. The Website is in "English (US)." Mayer

Mitchell
Silberberg &
Knupp LLP
15178858.1

¶18.  EO offers promotions in connection with U.S. holidays such as Black Friday. FAC ¶8(c).  EO sponsors U.S.-based entities such as "GuidedHacking," a website offering "reverse engineering and game hacking tutorials."  Mayer Ex. 80.  EO also promotes its products to U.S. customers via Twitter.  Mayer ¶22.  EO's Twitter feed boasts more than 8,000 followers, many (of not most) of whom are in the United States.[2]  FAC ¶89.  Additionally, EO built a network of U.S. resellers, who sold and delivered thousands of licenses for the Cheats to U.S. customers. (One reseller estimated 60-70% of his customers were in the U.S.)  Santiago ¶9. With Defendants' encouragement, resellers created promotional videos for EO, which they posted on platforms like YouTube.  Mayer ¶6.

Defendants engage directly with customers in the U.S.  EO moderators and administrators know many of EO's users are located in the U.S., either because they self-identify as U.S. users or ask questions about U.S. sales (e.g., "is there a way I can make a USD payment?").  Mayer ¶106, Exs. 81-84.  Defendants regularly responded to posts by U.S. users.  *Id.*  Rick once ran an EO promotion in which he gave away free subscriptions to users who posted reviews of EO on the (U.S.-based) website TrustPilot.  Mayer ¶27, Ex. 14.  Of 255 EO users who posted reviews on the TrustPilot Website, *189 (75%)* self-identified as being from the U.S.  Rick (or one of the other Defendants) *directly responded* to *90* of those U.S.-based reviews.  *Id.* ¶46.

In 2021, EO was identified by the Entertainment Software Association as one of the leading "notorious online markets" in comments made to the U.S. Trade Representative.  Mayer ¶7, Ex. 1.  The ESA noted, "[a] self-reported 291,000 members can purchase cheats for 14 popular action video games" on

---

[2]  As one illustration, EO ("to celebrate the release of Season 5" of *Call of Duty: Warzone*) recently offered (via its Twitter feed) a sweepstakes for a free trial subscription.  Two U.S. users won the sweepstakes.  Mayer Exs.13-15.

EngineOwning.com.  *Id.*  When this report was brought to EO's attention, it tweeted a sneering response: "lol good luck."  *Id.* ¶26, Ex.13.

**EO Targets Activision and Its U.S. Representatives.**  The COD Cheats are by far the most significant portion of EO's business.  EO offers *eight* products for the COD Games.  Mayer ¶11, Ex. 2.  The Website homepage features images and logos from the COD Games and the phrase "*Warzone. Victory*" (referring to COD:Warzone).  Mayer ¶13, Ex. 2.  The Website also contains a large message advertising EO's recent (January 29) release of cheats for *COD: Modern Warfare II*.  *Id.*

EO's marketing has been singularly focused on the COD Games.  EO's tweets are almost entirely dedicated to the COD Games.  Mayer ¶¶22-28, generally.  These include tweets announcing new features for the Cheats; providing updates about the status of the Cheats; offering promotions for the Cheats; or posting videos demonstrating the Cheats.  *Id.* Exs. 13-15.  EO recently used Twitter to proudly announce that its new Cheat allows players to crash COD servers.  *Id.* ¶27.

Defendants also unrepentantly harass Activision.  Defendants post dozens of images, memes, and other material aimed at Activision and its developers.  Mayer Exs. 12-13.  EO posted ads for its Cheats on the Twitter feed of a COD developer, followed by "The only proper anti-cheat they have is blocking me :(."  *Id.* ¶27, Ex. 13.  It responded to tweets from another COD developer with targeted taunts: "[w]e do work on Warzone 2.0 everyday though, stay tuned!"  *Id.*  As a marketing stunt, in January 2022 EO tried to ruin a "Black Ops 2 Revival Day" by offering its Black Ops 2 Cheat for free that same day.  *Id.*  (This stunt was so brazen it received press attention.)  Mayer Ex. 14(a).

Defendants also mocked Activision's enforcement activities and harassed Activision's California counsel.  *Id.* Ex. 2.  After being served with cease-and-desist letters by Activision, Defendants created "groups" on the Steam distribution

platform called "suck my d***, Activision" and "MSK Crime." *Id.* ¶¶53-54, Ex. 34.  Rick, Huch, and others created fake user profiles on Steam for Activision's attorneys including Marc Mayer and Daniel Kohler.  Defendants posted images and videos on its Website featuring Mr. Mayer's name.  This conduct escalated after the lawsuit was filed, at which time they posted crude, childish images of Activision's counsel.  Mayer Ex. 77 at 611.  Richt regularly posts Twitter messages mocking Mitchell Silberberg & Knupp lawyers.

**Activision's Enforcement Efforts.**  In 2017, Activision first identified Rick and Richts as among the primary operators of EO.  On March 16, May 11, and November 17, 2017, Activision hand-delivered cease-and-desist letters to Rick. Mayer ¶¶51-53, Exs. 32-34.  Rick ignored all of them.  *Id.*  Activision delivered letters to Richts on June 19 and July 24, 2017, which Richts also ignored.  *Id.* ¶¶72-73; Exs. 53-54. (Instead of responding, they created fake accounts for the MSK lawyers who signed the letters.)  *Id.* ¶¶74-75, Exs. 56-57.  In defiance of Activision's demands, Defendants continued to grow the Enterprise by developing and releasing new Cheats and recruiting new resellers, while changing their aliases and purporting to move the Enterprise to Belize.  *Id.* ¶12, 57.

On January 4, 2022, Activision filed its complaint against eight defendants, including most of the Defendants.  ECF 1.  Shortly thereafter, Activision sought early third-party discovery to identify additional key members of the Enterprise. ECF 9.  Based on documents they received, Activision amended its complaint to include additional individuals (including EO resellers in the U.S.) and to detail the specific role each defendant played in the Enterprise.  ECF 27.  After the lawsuit was filed, Defendants' activities continued unabated.  Gayduchenko Ex. 1 at 7, 9. (In fact, since filing this Motion EO posted five new tweets aimed at Activision.) Mayer Ex. 13.  Meanwhile, Defendants destroyed evidence and closed ranks to protect each other.  Gayduchenko Ex. 5 at 27, 26.

## II.    THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER DEFENDANTS PURSUANT TO RULE 4(k)(2).

Defendants first contest this Court's exercise of personal jurisdiction over them, downplaying or ignoring Activision's detailed allegations and disingenuously claiming the allegations are insufficiently particularized. Activision's allegations, supported by the evidence presented with this Opposition, show each Defendant engaged in specific, intentional acts in furtherance of the Enterprise. Defendants directly, actively, and knowingly created, marketed, sold, and distributed – or participated in, caused, and facilitated the creation, marketing, sale, and distribution of – the Cheats in the U.S. Through these activities, Defendants not only targeted the U.S. market (home to the largest COD player base) but specifically targeted *Activision*.

Under the federal long-arm statute, Fed. R. Civ. P. 4(k)(2), personal jurisdiction over a defendant is established if the claims arise under federal law and:

> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Activision's claims for trafficking in circumvention devices, false designation of origin, violation of the CFAA, and violation of the RICO statute arise under federal law. Defendants have not consented to jurisdiction in any state. Thus, personal jurisdiction is proper as long as the exercise of jurisdiction is consistent with due process. The "due process analysis under Rule 4(k)(2) is nearly identical to the traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between the [defendants] and the forum state, we consider contacts with the nation as a whole." *Lang Van, Inc. v. VNG Corp.*, 40 F.4th 1034, 1039 (9th Cir. 2022).

Defendants attack at length the exercise of *general* jurisdiction, Mot. 25-29.

However, Activision does not claim Defendants are subject to general jurisdiction in the U.S.  Defendants are subject to *specific* jurisdiction by virtue of their U.S.-related activities in connection with the Enterprise.  Under this Circuit's test for specific jurisdiction, Activision need only make a *prima facie* case: (1) the nonresident defendant (a) purposefully directed his activities at the forum [the U.S.] or (b) purposefully availed himself of the privilege of conducting activities in the forum; and (2) the claim arises out of or relates to the defendant's forum-related activities.  *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir. 2004).  Once Activision has done so, the burden then shifts to *Defendants* to present a "compelling case" that the exercise of jurisdiction would "not be reasonable."  *Id.*

Activision easily has met its burden.  Activision's *uncontested* allegations -- bolstered by the overwhelming and indisputable evidence – show Defendants' U.S. contacts were deliberate, purposeful, and extensive.  *See Lang Van*, 40 F.4th at 1038 ("[U]ncontroverted allegations in the complaint must be taken as true. . . .").  Defendants *never once* deny they directly participated in, facilitated, and worked together to accomplish the primary goal of the Enterprise: distributing the Cheats in the U.S.  Nor do they deny the claims arise from Defendants' forum-related activities – namely, distribution of the Cheats *in the U.S.  Id.* at 1041 ("VNG released its Zing MP3 in English to the United States. Absent release by VNG, this app was not available in the United States.")  Thus, Activision has far exceeded the threshold "*prima facie* showing of jurisdictional facts" required to defeat Defendants' Motion, *Schwarzenegger*, 374 F.3d at 800, while Defendants never claim the exercise of jurisdiction would be unreasonable.

### A.    The Defendants Purposefully Directed Their Activities At The Forum.

Because Activision's claims sound in tort, the appropriate inquiry is whether Defendants "purposefully direct[ed]" their activities at the United States.  *Mavrix*

1   *Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011).  To

2   establish "purposeful direction," this Court applies the "effects" test derived from

3   *Calder v. Jones*, 465 U.S. 783, 783 (1984).  This test "requires… the defendant

4   allegedly must have (1) committed an intentional act, (2) expressly aimed at the

5   forum state, (3) causing harm that the defendant knows is likely to be suffered in

6   the forum state." *Mavrix,* 647 F.3d at 1228.  The Ninth Circuit recently reaffirmed

7   "[j]urisdiction may be constitutionally maintained in such a scenario even if the

8   defendant never set foot in the forum state." *Burri Law PA v. Skurla*, 35 F.4th

9   1207, 1213 (9th Cir. 2022).  Activision has met its relatively light burden of proof

10   as to each of the three prongs.

11           **1.**       **Defendants Engaged In Intentional Acts.**

12       Defendants, both individually and collectively, engaged in numerous

13   "intentional acts" – *i.e.*, "actual, physical act[s] in the real world." *CYBERsitter,*

14   *LLC v. People's Republic of China*, 805 F. Supp. 2d 958, 969 (C.D. Cal. 2011).

15   Rick founded EO and at all times has been at the center of the operation, directing

16   and controlling all of the venture's activities, ranging from software development

17   to marketing.  As for the others, each of them engaged in a variety of acts in

18   furtherance of the venture.  They advertised and marketed the Cheats.  *See Blizzard*

19   *Ent., Inc. v. Joyfun Inc Co., Ltd.*, 2020 WL 1972284 at *6 (C.D. Cal. Feb. 7, 2020)

20   (intentional acts include "advertising the Infringing Game via platforms like

21   Facebook").  They set up social media chat rooms, two Discord servers, a

22   Telegram channel, and Steam "groups."  They recruited and corresponded with

23   resellers (including those in the U.S.)  They managed and oversaw the EO message

24   boards and posted thousands of messages, including updates, advice,

25   announcements, and payment assistance.  All of these activities were for one

26   purpose: to sell as many copies of the Cheats as possible.  And any one of these

27   acts is sufficient for liability.  *See Comcast of Illinois X, LLC. v. Hightech Elecs.,*

28   *Inc.*, 2004 WL 1718522, at *7 (N.D. Ill. July 29, 2004) (circumvention claim

against defendants who were "allegedly assisting sellers of illegal cable equipment in distributing such equipment.").

While each of the Defendants *individually* worked to further the purposes of the venture in the U.S., the overall contacts of the Enterprise also may be attributed to *all* of them, for at least two reasons:

*First, all* Defendants acted as "primary participants" in the unlawful conduct. *Calder*, 465 U.S. at 790 ("In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis.") Each therefore is subject to personal jurisdiction based on his active role in the Enterprise – and, specifically, his direct and critical role facilitating, encouraging, and ensuring the distribution of the Cheats in the U.S. *Allstar Mktg. Grp., LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1121 (C.D. Cal. 2009) ("[T]he uncontroverted allegation [individual defendants] personally participated and encouraged the sales of allegedly infringing products to this district… is sufficient to establish that they were the moving force behind the infringing activity."); *Wolf Designs, Inc. v. DHR Co.*, 322 F.Supp.2d 1065, 1072 (C.D. Cal. 2004) (personal jurisdiction where individual had "control of, and direct participation in the alleged activities."); *DirecTV, Inc. v. Leo*, 2010 WL 2740072, at *3 (C.D. Cal. July 8, 2010) (personal jurisdiction where "defendants committed intentional acts by participating in and overseeing the tortious activity..."); *Imageline, Inc. v. Mintskovsky*, 2009 WL 10672787, at *5 (C.D. Cal. June 16, 2009) (jurisdiction based on "uncontested allegations… that [defendant], through the CD Earth Web site, has conducted business, namely selling and distributing the allegedly infringing product, in California...")

*Second,* Activision's allegations establish Defendants are joint venturers in the Enterprise. Under California law, a joint venture is an undertaking by two or more persons jointly to carry out a for-profit enterprise with: (1) joint interest in a

common business; (2) an understanding to share profits and losses; and (3) a right to joint control. *Pepper, N.A. v. Expandi, Inc.*, 2016 WL 1611039, at *2 (N.D. Cal. Apr. 22, 2016). The law does not require any formality in the creation of a joint venture. *Id.* Each Defendant worked together in a common business, exercised joint control over the enterprise's resources (namely, the Website and the Cheats) and were primarily (if not solely) compensated by the sharing of profits or other benefits. *See* FAC ¶¶16-22 (several of Defendants are co-owners of the enterprise), ¶84 (sellers and resellers share profits). "[T]here is an abundance of persuasive authority holding that the contacts with the forum state of one co-joint venturer may be imputed to the other co-joint venturer for purposes of establishing personal jurisdiction in the forum[.]" *Finegan v. Autotransportes Tufesa S.A.* 2009 WL 331349, at *10 (D. Ariz. Feb. 11, 2009) (collecting cases); *see also Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 54 (1st Cir. 2002) (similar). As such, the contacts of each of the co-joint venture Defendants may be attributed to each other to support the exercise of jurisdiction.

### 2. Defendants "Expressly Aimed" Their Activities At The U.S.

#### a. Defendants Targeted The U.S. Market.

To determine whether an intentional act is "expressly aimed" at the forum, the Ninth Circuit requires allegations of conduct "indicat[ing] an intent or purpose to serve the market in the forum State." *Asahi Metal Indus. Co. v. Sup. Ct.,* 480 U.S. 102, 112 (1987). Examples of such conduct include "advertising in the forum, 'marketing the product through a distributor who has agreed to serve as the sales agent in the forum State,' and 'creat[ing], control[ling], or employ[ing] the distribution system that brought its [product] to' the forum." *Hendricks v. New Video Channel Am., LLC*, 2015 WL 3616983, at *6 (C.D. Cal. June 8, 2015) (*citing Asahi*, 480 U.S. at 112). Defendants engaged in all of that conduct, and as a result, thousands of U.S. players purchased and used the Cheats, generating millions of dollars in revenue for Defendants.

Mitchell
Silberberg &
Knupp LLP
15178858.1

19

***First***, Defendants – knowing there was a large market for the Cheats in the U.S. – created, controlled, and employed a distribution system intended to bring the Cheats to the U.S.  They created an English-language website, easily accessible to U.S. users, to market and sell the Cheats.  *See 3DO Co. v. Poptop Software, Inc.*, 1998 WL 962202, at *3 (N.D. Cal. Oct. 27, 1998) ("Defendants have posted a website, accessible by California residents, which permits users to download [infringing content].").  They set up two U.S.-based servers to ensure ease of access to the Cheats by U.S. users.  They accept credit cards in wide use in the United States, as well as payment systems they knew would be used primarily by U.S. users, such as Apple Pay.  Santiago, ¶¶6, 10.  To further deepen their reach into the U.S., Defendants recruited U.S. resellers, who make extensive sales into the U.S. and process direct payments in U.S. currency.  Mayer Ex. 18(b).  And though they knew that their conduct was unlawful (and that they were considered a "notorious market" by the U.S. game industry), Defendants chose not to block U.S. users.  *Lang Van*, 40 F.4th at 1042 (failure to geoblock indicates "intent to serve customers in the U.S. market," especially since defendant was included on a USTR "list of internet pirates.")

***Second***, Defendants market the Cheats to U.S. customers.  Defendants posted sales and promotions around U.S. holidays.  *See, e.g., Joyfun*, 2020 WL 1972284 at *6 (express aiming where defendant held events to coincide with U.S. holidays).  They offered coupon codes, which they distributed on U.S.-based social media websites such as Twitter.  *See* Mayer Exs. 13-15, generally.  They encouraged users to post promotional videos and TrustPilot reviews, giving free subscriptions to U.S. users who retweeted their content.  Mayer Ex. 27 at 182.

***Third,*** each of the Defendants engaged directly with U.S. players, including through the Website, Discord server, Twitter feed, or TrustPilot.  *Joyfun*, 2020 WL 1972284 at *6 (defendant, among other things, provided English-language chat rooms and communicated with users via Discord); *Metro-Goldwyn-Mayer Studios*

1    *Inc., v. Grokster, Ltd.*, 243 F. Supp. 2d 1073, 1087 (C.D. Cal. 2003) (relevant

2    factors are "whether the defendant encouraged residents of the forum state to

3    engage in relevant contacts with the defendant" and "whether the defendant

4    exchanged messages with forum residents...").  On the EO message board, each of

5    the Defendants helped U.S.-based customers with their purchases, provided

6    technical advice and support, and gave them advice as to how to cheat without

7    being caught.

8        **Fourth**, every time a U.S. customer purchased a subscription for the Cheats,

9    he or she entered into a continuing relationship with EO.  *See Colt Studio, Inc. v.*

10   *Badpuppy Enter.*, 75 F. Supp. 2d 1104, 1109-10 (C.D. Cal. 1999) ("The sale of

11   each subscription essentially involves an agreement between Badpuppy and a

12   consumer....").  This subscription agreement includes onerous (and likely illegal)

13   terms, such as: "you agree to renounce any cancellation right," and "[t]hese terms

14   may be changed at any time without notice."  Mayer Ex. 8.

15           **b.      Defendants Knowingly Targeted Activision.**

16       Defendants also individually targeted **Activision**, which they knew was a

17   U.S. company.  *See Blizzard Ent., Inc., v. Bossland GmbH*, 2017 WL 412262, at *4

18   (C.D. Cal. Jan. 25, 2017) ("Bossland had to anticipate that Blizzard, a company

19   well known to be based in the United States, would suffer loss in the United States

20   as a result of Bossland's software.")  They did so **knowing** their conduct was

21   unlawful and would cause harm to Activision and its customers in the U.S.  *Lang*

22   *Van*, 40 F.4th at 1041 ("VNG purposefully targeted American companies and their

23   intellectual property.")

24       "[T]he Ninth Circuit has held that specific jurisdiction exists where a

25   plaintiff … alleges that defendant intentionally infringed its intellectual property

26   rights knowing [the plaintiff] was located in the forum state.'"  *Cal Brewing Co. v.*

27   *3 Daughters Brewing LLC*, 2016 WL 1573399, at *3 (E.D. Cal. Apr. 19, 2016);

28   *Burri Law*, 35 F.4th at 1215 (defendant engages in express aiming when conduct is

1  "for the very purpose of having their consequences felt in the forum state."); *Amini*

2  *Innovation Corp. v. JS Imports, Inc.*, 497 F. Supp. 2d 1093, 1106 (C.D. Cal. 2007)

3  (specific jurisdiction "where a plaintiff brings suit in its home forum against an

4  out-of-state defendant, alleging that the defendant engaged in infringing activities

5  knowing that plaintiff was located in the forum.")

6      Defendants target Activision in every possible way.  The Website features

7  Activision logos, screen captures, and videos.  *Lang Van*, 40 F.4th at 1041.

8  Defendants mock Activision incessantly for their amusement.  Defendants

9  leveraged Activision's own Twitter feeds for their benefit.  Defendants sabotage

10  promotional events.  Defendants even harass Activision's U.S. lawyers, flouting

11  the most basic standards of professionalism.  But most critically, the Cheats, ***by***

12  ***design*,** are intended to harm Activision.  The Cheating Software has absolutely no

13  purpose ***but*** to harm Activision's Games.  They cannot be used with any products

14  other than the COD Games.  They cannot be used without circumventing

15  Activision's anti-cheat software and without breaching Activision's TOU.

16      In *Bossland*, Activision's affiliate Blizzard brought claims against a

17  German-based company engaged in the development and distribution of cheating

18  software.  The defendant moved to dismiss for lack of personal jurisdiction.  The

19  Court denied the motion, finding the sale of cheating software was an "intentional

20  act," and by selling software in the U.S., defendant had aimed its conduct at the

21  U.S. – and at Blizzard in particular:

22      "Bossland's business is parasitic in nature – it functions
       by piggybacking on Blizzard's sale of its games and
23      undermining the gaming environment Blizzard is seeking
       to create.  But like a direct competitor, Bossland's actions
24      are pointedly undermining Blizzard's brand and
       profitability.  Indeed, Bossland's activity is even more
25      intermeshed with Blizzard's business than a direct
       competitor's would be, as Bossland's products can be
26      used only after a person has already purchased a Blizzard
       game."  2017 WL at *6.
27

28

Mitchell
Silberberg &
Knupp LLP

15178858.1

22

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

Likewise here, the Cheats are parasitic software products aimed directly at Activision, with no purpose other than to harm Activision and its products.

### 3.     The Harm to Activision Was Expected And Intended.

"[A] corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business."  *CollegeSource, Inc. v. AcademyOne, Inc.,* 653 F. 3d 1066, 1079 (9th Cir. 2011).  It obviously was foreseeable – and Defendants knew – that the distribution of the Cheats would harm Activision in the U.S.

### B.     <u>The Exercise of Jurisdiction Is Not Unreasonable.</u>

The Ninth Circuit considers seven factors in determining reasonableness.  *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002).  Defendants have not addressed ***any*** of these factors – far less attempted to make a "***compelling case***" that jurisdiction is so unreasonable as to violate due process.

**(i)     Extent of Purposeful Interjection**.  Defendants injected themselves into the U.S. market by marketing and promoting the Cheats, causing them to be distributed in the U.S., and offering support to U.S. customers —all with the intent to harm Activision and its games.  *See AMA Multimedia LLC v. Sagan Ltd.*, 2016 WL 5946051, at *5 (D. Ariz. Oct. 13, 2016) (defendant's website targeted the U.S. market).

**(ii)     Burden of Defending in the Forum.**  "[I]n almost any case where the defendant does not reside in the forum state, some additional inconvenience is inevitable." *Indiana Plumbing Supply, Inc. v. Standard of Lynn, Inc.*, 880 F. Supp. 743, 748 (C.D. Cal. 1995).  As further discussed below, Defendants' burden of defending this case is not unreasonable, especially given the degree to which they targeted Activision and its products.

**(iii)     Extent of Conflict With the Sovereignty of the Defendants' State.** There is no conflict with the sovereignty of Germany, since this lawsuit addresses Defendants' violations of Activision's rights in the ***U.S.  See LiveCareer Ltd v. Su***

*Jia Techs. Ltd.*, 2015 WL 1448505, at *9 (N.D. Cal. Mar. 31, 2015) ("Here, although Cyprus has some interest in regulating the conduct of its corporations, [plaintiff's] complaint only raises questions of U.S. law.").  This Court need not adjudicate any issues of German law.

(iv)    **Forum State's Interest in Adjudicating the Dispute.**  U.S. courts have a particular interest in protecting Activision – a U.S. company with a significant U.S. presence.  *See AMA*, 2016 WL 5946051, at *7 ("The United States has a significant interest in resolving disputes of United States copyright law involving infringement by foreign defendants.")  This Court also has an interest in protecting U.S. consumers from foreign bad actors who seek to ruin a paid entertainment experience for their own profit.

(v)    **Most Efficient Judicial Resolution of the Controversy.**  Because this dispute involves infringements in the U.S., under U.S. copyright law, a court in Germany cannot as effectively or efficiently decide the issues presented here. Krueger ¶¶12-20.

(vi)    **Importance of the Forum to the Plaintiff's Interest in Convenient and Effective Relief**.  Activision can only effectively and conveniently obtain relief for its U.S. federal law claims in a U.S. Court.  Krueger ¶¶12-20.

(vii)   **Existence of an Alternative Forum**.  As set forth below, Activision cannot have this lawsuit adjudicated by a German court, since that Court will not have jurisdiction over the U.S. Defendants.

## III.    DEFENDANTS CANNOT MEET THEIR BURDEN OF PROVING *FORUM NON CONVENIENS* DISMISSAL IS WARRANTED.

Defendants correctly note that to obtain dismissal of the action on *forum non conveniens* grounds they must show: "(1) the existence of an adequate alternative forum, and (2) the balance of private and public interest factors favors dismissal." *Boston Telecom. Grp., Inc. v. Wood,* 588 F.3d 1201, 1206 (9th Cir. 2009).  But Defendants ignore that "the doctrine of *forum non conveniens* is an ***exceptional***

*tool* to be employed *sparingly*." *Gutierrez v. Advanced Med. Optics, Inc.*, 640 F.3d 1025, 1029 (9th Cir. 2011) (emphasis added.)  "Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Wood*, 588 F.3d at 1207.  Put another way, the defendant must make a "clear showing of facts which establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience." *Id.* at 1212.

Defendants' burden of proof is especially high because California-based Activision filed this lawsuit in its home forum.  "The *forum non conveniens* analysis introduces a *presumption* that litigation is convenient in the plaintiff's chosen forum when a domestic plaintiff sues at home." *Cooper v. Tokyo Elec. Power Co.*, 860 F.3d 1193, 1210-11 (9th Cir. 2017) (emphasis added).  "[A] real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown." *Piper Aircraft v. Reyno*, 454 U.S. 235, 255 n.3 (1981)*; see also Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1229 (9th Cir. 2011) (U.S.-based plaintiff entitled to a "strong presumption that its choice of forum was convenient.").

Defendants cannot meet their heavy burden of proof on either prong of the *forum non conveniens* test.  Not only would a German court be unable to adjudicate this dispute (a fact which alone is dispositive), but Defendants do not point to any serious burden not present in every case against a foreign defendant.  Defendants knew they might have to attend trial in the U.S. when they targeted Activision, and it is not unfair or unreasonable for them to do so.  *In re Amwest Ins. Grp., Inc.*, 285 B.R. 447, 456 (Bankr. C.D. Cal. 2002) ("[d]ebtor assumed the risk of faraway litigation by engaging in business in Nebraska [and thus] should bear the risk of having to litigate in a forum non conveniens").

### A.   <u>Germany Is Not An Adequate Alternative Forum.</u>

Defendants' "adequacy" argument focuses exclusively on whether *they* would be subject to jurisdiction in a German court.  However, Defendants ignore

Mitchell Silberberg & Knupp LLP

15178858.1

1  that "key in this analysis is the availability of an alternative forum where *all*

2  defendants are amenable to personal jurisdiction."  *See Grokster,* 243 F. Supp. 2d

3  at 1095 (emphasis in original); *Alpine View Co. v. Atlas Copco AB,* 205 F.3d 208,

4  221 (5th Cir. 2000) ("A foreign forum is available when the entire case and *all*

5  *parties* can come within the jurisdiction of that forum.") (emphasis added); *Lans v.*

6  *Adduci Mastriani & Schaumberg L.L.P.,* 786 F. Supp. 2d 240, 291 (D.D.C. 2011)

7  (emphasis added) ("there is wide-ranging consensus among the various Circuits

8  that a dismissal based on *forum non conveniens* requires… the alternate forum

9  have jurisdiction over *all* of the moving party's co-defendants." (emphasis added)).

10       Several defendants in this action are *not* amenable to jurisdiction in

11  Germany (and have not consented to jurisdiction), including at least one corporate

12  defendant (Garnatz) and *six* individuals: Jondah (UK), Byrd (U.S.), Masias (U.S.),

13  Baldwin (U.S.), Median (U.S.), Cartigny (Netherlands).  Defendants also now

14  claim the Enterprise is based in the U.A.E., evidently hoping a U.A.E. shell entity

15  would escape jurisdiction in Germany.  At minimum, if the case against

16  Defendants were dismissed Activision would be required to litigate (at least) *two*

17  actions – one in Germany against certain defendants, and another in the U.S.

18  against the remaining defendants.

19       **B.    Defendants Have Not Met Their Burden Of Proving The Private**

20              **And Public Interest Factors Support Dismissal.**

21       Defendants' recitation of the various "public" and "private" interest factors

22  do not even come close to meeting their heavy burden of proof.  The *only*

23  purported "burden" Defendants claim they will suffer are the relatively small travel

24  and hotel costs ($2,000-$3,000 per Defendant) and the inconvenience of traveling

25  to the U.S. for a few days.[3]  Defendants' claims ring hollow in light of their receipt

26  of millions of dollars from U.S. sales of the Cheats.  If Defendants have money to

27

28  [3] Some of these travel costs are exaggerated and include business class tickets.
    *See, e.g.,* Rick [ECF 68-15] Ex. A.

set up Dubai corporations and buy drugs, buy sports cars, and live in presidential suites they certainly have the financial wherewithal to buy a plane ticket. Meanwhile, Defendants do not identify a single witness unable to attend trial or sit for deposition in the U.S., a single document or piece of evidence not easily transportable, or any other disproportionate "oppressiveness and vexation." *Carijano*, 643 F.3d at 1234. The mild inconvenience of traveling to California for trial is hardly sufficient to justify the "exceptional" tool of *forum non conveniens,* especially given the deliberate manner in which Defendants have exploited the U.S. market and Activision's intellectual property.

Defendants' only other basis for *forum non conveniens* is that the **European** distributor of the COD Games (Activision Blizzard International, B.V.) brought unfair competition claims under **German** law in Ingolstadt, Germany against two of the ten Defendants: Rick and EngineOwning UG. That case is not "parallel" litigation, is very different from this Action, and does not justify dismissal of this case – whether for convenience or other reasons. Contrary to the fake document Defendants submitted to the Court, Activision is **not** a party to the Ingolstadt Action. The Ingolstadt Action does not require testimony from Activision's U.S. employees; it does not include most of the Defendants; it does not address distribution in the United States; it will not adjudicate any issues of U.S. law; it does not (and cannot) seek damages for U.S. sales; and it does not (and cannot) include claims for trafficking in circumvention software, trademark infringement, and violation of the RICO statute. Krueger ¶¶12-20. *Cabell v. Zorro Prods.*, 2017 WL 2335597, *13, *19-20 (N.D. Cal. May 30, 2017) (denying *forum non conveniens* in copyright case with parallel German litigation because "Plaintiff asserts claims under U.S. law that are distinct and independent of the German lawsuits, and alleges specific facts concerning events that occurred on U.S. soil.")

Regardless, the mere existence of a pending case (even a truly parallel case, which the Ingolstadt Action is not) cannot alone justify *forum non conveniens*

1    dismissal.  *Guidi v. Inter-Cont'l Hotels Corp.*, 224 F. 3d 142 (2d Cir. 2000) ("The

2    existence of related litigation… is not listed as a relevant factor in the forum non

3    conveniens analysis laid out in [*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)].")

4                    **1.      Private Interest Factors**

5          Litigating this case in Germany would not serve any interests of efficiency

6    or convenience; it would only shift the inconvenience to Activision; deprive

7    Activision of access to key witnesses, third party documents, and deposition

8    testimony; and unfairly force Activision to submit U.S. claims to a German court.

9    *Lang Van*, 40 F.4th at 1043 (overseas litigation "is clearly not more convenient for

10   [plaintiff], which is a California corporation, with its principal place of business in

11   California.").

12         **Residence of Parties and Witnesses.**  Activision is a resident of California,

13   as are its witnesses.  It is not a "resident of Germany."  Mot. 35.  Nor are the U.S.

14   defendants "make weight."  *Id.* at 34.  Each of the U.S. defendants knowingly

15   distributed the Cheats in the U.S., making them directly (and jointly) liable for

16   trafficking in circumvention technology.  *See, e.g., Dish Network LLC v. Barnaby*,

17   2016 WL 6603202, at *3 (E.D. Tenn. Nov. 8, 2016) (defendants trafficked in

18   circumvention technology when they purchased and sold passcodes).

19         Defendants also fail to specifically identify *any* third party witnesses located

20   in Germany – a fatal omission from their argument.  *See CYBERsitter, LLC v.

21   People's Republic of China ("CYBERsitter I")*, 2010 WL 4909958 at *6 (C.D. Cal.

22   Nov. 18, 2010) (moving party must identify specific "witnesses that would

23   potentially testify at trial" and describe "'the materiality and importance of the

24   anticipated … witnesses' testimony or evidence.'").  In fact, most critical party and

25   third party witnesses are located in California, including:

26         ●     Members of the COD business team, who will testify concerning the

27   impact the Cheats have had on the Games; the remedial efforts taken by Activision

28

Mitchell
Silberberg &
Knupp LLP

15178858.1

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

to combat the Cheats; and the loss in Activision's revenue from the Cheats. Activision ¶18(a).

● Activision's custodian of records, who will authenticate documents concerning the prevalence of the Cheats and customer reactions to them. *Id.* ¶18(b).

● Representatives of platforms (e.g., Discord, Twitter, TrustPilot) used by Defendants to market and sell the Cheats. *Id.* ¶18(c).

● Representatives of payment processors used by Defendants, who possess information concerning U.S. sales of the Cheats. *Id.* ¶18(d).

● U.S.-based resellers of the Cheats, who will testify concerning their recruitment by EO and their sales to U.S. customers. *Id.* ¶18(e).

**Convenience to the Litigants / Costs of Bringing Witnesses to Trial.** Defendants cannot dispute that litigating this case in Germany would be inconvenient for Activision and its representatives. *See Via Techs., Inc. v. Asus Comput. Int'l*, 2015 WL 3809382, at *8 (N.D. Cal. June 18, 2015) ("Though Defendants may bear costs to transport witnesses to this district, Plaintiffs would be subject to a reciprocal burden were the case to be dismissed and instead litigated in Taiwan."). Activision's witnesses are not fluent in German, and any testimony would require the use of an interpreter. Activision ¶19.

As for Defendants, the only purported "hardship" is the cost of their travel (which would be shifted to Activision if the case were dismissed) and the time spent at the trial (which would be the same in either venue.) These inconveniences are the cost of doing business in the United States and faced by every foreign defendant. *See Mintel Learning Tech., Inc. v. Beijing Kaidi Educ. & Tech. Dev. Co..*, 2007 WL 2403395, *10 (N.D. Cal. Aug. 20, 2007) ("[T]he cost of transporting witnesses would be generally the same for [each] part[y], whether the trial took place in California or China"); *CYBERsitter I*, 2010 WL 4909958, at *7 ("Even if Sony did show that Defendants incurred more in international travel

expenses by transporting witnesses to California than Solid Oak would transporting witnesses to China, this still would not amount to 'oppressiveness and vexation' to Sony 'out of all proportion to [Solid Oak's] convenience.").[4] Moreover, since Defendants speak (and read) English, they can testify in the U.S. without an interpreter.

**Physical Evidence.**  Defendants' only argument is that some (unidentified) documents and information are on "electronic devices" located in Germany.  This is not a serious burden; all of this digital data can be easily transmitted to the United States.  *Doe v. Epic Games, Inc.*, 435 F.Supp.3d 1024, 1042 (N.D. Cal. 2020) ("[I]n the age of electronically stored information, the ease of access to evidence is neutral because much of the evidence in this case will be electronic documents, which are relatively easy to obtain in any district").  Moreover, because the relevant evidence in this case is in English, trial in Germany would require extensive translation.

**Compelling Testimony of Unwilling Witnesses.**  As noted below, key witnesses could not be compelled to testify in a German court, including the U.S.-based resellers, U.S. players who purchased and used the Cheats, U.S. players who quit playing the COD Games due to rampant cheating, and U.S.-based payment processors who possess relevant financial data.

**Enforceability of Judgment.**  A judgment in the German court would be inadequate, because the German court lacks the ability to issue injunctive relief against conduct occurring outside Germany, including sales of the Cheating Software in the U.S.  Krueger ¶15.  By contrast, a monetary judgment in the U.S. would be enforceable against Defendants in Germany.  Fedtke [ECF 68-5] at 14

---

[4]  To the extent any Defendants claim they have family care or health issues, there are many tools to alleviate any specific logistical burden, *e.g.*, allowing testimony by videoconference.

1 ("Foreign judgments issued by courts of countries *outside* the EU are generally

2 recognized and enforced in Germany.")

3     **Other Practical Problems.**  In a last-ditch effort to tilt the balance,

4 Defendants object to the expense of the U.S. action because it "duplicates and

5 multiples[sic]" the Ingolstadt Action, and German legal fees are less than U.S.

6 legal fees.  As noted, there is no duplication: the claims, parties, witness, and

7 remedies are completely different.  Defendants' "fee cap" argument is based on the

8 limited damages sought in the Ingolstadt action.  Much more is at stake in this

9 action.  The cost of litigation in Germany (including court fees) is likely to exceed

10 $3 million, which is ***more*** costly than U.S. litigation is likely to be.  Mayer ¶100.

                 **2.**      **Public Interest Factors**

12     **Local Interest.**  There is a very strong local interest in protecting a

13 California-based company ***and*** its U.S. customers from the sale of malicious

14 software deliberately designed to harm its business.  *Dole Food Co. v. Watts,* 303

15 F.3d 1104, 1119 (9th Cir. 2002) ("California has an interest in protecting

16 corporations based in California.").  That Defendants engaged in their unlawful

17 activities over the Internet from overseas does not negate this strong interest.  *See*

18 *Wood*, 588 F.3d at 1212 ("[W]ith this [public] interest factor, we ask only if there

19 is an identifiable local interest in the controversy, not whether another forum also

20 has an interest.")  Dismissal of this action would only encourage bad actors like

21 Defendants to engage in unlawful activities targeting U.S. companies, believing

22 themselves immune from U.S. liability.

23     **Familiarity With Governing Law.**  Activision has ***only*** asserted claims

24 under U.S. law, and not under German law or the laws of any other country.

25 Defendants' own expert concedes that a German court would be required to apply

26 U.S. law in this case.  *See* Fedtke at 8 ("Violations that affect a foreign market can

27 be pursued in German courts under the laws of the relevant foreign jurisdiction (in

28 this case U.S. law).")  *See Heriot v. Byrne*, 2008 WL 4874297, *6 (N.D. Ill. July

21, 2008) (denying motion to dismiss where copyright infringement and unjust enrichment claims are "governed by U.S. law and state law.").

**Burden on Local Courts.**  There will be no undue burden on this Court or a local jury in litigating this case.  Nor will the jury be required to "untangle" any complex legal or factual issues to decide this case.  (In fact, Defendants' liability is clear and its technology is not subject to dispute.)

**Court Congestion.**  Dismissal of the claims against Defendants would not ease any court congestion, because the claims against the U.S. defendants will continue.  Regardless, Defendants have not offered any evidence concerning the relative court congestion in Germany.  *See Dole,* 303 F.3d at 1119 ("There is no evidence before us about relative court congestion in The Netherlands and in California.")  Regardless, "it is unfair for a court to subject a United States corporation to the courts of another country merely because plaintiff's home country courts are congested."  *Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1337 (9th Cir. 1984).

**Costs of Resolving A Dispute Unrelated To The Forum.**  As noted, this dispute is directly related to this forum, which is where Activision is located and where the injury occurred.  *CYBERsitter I*, 2010 WL 4909958 at *8 ("Because [plaintiff's] principal place of business is in the Central District of California and it alleges harms committed by foreign defendants, this court has a particular interest in adjudicating the matter.")

## IV.   NO "EXCEPTIONAL CIRCUMSTANCES" SUPPORT THE SURRENDER OF JURISDICTION UNDER COMITY PRINCIPLES.

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. DE C.V.,* 412 F.3d 418, 423 (2d Cir.

2005).  However, "in order for a court to decline jurisdiction on grounds of international comity, it must find 'exceptional circumstances exist that justify the surrender of that jurisdiction.'"  *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.,* 896 F.3d 174, 190 (2d Cir. 2018) (*quoting Royal & Sun All. Ins. Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 93 (2d Cir. 2006)).

Even if the Ingolstadt Action was "parallel" (which it is not), the mere existence of parallel litigation in a foreign jurisdiction "does not negate the district courts' 'virtually unflagging obligation... to exercise the jurisdiction given them." *Leopard*, 896 F.3d at 190.  Put another way, "[t]he exceptional circumstances that would support such a surrender [of jurisdiction] must, of course, raise considerations which are not generally present as a result of parallel litigation, otherwise the routine would be considered exceptional, and a district court's unflagging obligation to exercise its jurisdiction would become merely a polite request."  *Id.*

Defendants cannot point to any "exceptional circumstances" present here. To the contrary, this action and the Ingolstadt Action involve completely different parties, different claims, different witnesses, and different conduct.  The Ingolstadt Action is limited to the conduct of just two Defendants *in Germany*, and seeks relief based on the damage caused to the *European* distributor of the COD Games. The plaintiff in the Ingolstadt Action does not seek damages for U.S. sales of the Cheats, and did not assert claims for trafficking in anti-circumvention devices, trademark infringement, violation of the Computer Fraud and Abuse Act, RICO, or conspiracy.  Indeed, the *only* similar claim in the two actions is the claim for intentional interference with contract.  But the Ingolstadt Action addresses the contractual relationship between the Netherlands plaintiff and its *European* customers, while this action deals with *Activision's* contracts with its *U.S.* players. Accordingly, there is absolutely no conflict or inconsistency between the two

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

Mitchell
Silberberg &
Knupp LLP
15178858.1

1   actions, and a judgment in the Ingostadt Action would not have any bearing or

2   impact on this action.[5]  Abstention would be wholly unjustified here.

3   **V.     DEFENDANTS' RULE 12(b)(6) ARGUMENTS ARE MERITLESS.**

4        **A.     <u>Activision Did Not Rely On Impermissible "Group Pleading."</u>**

5        Rule 8 requires a "short and plain statement" of the plaintiff's claims and

6   grounds for jurisdiction.  Fed. R. Civ. P. 8(a)(1),(2).  In order to explain *concisely*

7   how a large network of individuals together carry out multiple, intertwined courses

8   of complex conduct, a plaintiff is permitted to make shorthand reference to conduct

9   carried out by all "defendants" (working together), and/or to defined sub-groupings

10  of defendants.  *See, e.g., ConsumerDirect, Inc. v. Pentius, LLC*, 2022 WL

11  1585702, at *5–6 (C.D. Cal. Apr. 4, 2022).

12       Plaintiff's complaint necessarily employs both of these drafting tools.  This

13  shorthand, in service of Rule 8-*required* brevity and clarity, is permissible so long

14  as "group pleading is limited to defendants who are similarly situated[,]"  *Parity*

15  *Networks, LLC v. Moxa Inc.*, 2020 WL 6064636, at *3 (C.D. Cal. Sept. 11, 2020),

16  and "it can be reasonably inferred that" allegations made against all defendants are

17  also made "against each individual defendant[,]"  *Celgard, LLC v. Shenzhen Senior*

18  *Tech. Material Co. (US) Rsch. Inst.*, 2021 WL 9763371, at *5 (N.D. Cal. Feb. 8,

19  2021).  *See also In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d

20  1033, 1059 (S.D. Cal. 2017) ("some level of group pleading is permissible[,]" if

21

22  _____

    [5] Because the Ingolstadt Action and this action are not parallel and are not in

23  conflict, analysis of the *Mujica v. AirScan Inc*., 771 F.3d 580, 603 (9th Cir. 2014)

    test is unnecessary.  Nevertheless, each of the factors plainly supports the exercise

24  of jurisdiction: (1) the conduct at issue in this lawsuit took place in the U.S., where

    the Cheats were distributed, the Activision servers were improperly accessed, and

25  Activision's contracts were breached; (2) Activision and several of the defendants

    are U.S. residents; (3) the conduct at issue targeted a U.S. company and U.S. users;

26  (4) this lawsuit will not impact any U.S. foreign policy interests, and (5) there is a

    strong public policy in favor of protecting U.S. companies from misconduct by

27  foreign actors.

not common, so long as "the Court is able to discern that these groups, and their actions, include" the individual defendants).

Defendants, for their part, do not claim any difficulty understanding that references to "Defendants" means each defendant individually undertook the conduct alleged through his specified role within EO.  Defendants also do not argue Plaintiff's use of sub-groupings of defendants who are similarly situated (e.g., "Corporate Defendants," "Owners and Founders," "Software Developers") is unclear or confusing.  Nor could they, as the Complaint identifies and explains the roles of each group and the roles of each individual *within* each group.  *See* FAC ¶¶14-67.  Where, as here, a complaint "contains details about the structure and content" of a complex enterprise along with allegations about the role of each defendant therein, "it would be a meaningless exercise to force [a plaintiff] to re-allege that [defendants] were individually involved in" any more specific activity "when the Court can already see that." *Packaged Seafood*, 242 F. Supp. 3d at 1059.

It also is not the case that "Plaintiff fails to aver any particular conduct to any particular defendant[.]" Mot. 42.  The role of each individual Defendant is alleged with considerable detail, both discretely and vis-à-vis the larger context of the alleged inner workings of EO.  Activision alleges EO is a "commercial enterprise" consisting of a "German business entity and more than a dozen individuals" who work together to operate the "Website" and sell cheats for COD Games, both directly and through "resellers[,]" also recruited through the website. FAC ¶2.  Activision identifies the specific roles of each Defendant within the Enterprise, including conduct undertaken by each to support the website and sales of cheats.  FAC ¶¶ 17-18, 20-22, 29, 30-31, 43.

Courts within this Circuit consistently confirm allegations similar to, if not far less detailed than, those here are sufficient to give notice.  *Parity*, 2020 WL 6064636, at *3 (permissible group pleading put defendants on notice of each

1   defendant's general role in the conduct with allegation one entity was the "sales

2   arm" of the other); *Centaur Classic Convertible Arbitrage Fund Ltd. v.*

3   *Countrywide Fin. Corp.*, 793 F. Supp. 2d 1138, 1145 (C.D. Cal. 2011) (same

4   where the complaint also contained "individualized allegations"); *ConsumerDirect,*

5   *Inc.*, 2022 WL 1585702, at *5–6 (allegations properly "delineate different roles for

6   the different defendants").  Defendants cannot claim any genuine confusion or lack

7   of notice regarding what conduct allegedly caused the harm Activision now

8   claims.[6]

9       **B.    Activision Has Stated A RICO Claim.**

10      Activision alleges in detail how each Defendant, working together and

11  separately: 1) conducts or otherwise participates in a RICO "enterprise," which is

12  2) engaged in a pattern of "racketeering activity" within the meaning of 18 U.S.C.

13  § 1962(c).  FAC ¶¶ 144-151.  Defendants do not dispute Activision has fully

14  pleaded the Enterprise qualifies as a RICO enterprise, has a common and

15  continuing purpose, and is dedicated to a common course of conduct, *i.e.*, a

16  "complex and multi-stage development and sales operation" to market and

17  distribute the Cheats in the U.S.  *Id.* ¶ 148.  Defendants' only argument – that

18  Activision fails to "specify any particular act performed by any particular

19  defendant"– ignores the many allegations that do just that in detail.

20      Activision alleges participation in, and conduct of, the enterprise within the

21  definition of §1962(c) includes sales and marketing activity of "a network of

22  sellers and resellers," FAC ¶ 154, as well as creators and "moderators" of "groups"

23

24  [6]  The cases Defendants rely upon are inapposite because they each involve
25  pleading problems "other than the fact that [plaintiff] used group pleading,"
    *Celgard*, 2021 WL 9763371 at *5.  *See* Mot. 42-43 (*citing, e.g., 818 Media Prods.,*
26  *LLC v. Wells Fargo Bank, N.A.*, 2017 WL 3049565, at *4 (C.D. Cal. Feb. 9, 2017))
27  (allegations refer to both Defendants "only 'sometimes,' leaving the parties and the
    Court to guess which allegations involve both entities, and which only a specific
28  entity.").

Mitchell
Silberberg &
Knupp LLP

15178858.1

36

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

and "chat rooms" promoting the Cheating Software and providing "customer" and "technical" support to purchasers, *id.* ¶¶148, 153.  Activision specifies how each of the Defendants has been involved in precisely each of those efforts.  *See id.* ¶¶22, 29, 30-31, 43.  Activision also alleges repeatedly that the enterprise is carried out through the Website, *id.* ¶¶1-2, 12, 82-83, and the resources of the enterprise include website accounts, groups, and various materials made available on, or hosted by, the Website, *id.* ¶¶84, 153.  Activision alleges "administrators" act to "operate and maintain" those resources, and several of the Defendants are "administrators."  *See id.* ¶¶17, 18, 20-21.

As for racketeering activity, Activision alleges *two* RICO predicate acts: violations of the Access Device Statute and Wire Fraud.  Defendants concede the former is properly pleaded, but argue the specific nature or manner of acts of fraud are not identified.  Mot. 44.  To the contrary, Activision particularly alleges acts of fraud occurred when each of the Defendants "signed Activision's TOU under false pretenses in order to gain the benefit of the contract" at multiple times over the past several years, as far back as 2012.  FAC ¶161.  This is specific enough to identify "the factual circumstances surrounding the fraud with particularity."  *Shuler v. Walter E. Heller W. Inc.*, 956 F.2d 1168, 1168 (9th Cir. 1992) ("The fraud was entering into the... agreement with only a limited intention of performing.  This is a sufficient averment.") (*quoting Walling v. Beverly Enterps.,* 476 F.2d 393, 397 (9th Cir.1973)).

**C.    Activision Has Stated A Section 43(a) Claim**

To state a claim for false designation of origin under the Lanham Act, a plaintiff must allege the defendant: (1) used a designation or false designation of origin, (2) the use was in interstate commerce, (3) the use was in connection with goods or services, (4) the designation or false designation is likely to cause confusion as to its connection with another person, and (5) the plaintiff has been or

is likely to be damaged by these acts. *SKWS Enterprises, Inc. v. Levonchuck*, 2018 WL 11351584, at *2 (C.D. Cal. Apr. 2, 2018).

Defendants admit Activision has alleged all of the elements of the claim. There is no dispute: Defendants used **identical** copies of Activision's distinctive COD logos in marketing their products; the COD Games' titles and logos are strong marks; and the Cheats are related to the COD Games. Defendants' only argument is simply that because of the **nature** of Defendants' business (offering cheating software), a potential consumer could not possibly believe Activision was affiliated with, sponsored, or endorsed EO. But a plaintiff "is not required to prove the likelihood of confusion at the pleading stage." *Charisma Brands, LLC v. AMDL Collections, Inc.*, 2019 WL 6331399, at *4 (C.D. Cal. Sept. 3, 2019). Instead, "the likelihood of confusion is a fact-specific inquiry best left for decision after discovery" and "[a]t the pleading stage, a plaintiff simply must plausibly allege, in a manner sufficient under the *Iqbal/Twombly* standard, a likelihood of confusion between the marks."[7] *Id.*

It is not implausible a consumer visiting the Website would mistakenly believe Activision authorized or otherwise was associated with EO's business – especially given the number of COD-related products Defendants sell, the extensive use of COD logos and imagery, the prominent use of "Warzone Victory!" on the Website, and the absence of any clear or prominent disclaimer. The likelihood of confusion issue should not be decided at the pleading stage and should be subject to further factual development.

### D. Activision Has Stated A Claim For Violation of the CFAA.

Activision alleges that by marketing, distributing, and encouraging customers to use their Spoofer (which trick or circumvent Activision's HWID bans), Defendants "knowingly aided and abetted, conspired with, or otherwise

---

[7] Defendants' suggestion they do not affirmatively "trick" customers (Mot. 48) is beside the point; all that is required is to allege consumers are likely to be confused as to Activision's affiliation with EO.

caused" players of the COD Games who lost access to Activision's COD servers to intentionally access those servers without authorization.  Alleging the use of a spoofer to overcome a loss of authorized access and gain access to a restricted server is sufficient to make out a CFAA violation.  *See, e.g., Niantic, Inc. v. Global++*, 2019 WL 8333451, at *6-7 (N.D. Cal. Sept. 26, 2019).  Defendants' only claim (without support) is that ***they*** cannot be liable for that violation because they did not ***personally*** access the server but instead aided and abetted, facilitated, or induced the violation.

Defendants' argument fails.  It is settled law that the CFAA ***does*** in fact encompass acts of aiding and abetting unauthorized access to a protected computer server.  *United States v. Nosal,* 844 F.3d 1024, 1040-41 (9th Cir. 2016); *COR Sec. Holdings Inc v. Banc of California, N.A*, 2018 WL 4860032, at *7–8 (C.D. Cal. Feb. 12, 2018) ("[T]he Ninth Circuit implicitly recognized aiding and abetting liability under the CFAA, at least for criminal violations.").  Moreover, "numerous courts have recognized that vicarious or indirect liability under section 1030(g) extends to parties who direct, encourage, or induce others to commit acts that violate the statute."  *Ryanair DAC v. Booking Holdings Inc.*, 2022 WL 13946243, at *3–4 (D. Del. Oct. 24, 2022) (collecting cases)*; see also Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1067 (9th Cir. 2016) ("Once permission [to access a computer] has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability.")

Finally, even if there were some basis to conclude the statute did not encompass "aiding and abetting" or secondary liability, the statute ***on its face*** encompasses the act of "conspiring" to commit a violation.  17 U.S.C. § 1030(b).  Activision sufficiently alleged Defendants "conspired" to gain unauthorized access to Activision's protected servers.

E.   **Defendants' Invocation of Extraterritoriality Is Meritless.**

Defendants' cursory argument the claims in this case implicate extraterritoriality principles is baseless.  Relying on largely outdated authorities, Defendants completely ignore the Supreme Court's prevailing "two-step framework for analyzing extraterritoriality issues":

> First, the Court asks … whether the statute gives a clear, affirmative indication that it applies extraterritorially.  If … the statute is not found extraterritorial at step one, the Court moves to step two, where it examines the statute's "focus" to determine whether the case involves a domestic application of the statute.  If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad.

*RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 326 (2016).  Applying this framework to the statutory claims at issue here, Defendants' brief extraterritoriality arguments are a "red herring[.]"  *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1073–74 (S.D. Cal. 2019).

1.   **The Lanham Act, CFAA, and RICO Apply Extraterritorially.**

Defendants primarily base their extraterritoriality challenge upon a single, unsupported assertion: "[n]one of the federal statutes" underlying claims in this case "has any clear indication that they were meant to apply" extraterritorially as a matter of statutory interpretation.  Mot. 49.  Settled law easily disproves that argument with regard to three of the four federal statutes at issue here.

*First*, "the text of the CFAA provides a clear indication of extraterritorial application."  *See In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 448–49 (N.D. Cal. 2018).  Plaintiff alleges Defendants' conduct caused unauthorized access and damage to a "protected computer[,]" FAC ¶123, which is defined to include any computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United

States….” 18 U.S.C. § 1030(e)(2)(B).  This “definition is as clear an indication as possible short of saying ‘this law applies abroad.’” *In re Apple Inc.*, 347 F. Supp. 3d at 448–49; *see also Ryanair DAC v. Expedia Inc.*, 2018 WL 3727599, at *2 (W.D. Wash. Aug. 6, 2018).

*Second*, with regard to Activision’s Racketeering and Corrupt Practices Act (“RICO”) claims, “[§]1962 [including (c), (d)] applies to foreign racketeering activity … to the extent that the predicate[ acts] alleged … themselves apply extraterritorially.” *Nabisco*, 579 U.S. at 326.[8]  Activision also alleges at least one predicate act that applies extraterritorially – Trafficking in and Use of Counterfeit Access Devices (“Access Device Statute”), 18 U.S.C. § 1029.  FAC ¶¶166-174; *see also* 18 U.S.C. § 1961(1) (listing Access Device Statute as racketeering predicate act).  “[T]he plain language of § 1029 indicates a congressional intent to apply the statute extraterritorially.” *United States v. Ivanov*, 175 F. Supp. 2d 367, 375 (D. Conn. 2001).  The other, Wire Fraud, is alleged to have arisen out of U.S. contracts, *i.e.*, Activision’s TOUs.  FAC ¶159.

*Third*, with regard to Plaintiff’s False Designation of Origin claim, the Supreme Court long ago “settled th[e] question” – the “statute gives a clear, affirmative indication that it applies extraterritorially[.]” *Trader Joe’s Co. v. Hallatt*, 835 F.3d 960, 966 (9th Cir. 2016) (holding false designation of origin claims apply extraterritorially) (*citing Steele v. Bulova Watch Co.*, 344 U.S. 280, 286 (1952)).  Defendants do not argue or identify any additional limits on the statute’s foreign application implicated here.  Nor could they, as Activision alleged in detail the significant impact Defendants’ conduct has had on Activision’s U.S. business.  FAC ¶¶91, 133-134, 139, 164, 182.

---

[8] Defendants’ (unsupported) claim that the statute as a whole has no extraterritorial application, Mot. 49, has been rejected because it “would lead to difficult line-drawing problems and counterintuitive results, such as excluding from RICO’s reach foreign enterprises that operate within the United States.” *Id.* at 327.

Mitchell
Silberberg &
Knupp LLP
15178858.1

41

1

### 2.     Activision's Claims Involve Permissible Domestic Applications.

Even if there were a basis to conclude certain of the statutes at issue did not apply extraterritorially, *all of Plaintiff's claims,* including the DMCA and state law claims, involve permissible ***domestic*** applications of the relevant statutes.  All of the conduct that is the focus of Activision's statutory claims took place ***in the U.S.*** – including the distribution of the Cheats, the contractual breaches induced by Defendants, and the unlawful access to Activision's protected servers.  *Id.*, *see also* ¶¶8, 28, 148, 151, 153, 155, 165.  *See* CFAA, 18 U.S.C. §1030 (unauthorized access of computers took place in the U.S., FAC ¶¶123, 173, 174); Access Device Statute, 18 U.S.C. §1029(a)(1), (2) (trafficking of counterfeit access devices took place in the United States, *id.*); Lanham Act, 15 U.S.C. §1125(a) (confusion or deceit among consumers took place among users of Activision's goods and services in the U.S., FAC ¶¶8, 28, 151, 153, 155, 165).

The same result is required for Plaintiff's DMCA claim, the focus of which is the "import, offer to the public, provi[sion], or otherwise traffic[king]" of circumvention technology.  17 U.S.C. § 1201(a)(2).  It is a well-established principle of copyright law that "the distribution right includes the right to import copies of the work."  *Palmer v. Braun,* 376 F. 3d 1254, 1258 (11th Cir. 2004) (*quoting GB Mktg. USA Inc. v. Gerolsteiner Brunnen GmbH & Co.,* 782 F.Supp. 763, 772-73 (W.D.N.Y.1991)).  Moreover, courts consistently hold that where similar statutorily proscribed trafficking or sales activity is allegedly domestic, there is no extraterritoriality problem.  *See, e.g., Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 247 (2010) ("The Exchange Act's focus is not on the place where the deception originated, but on purchases and sales of securities in the United States"); *United States v. Ubaldo*, 859 F.3d 690, 700-701 (9th Cir. 2017)

1    (focus of weapons trafficking statute is on the location of the importation because

2    "smuggling by its very nature involves foreign countries").[9]

3            Defendants' conclusory attack on Plaintiff's common law claims is also

4    baseless.  Defendants' conduct did not "occur entirely abroad," Mot. 51, and

5    Defendant offers no support for its contention Activision cannot suffer a U.S.

6    injury if it "has offices in Germany[,]" *id.* 49.  Activision does not have a German

7    office (Activision ¶7), and has specifically pleaded the U.S. location of its injuries,

8    which are different from those of the (distinct and separate) plaintiff in the

9    Ingolstadt Action.  *See* Krueger ¶¶5-7.   Activision has also pleaded that this suit is

10   "based on [contracts] which had substantial connection with [California,]" –

11   namely, Activision's agreements with its customers.  *See Healthcare Ally Mgmt. of*

12   *California, LLC v. Med. Mut. of Ohio*, 2015 WL 12746216, at *6 (C.D. Cal. Jan.

13   26, 2015) (defendant carried out tortious activity in California while located in

14   Ohio).

15   **VI.    ACTIVISION IS, AT MINIMUM, ENTITLED TO JURISDICTIONAL**

16           **AND VENUE DISCOVERY.**

17           Even without the benefit of formal discovery, Activision has satisfied its

18   burden of making a *prima facie* showing of personal jurisdiction.  However, should

19   there be any remaining doubt, Activision requests it be permitted to take discovery

20   on Defendants' contacts with the United States and financial ability to litigate this

21   case in the U.S.  *See Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670,

22

23   _____

24   [9] The "extraterritorial application of the DMCA is [also] irrelevant" because the
     statute, taken as a whole, is focused upon *the location of the circumvention*
     *technology* when it is sold and used.  *Synopsys, Inc.*, 401 F. Supp. 3d at 1073–74;
     *see also Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1372 (Fed. Cir.

25   2008) (extraterritoriality defense fails where DMCA violations occurred "at least

26   in part[ ] in the United States"); *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883
     F.3d 904, 915 (D.C. Cir. 2018) (Congress did not intend for the DMCA to allow

27   "large-scale criminal copyright pirates … [to] avoid United States copyright
     liability simply by locating" some aspects of their operation outside the United

28   States).

Mitchell
Silberberg &
Knupp LLP

15178858.1

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

672-73 (S.D. Cal. 2001).  *See also Good Job Games Bilism Yazilim Ve Pazarlama A.S. v. SayGames, LLC*, 2021 WL 5861279, at *1 (9th Cir. Dec. 10, 2021) ("The question of jurisdiction in the Internet age is not well-settled" and "discovery… might well demonstrate facts sufficient to constitute a basis for jurisdiction.") (*quoting Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003)).

Courts have broad discretion to authorize jurisdictional discovery upon a "colorable showing" that personal jurisdiction exists.  *See eMag Sols., LLC v. Toda Kogyo Corp.*, 2006 WL 3783548, at *2 (N.D. Cal. Dec. 21, 2006) (citing *Orchid Biosciences* at 672-673) ("[A] plaintiff is not obligated to make out a 'prima facie' case of personal jurisdiction before it can obtain limited jurisdictional discovery, because '[i]t would … be counterintuitive to require a plaintiff, *prior* to conducting discovery, to meet the same burden that would be required to defeat a motion to dismiss.'").  Activision has made far more than a "colorable showing," *and* has already submitted documents confirming any such discovery would not be a fishing expedition.  Activision has identified the potential topics for discovery (*see* Mayer ¶¶101-103), and these topics would bear directly on the issues presented in Defendants' motion.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

DATED: FEBRUARY 17, 2023    MARC E. MAYER
MARK C. HUMPHREY
GENEVIEVE L. JAVIDZAD
MITCHELL SILBERBERG & KNUPP LLP

By: */s/ Marc E. Mayer*
Marc E. Mayer (SBN 190969)
Attorneys for Plaintiff

**MEMO IN OPPOSITION TO MOTION TO DISMISS**

Mitchell Silberberg & Knupp LLP

15178858.1

1

## <u>CERTIFICATE OF COMPLIANCE</u>

2

3       The undersigned, counsel of record for plaintiff Activision Publishing, Inc.

4   ("Activision") certifies that this brief contains 13,980 words, which complies with

5   the word limit set by court order dated November 23, 2022.

6

7   DATED: FEBRUARY 17, 2023        MARC E. MAYER
                                     MARK C. HUMPHREY
8                                    GENEVIEVE L. JAVIDZAD
                                     MITCHELL SILBERBERG & KNUPP LLP
9

10                                   By:  */s/ Marc E. Mayer*
                                          Marc E. Mayer (SBN 190969)
11                                        Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28