MARC E. MAYER (SBN 190969)
   mem@msk.com
MARK C. HUMPHREY (SBN 291718)
   mxh@msk.com
GENEVIEVE L. JAVIDZAD (SBN 336138)
   glj@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

THERESA B. BOWMAN (*pro hac vice*)
   tbb@msk.com
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street NW, Suite 700
Washington, DC 20036
Telephone: (202) 355-7900
Facsimile: (202) 355-7899

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., a Delaware corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ENGINEOWNING UG, a German corporation, et al.,<br><br>Defendants.<br><br>　　　　　Defendants. | CASE NO. 2:22-cv-00051-MWF (JCx)<br><br>[Assigned to Judge Michael W. Fitzgerald]<br><br>**PROOF OF SERVICE OF SUMMONS ON DEFENDANT CHARLIE WIEST**<br><br>Complaint Filed: 1/4/2022<br>Amended Complaint Filed: 9/16/2022 |

Mitchell
Silberberg &
Knupp LLP

15304752.1

1    **TO THE ABOVE-ENTITLED COURT:**

2       **PLEASE TAKE NOTICE that** Plaintiff Activision Publishing, Inc.

3 ("Plaintiff") effectuated service of the following initiating documents on Defendant

4 **Charlie Wiest**:

5      1. Summons on Complaint;

6      2. Civil Cover Sheet;

7      3. Complaint;

8      4. Complaint Translated in German;

9      5. Civil Cover Sheet Translated in German; and,

10      6. Summons on Complaint Translated in German.

11 These initiating documents were served by the following method:

12      A.    In compliance with the Hague Convention on the Service Abroad of

13 Judicial and Extra-Judicial Documents in Civil and Commercial Matters (Done at

14 The Hague November 15, 1965) (Entered Into Force for the U.S. on February 10,

15 1969) and in accordance to section 180 of the Civil Procedure Code at

16 Friedenstrasse 13c, 15741 Bestensee on October 25, 2022, *see* **Exhibit A**.

17

18 DATED: April 5, 2023            MARC E. MAYER
                                  MARK C. HUMPHREY

19                                   THERESA B. BOWMAN
                                  GENEVIEVE L. JAVIDZAD

20                                   MITCHELL SILBERBERG & KNUPP LLP

21                     By:  */s/ Marc E. Mayer*

22                                Marc E. Mayer (SBN 190969)
                               Attorneys for Plaintiff

23

24

25

26

27

28

# EXHIBIT A

## ZUSTELLUNGSZEUGNIS / ATTESTATION / CERTIFICATE

Die unterzeichnete Behörde beehrt sich, nach Artikel 6 des Übereinkommens zu bescheinigen,

The undersigned authority has the honour to certify, in conformity with article 6 of the Convention,

L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

1.  dass der Antrag erledigt worden ist *) / that the document has been served *) / que la demande a été exécutée *)
    - am (Datum): - the (date): / - le (date):

    ### 25.10.2022

    - in (Ort, Straße, Nummer): - at (place, street, number): / - à (localité, rue, numéro):

    ### Friedenstraße 13c, 15741 Bestensee

    - in einer der folgenden Formen nach Artikel 5: - in one of the following methods authorised by article 5: / - dans une des formes suivantes prévues à l'article 5:

    a)  in einer der gesetzlichen Formen (Artikel 5 Absatz 1 Buchstabe a)  *).
        in accordance with the provisions of sub-paragraph a) of the first paragraph of article 5 of the Covention *). / selon les formes légales (article 5, alinéa premier, lettre a) *).

    ### Gemäß § 180 ZPO durch Einlegen in den zur Wohnung gehörenden Briefkasten.

    b)  in der folgenden besonderen Form  *): / in accordance with the following particular method *): / selon la forme particulière suivante *):

    c)  durch einfache Übergabe *). / by delivery to the addressee, who accept it voluntarily *). / par remise simple *).

    Die in dem Antrag erwähnten Schriftstücke sind übergeben worden an:
    The documents referred to in the request have been delivered to: / Les documents mentionnés dans la demande ont été remis à:
    - (Name und Stellung der Person): - (identity and description of person): / - (identité et qualité de la personne):

    - Verwandtschafts-, Arbeits- oder sonstiges Verhältnis zum Zustellungsempfänger:
    -  relationship to the addressee, (family, buisiness or other): / - liens de parenté, de subordination ou autres, avec le destinataire de l'acte:

2.  dass der Antrag aus folgenden Gründen nicht erledigt werden konnte *):
    that the document has not been served, by reason of the following facts *): / que la demande n'a pas été exécutée, en raison des faits suivants *):

Nach Artikel 12 Absatz 2 des Übereinkommens wird die ersuchende Stelle gebeten, die Auslagen, die in der beiliegenden Aufstellung im einzelnen angegeben sind, zu zahlen oder zu erstatten *).
In conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement *).
Conformément à l'article 12, alinéa 2, de ladite Conevtion, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint *).

**Anlagen** / Annexes / Annexes

**Zurückgesandte Schriftstücke:** / Documents returned: / Pièces renvoyées:      **Erledigungsstücke**

Ausgefertigt in Potsdam am 7. November 2022

(Hartung)
Unterschrift und Siegel

 **LAND BRANDENBURG**

| **Ministerium der Justiz**

Ministerium der Justiz des Landes Brandenburg | Heinrich-Mann-Allee 107 | 14473 Potsdam

ABC Legal Services
633 Yesler Way
Seattle, WA 98104
USA

Heinrich-Mann-Allee 107
14473 Potsdam

Bearbeiterin: Frau Hartung
Telefon:       (03 31) 8 66 - 0
Nebenstelle: (03 31) 8 66 - 32 19
Fax: (03 31) 8 66 32 06
E-Mail: Poststelle@mdj.brandenburg.de
Internet: www.mdj.brandenburg.de

Aktenzeichen (bei Antwort bitte angeben):
(II.1) 9341:A4-E II.002/22

Potsdam, 8. November 2022

**Ihr Ersuchen vom 26. September 2022 um Zustellung von Schriftstücken an Herrn Charlie Wiest, Friedenstraße 13c, 15741 Bestensee (Aktenzeichen: 2:22-cv-00051-MWF)**

Anlage: 1 Blattsammlung

Sehr geehrte Damen und Herren,

die mit oben genanntem Ersuchen eingereichten Unterlagen konnten Herrn Charlie Wiest, wie Sie dem anliegenden Zeugnis über die Zustellung entnehmen können, am 25.Oktober 2022 durch Einlegung in den zur Wohnung/zum Geschäftsraum gehörenden Briefkasten zugestellt worden.

Mit freundlichen Grüßen
Im Auftrag



(Dr. Koch)

Datenschutzhinweis: Durch das Ministerium der Justiz werden die für die Erfüllung der Aufgaben erforderlichen personenbezogenen Daten verarbeitet. Weitere Informationen gemäß Artikel 13 und 14 der Datenschutzgrundverordnung (2016/679 EU) können Sie der Internetpräsentation https://mdj.brandenburg.de/mdj/de/datenschutz/ entnehmen.

**Exhibit A
Page 5**

# CERTIFICATE

The undersigned authority has the honour to certify, in conformity with article 6 of the Convention,

1) that the document has been served*

- the (date)      **October 25, 2022**

- at (place, street, number)   **Friedenstrasse 13c, 15741 Bestensee**
- in one of the following methods authorized by Article 5:

a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention.*

**In accordance to section 180 of the Civil Procedure Code by placing it in the apartment mailbox.**

b) in accordance with the following particular method* :

c) by delivery to the addressee, who accepted it voluntarily*

The documents referred to in the request have been delivered to:

- (identity and description of person)

- relationship to the addressee (family, business or other)

2) that the document has not been served, by reason of the following facts* :

In conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.

Annexes

Documents returned:      **Completed forms**

In appropriate cases, documents establishing the service:

Done at **Done at Potsdam, November 7, 2022**

the

Signature and/or stamp

//round seal//

Privacy notice: The Ministry of Justice processes personal data that are required for fulfilling its tasks. For more information according to Article 13 and Article 14, Data

Protection Regulation (2016/679 EU), please see internet presentation https://mdj.brandenburg.de/mdj/de/datenschutz/.

[Crest]  FEDERAL STATE OF BRANDENBURG

**Ministry of Justice**

Ministry of Justice of the Federal State of Brandenburg │ Heinrich-Mann-Allee 107 │ 14473 Potsdam

Heinrich-Mann-Allee 107

14473 Potsdam

ABC Legal Services

633 Yesler Way

Seattle, WA 98104

USA

Person processing the case:

Mrs. Hartung

Tel: +49 (0)3 31 8 66 - 0

Ext: +49 (0)3 31 8 66 - 32 19

Fax: +49 (0)3 31 8 66 - 32 06

E-Mail:

Poststelle@mdj.brandenburg.de

Internet: www.mdj.brandenburg.de

File number (state file number in

replies)

(II.1) 9341:A4-E II.002/22

Potsdam, November 8, 2022

**Your request of September 26, 2022 for service of process on Mr. Charlie Wiest,**

**Friedenstraße 13c, 15741 Bestensee (File number: 2:22-cv-00051-MWF)**

Enclosure: 1 set of documents

To whom it may concern:

Service of documents, submitted together with above request, on Mr. Charlie Wiest, as evidenced by the enclosed Certificate of Service, was completed on October 25, 2022 by placing the documents in the mailbox of the apartment/office.

Best regards,

For:                                           (Seal: FEDERAL STATE OF BRANDENBURG

                                                      MINISTRY OF JUSTICE; 17]

[Signature]

(Dr. Koch)

Privacy notice: The Ministry of Justice processes personal data that are required for fulfilling its tasks. For more information according to Article 13 and Article 14, Data Protection Regulation (2016/679 EU), please see internet presentation https://mdj.brandenburg.de/mdj/de/datenschutz/.

**Exhibit A**
**Page 7**

# REQUEST
# FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS

**Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at The Hague, November 15, 1965.**

| Identity and address of the applicant | Address of receiving authority |
|---|---|
| **ABC Legal Services**<br>**633 Yesler Way**<br>**Seattle, WA 98104**<br>**United States of America**<br><br>Authorized applicant pursuant to public law 97-351 of Feb. 26, 1983<br>which amended rule 4(c) 2(a) Federal Rules of Civil Procedure | **Ministerium der Justiz des Landes**<br>**Brandenburg**<br>**Heinrich-Mann-Allee 107**<br>**14473 Potsdam**<br>**Germany** |

The undersigned applicant has the honour to transmit-in-duplicate the documents listed below and, in conformity with article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e.;

(identity and address)

**CHARLIE WIEST**
**Friedenstraße 13C**
**15741 Bestensee**
**Germany**

DOB:                          Phone:

☒ (a) in accordance with the provisons of sub-paragraph (a) of the first paragraph of article 5 of the Convention.*

☐ (b) in accordance with the following particular method (sub-paragraph (b) of the first paragraph of article 5):*

_____

☐ (c) by delivery to the addressee, if he accepts it voluntarily (second paragraph of aticle 5).*

The authority is requested to return or to have returned to the applicant a copy of the documents – and of the annexes* – with a certificate as provided on the reverse side.

Hearing Date:

List of Documents:

**SUMMONS IN A CIVIL ACTION ON AMENDED COMPLAINT; AMENDED COMPLAINT FOR: (1) TRAFFICKING IN CIRCUMVENTION DEVICES; (2) FALSE DESIGNATION OF ORIGIN; (3) VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT; (4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; (5) UNFAIR COMPETITION; (6) VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C); (7) VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(D); IN BOTH ENGLISH AND GERMAN**

Done at Seattle, Washington USA, on Sep 26 2022

Signature and/or stamp



Tracking #: **0093948117**

USM-94 (Est. 11/22/77)
(Formerly OBD-116, which was formally LAA-116, both of which may still be used)
* Delete if inappropriate

**Exhibit A**
**Page 8**

# CERTIFICATE

**The undersigned authority has the honour to certify, in conformity with article 6 of the Convention,**

1) that the document has been served*
   the (date) _____
   at (place, street, number) _____

   in one of the following methods authorized by article 5:
   ☐ (a) in accordance with the provisions of sub-paragraph (a)
   of the first paragraph of article 5 of the Convention.*

   ☐ (b) in accordance with the following particular method:*
   _____
   _____

   ☐ (c) by delivery to the addressee, who accepted it voluntarily.*

   The documents referred to in the request have been delivered to:
   (identity and description of person)
   _____
   _____

   relationship to the addressee family, business, or other
   _____

2) that the document has not been served, by reason of the following facts:*
   _____
   _____

**In conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement.***

Annexes

Documents returned:

_____          Done at _____, the _____
_____
_____          Signature and/or stamp

In appropriate cases, documents establishing
the service:

_____          _____
_____
_____

  Tracking #: 0093948117

USM-94 (Est. 11/22/77)
(Formerly OBD-116, which was formally LAA-116, both of which may still be used)
* Delete if inappropriate

**Exhibit A
Page 9**

# SUMMARY OF THE DOCUMENT TO BE SERVED

**Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at The Hague, November 15, 1965.**

## (article 5, fourth paragraph)

Name and address of the requesting authority:     **ABC Legal Services**
**633 Yesler Way**
**Seattle, WA 98104**
**United States of America**

Particulars of the parties:

    **ACTIVISION PUBLISHING, INC., a Delaware corporation**    vs.    **ENGINEOWNING UG, a German corporation; ET AL.**

## JUDICIAL DOCUMENT*

Nature of the document:
    **To give notice to the Defendant of the institution against them of a civil lawsuit.**

Nature and purpose of the proceedings and, where appropriate, the amount in dispute:
    **Plaintiff is seeking to recover civil damages and other relief, amount to be determined in court.**

Date and place for entering appearance:*
    **Defendant has 21 days from receipt of the accompanying Summons to make a written appearance, address is noted on the Summons.**

Court which has given judgment:*
    **n/a**

Date of judgment:*
    **n/a**

Time limits stated in the document:*
    Hearing Date:

## EXTRAJUDICIAL DOCUMENT*

Name and purpose of the document:
    **n/a**

Time limits stated in the document:*
    **n/a**



Tracking #: **0093948117**

USM-94 (Est. 11/22/77)
(Formerly OBD-116, which was formally LAA-116, both of which may still be used)
* Delete if inappropriate

**Exhibit A**
**Page 10**

## WARNING

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters,
signed at The Hague, the 15th of November 1965

**Identité et adresse du destinataire / Identity and address of the addressee / -----:**

> CHARLIE WIEST
> Friedenstraße 13C
> 15741 Bestensee
> Germany

### IMPORTANT

LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET
OBLIGATIONS. LES «ELEMENTS ESSENTIELS DE L'ACTE» VOUS DONNENT QUELQUES
INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE
ATTENTIVEMENT LE TEXTE MEME DU DOCUMENT. IL PEUT ETRE NECESSAIRE DE DEMANDER UN
AVIS JURIDIQUE.

SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITE D'OBTENIR
L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS
LE PAYS D'ORIGINE DU DOCUMENT.

LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITES D'OBTENIR L'ASSISTANCE
JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE PEUVENT ETRE

### IMPORTANT

*THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND
OBLIGATIONS. THE 'SUMMARY OF THE DOCUMENT TO BE SERVED' WILL GIVE YOU SOME
INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD HOWEVER READ THE DOCUMENT
ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.*

*IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE
POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR
IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.*

*ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE
DOCUMENT WAS ISSUED MAY BE DIRECTED TO:*

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

*Il est recommandé que les mentions imprimées dans cette note soient rédigées en langue française et en
langue anglaise et le cas échéant, en outre, dans la langue ou l'une des langues officielles de l'Etat d'origine
de l'acte. Les blancs pourraient être remplis soit dans la langue de l'Etat où le document doit être adressé, soit
en langue française, soit en langue anglaise.*

*It is recommended that the standard terms in the notice be written in English and French and where
appropriate also in the official language, or one of the official languages of the State in which the document
originated. The blanks could be completed either in the language of the State to which the documents is to be
sent, or in English or French.*

  Tracking #: 0093948117

USM-94 (Est. 11/22/77)
(Formerly OBD-116, which was formally LAA-116, both of which may still be used)
* Delete if inappropriate

**Exhibit A
Page 11**

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ACTIVISION PUBLISHING, INC., a Delaware corporation**<br>Plaintiff/Petitioner<br><br>vs.<br><br>**ENGINEOWNING UG, a German corporation; ET AL.**<br>Defendant/Respondent | Cause #:    **2:22-cv-00051-MWF (JCx)**<br><br><br>CERTIFICATE OF SERVICE |

This service has been completed in compliance with the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters (Done at The Hague November 15, 1965) (Entered Into Force for the U.S. on February 10, 1969). The Certificate of Service attached is also in compliance.



**ABC Legal Services,**
633 Yesler Way, Seattle WA 98104
206-521-9000

Tracking #: **0093948117**



**ORIGINAL
PROOF OF SERVICE**

**Mitchell Silberberg & Knupp LLP**
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
310-312-2000

Page 1 of 1

**Exhibit A
Page 12**

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., a Delaware corporation, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) ) Civil Action No. 2:22-cv-00051-MWF (JCx) |
| ENGINEOWNING UG, a German corporation, [see attached] | ) ) ) ) |
| *Defendant(s)* | ) |

### SUMMONS IN A CIVIL ACTION ON AMENDED COMPLAINT

To: *(Defendant's name and address)*
    Charlie Wiest
    Puschkinstraße 13c, 15711 Königs Wusterhausen
    Friedenstraße 13C, 15741 Bestensee

        A lawsuit has been filed against you.

        Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
    Marc E. Mayer (SBN 190969)
    Mitchell Silberberg & Knupp LLP
    2049 Century Park East, 18th Floor
    Los Angeles, CA 90067
    Telephone: (310) 312-2000

        If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:   September 19, 2022

                                                      Signature of Clerk or Deputy Clerk

American LegalNet, Inc.
www.FormsWorkFlow.com

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by* <u>*Fed. R. Civ. P. 4*</u> *(l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____, a person of suitable age and discretion who resides there,

on *(date)* _____, and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____; or

☐ I returned the summons unexecuted because _____; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 _____

I declare under penalty of perjury that this information is true.


Date: _____                     _____
                                                                                      *Server's signature*

                                                                            _____
                                                                                      *Printed name and title*

                                                                            _____
                                                                                      *Server's address*

Additional information regarding attempted service, etc:


American LegalNet, Inc.
www.FormsWorkFlow.com

**Exhibit A**
**Page 14**

Case 2:22-cv-00051-MWF-JC   Document 102   Filed 04/05/23   Page 15 of 129   Page ID
Case 2:22-cv-00051-MWF-JC   Document 36   Filed 09/19/22   Page 3 of 3   Page ID #:560
#:998

| | |
|---|---|
| 1 | MARC E. MAYER (SBN 190969) |
| | mem@msk.com |
| 2 | MARK C. HUMPHREY (SBN 291718) |
| | mxh@msk.com |
| 3 | GENEVIEVE L. JAVIDZAD (SBN 336138) |
| | glj@msk.com |
| 4 | MITCHELL SILBERBERG & KNUPP LLP |
| | 2049 Century Park East, 18th Floor |
| 5 | Los Angeles, CA 90067-3120 |
| | Telephone: (310) 312-2000 |
| 6 | Facsimile: (310) 312-3100 |
| 7 | Attorneys for Plaintiff |

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| 11 | | |
| 12 | ACTIVISION PUBLISHING, INC., a Delaware corporation, | CASE NO. 2:22-cv-00051-MWF (JCx) |
| 13 | Plaintiff, | [Assigned to Judge Michael W. Fitzgerald] |
| 14 | v. | **AMENDED COMPLAINT FOR:** |
| 15 | ENGINEOWNING UG, a German corporation, CMM HOLDINGS S.A., a | **(1) TRAFFICKING IN CIRCUMVENTION DEVICES;** |
| 16 | German corporation, GARNATZ ENTERPRISE LTD, a Belize | **(2) VIOLATION OF THE COMPUTER FRAUD AND ABUSE** |
| 17 | Corporation, VALENTIN RICK, LEONARD BUGLA, LEON FRISCH, | **ACT;** |
| 18 | IGNACIO GAYDUCHENKO, MARC-ALEXANDER RICHTS, | **(3) INTENTIONAL INTERFERENCE WITH** |
| 19 | ALEXANDER KLEEMAN, LEON SCHLENDER, ERICK PFEIFER, | **CONTRACTUAL RELATIONS;** |
| 20 | BENNET HUCH, ZAIN JONDAH, RICKY SZAMEITAT, MARCEL | **(4) UNFAIR COMPETITION;** |
| 21 | BINDEMANN, ALEXANDER KLEEMANN, REMO LÖFFLER, | **(5) VIOLATIONS OF THE RACKETEERING INFLUENCED** |
| 22 | MARVIN BAOTIC NEUMEYER, HENDRIK SMAAL, CHARLIE | **AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C.** |
| 23 | WIEST, DENNIS REISSLEICH, TYLER BYRD, SIMON MASIAS, | **§ 1962(C);** |
| 24 | NICHOLAS JAMES BALDWIN, ANTONIO MEDIAN, REMY | **(6) VIOLATIONS OF THE RACKETEERING INFLUENCED** |
| 25 | CARTIGNY, PASCAL CLASSEN, MANUEL T. SANTIAGO, AND | **AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C.** |
| 26 | KATERINA DISDLE, and DOES 1-50, inclusive, | **§ 1962(D)** |
| 27 | | |
| | Defendants. | **Demand For Jury Trial** |
| 28 | | |

Mitchell
Silberberg &
Knupp LLP

14793462.1

1   MARC E. MAYER (SBN 190969)
      mem@msk.com
2   MARK C. HUMPHREY (SBN 291718)
      mxh@msk.com
3   GENEVIEVE L. JAVIDZAD (SBN 336138)
      glj@msk.com
4   MITCHELL SILBERBERG & KNUPP LLP
    2049 Century Park East, 18th Floor
5   Los Angeles, CA  90067-3120
    Telephone: (310) 312-2000
6   Facsimile: (310) 312-3100

7   Attorneys for Plaintiff

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  ACTIVISION PUBLISHING, INC., a<br>12  Delaware corporation,<br><br>13            Plaintiff,<br><br>14       v.<br><br>15  ENGINEOWNING UG, a German<br>corporation, CMM HOLDINGS S.A., a<br>16  German corporation, GARNATZ<br>ENTERPRISE LTD, a Belize<br>17  Corporation, VALENTIN RICK,<br>LEONARD BUGLA, LEON FRISCH,<br>18  IGNACIO GAYDUCHENKO, MARC-<br>ALEXANDER RICHTS,<br>19  ALEXANDER KLEEMAN, LEON<br>SCHLENDER, ERICK PFEIFER,<br>20  BENNET HUCH, ZAIN JONDAH,<br>RICKY SZAMEITAT, MARCEL<br>21  BINDEMANN, ALEXANDER<br>KLEEMANN, REMO LÖFFLER,<br>22  MARVIN BAOTIC NEUMEYER,<br>HENDRIK SMAAL, CHARLIE<br>23  WIEST, DENNIS REISSLEICH,<br>TYLER BYRD, SIMON MASIAS,<br>24  NICHOLAS JAMES BALDWIN,<br>ANTONIO MEDIAN, REMY<br>25  CARTIGNY, PASCAL CLASSEN,<br>MANUEL T. SANTIAGO, AND<br>26  KATERINA DISDLE, and DOES 1-50,<br>inclusive,<br>27<br>            Defendants. | CASE NO. 2:22-cv-00051-MWF (JCx)<br><br>[Assigned to Judge Michael W. Fitzgerald]<br><br>**AMENDED COMPLAINT FOR:**<br><br>**(1) TRAFFICKING IN<br>CIRCUMVENTION DEVICES;**<br><br>**(2) FALSE DESIGNATION OF<br>ORIGIN;**<br><br>**(3) VIOLATION OF THE<br>COMPUTER FRAUD AND ABUSE<br>ACT;**<br><br>**(4) INTENTIONAL<br>INTERFERENCE WITH<br>CONTRACTUAL RELATIONS;**<br><br>**(5) UNFAIR COMPETITION;**<br><br>**(6) VIOLATIONS OF THE<br>RACKETEERING INFLUENCED<br>AND CORRUPT<br>ORGANIZATIONS ACT, 18 U.S.C.<br>§ 1962(C);**<br><br>**(7) VIOLATIONS OF THE<br>RACKETEERING INFLUENCED<br>AND CORRUPT<br>ORGANIZATIONS ACT, 18 U.S.C.<br>§ 1962(D)**<br><br>**Demand For Jury Trial** |

Mitchell
Silberberg &
Knupp LLP

14793462.1

Exhibit A
Page 16

28

1    Activision Publishing, Inc. ("Activision" or "Plaintiff") alleges as follows:

2    **PRELIMINARY STATEMENT**

3    1.     Activision is the owner and publisher of the *Call of Duty* series of

4    video games (the "COD Games").  By this lawsuit, Activision seeks to put a stop

5    to unlawful conduct by a multi-national business enterprise that is distributing and

6    selling for profit numerous malicious software products designed to enable

7    members of the public to gain unfair competitive advantages (*i.e.*, to cheat) in the

8    COD Games.  These ongoing activities damage Activision's games, its overall

9    business, and the experience of the COD player community.

10    2.     EngineOwning ("EO" or the "Enterprise") is a commercial enterprise

11    consisting of a German business entity and more than a dozen individuals

12    (collectively, "Defendants").  Defendants collectively and jointly are engaged in

13    the development, sale, distribution, marketing, and exploitation of a portfolio of

14    malicious cheats and hacks for popular online multiplayer games, most

15    prominently the COD Games.  Via their official website (www.engineowning.to)

16    (the "EO Website") and other related websites and social media accounts, EO and

17    numerous affiliated individuals and resellers sell cheats for numerous COD Games,

18    including without limitation *Call of Duty: Warzone, Call of Duty: Modern Warfare

19    (2019), Call of Duty World War II, Call of Duty: Modern Warfare III; Call of Duty

20    Black Ops, Call of Duty Black Ops II,* and *Call of Duty Black Ops III* (collectively,

21    the "Cheating Software").  EO has also recently released new cheating software for

22    the popular multiplayer game *Overwatch*, which is published by Activision's

23    affiliate, Blizzard Entertainment, Inc.  The Cheating Software enables players to

24    manipulate the COD Games to their personal advantage, such as by automatically

25    aiming weapons, revealing the locations of opponents, and allowing the player to

26    see information that is not normally available to players because it would give

27    them an unfair advantage within the game.

28

Mitchell
Silberberg &
Knupp LLP
14793462.1

2

**Exhibit A
Page 17**

3.     The COD Games are designed to be enjoyed by and fair for all players.  When players use exploits like the Cheating Software, such conduct disturbs game balance and in many cases leads non-cheating players to quit matches in frustration.  Widespread cheating also can lead to negative social media posts and headlines in the press, which can impact consumer confidence.  Accordingly, Activision has spent and continues to spend an enormous amount of resources to combat cheating in its games.  Notwithstanding those efforts, Defendants' sale and distribution of the Cheating Software has caused Activision to suffer massive and irreparable damage to its goodwill and reputation and to lose substantial revenue.

4.     In creating, marketing, selling, servicing, and distributing the Cheating Software, Defendants have engaged in numerous unlawful acts under United States and California law.  Defendants have violated Section 1201 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(b)(1), by selling, importing, offering, providing, and otherwise trafficking in technologies that circumvent or evade anti-cheat technologies used by Activision to protect the integrity of the COD Games.  Moreover, by selling (or including with their products) so-called "hardware ID" ("HWID") spoofers, Defendants enable members of the public to access restricted services for which they have previously been denied access.  Defendants also have knowingly, intentionally, and maliciously interfered with and disrupted the contracts Activision has with its customers in the United States, which explicitly prohibit the exact type of cheating that Defendants enable, encourage, and solicit by marketing and selling their Cheating Software.  Defendants have engaged in unfair competition pursuant to California Business & Professions Code § 17200 *et seq.* and under California common law, by operating an unlawful, unfair, and/or fraudulent business.  Finally, Defendants have committed violations of the Racketeering Influenced and

Exhibit A
Page 18

1 | Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d) by

2 | conducting and participating in an enterprise engaged in racketeering activity.

3 |      5.     Defendants not only know that their conduct is unlawful, but they

4 | engage in that conduct with the deliberate intent to harm Activision, its businesses,

5 | and its player community. This Court must put a stop to Defendants' misconduct,

6 | and Activision is entitled to monetary damages, injunctive and other equitable

7 | relief, and punitive damages against Defendants.

8 |

9 |                                  **JURISDICTION AND VENUE**

10 |      6.     This is a civil action seeking damages, injunctive relief, and other

11 | equitable relief under the anti-circumvention provisions of the DMCA, 17 U.S.C. §

12 | 1201, and the laws of the State of California.

13 |      7.    This Court has subject matter jurisdiction over Activision's claims for

14 | violating the anti-circumvention provisions of the DMCA pursuant to 28 U.S.C. §§

15 | 1331 and 1338(a). Pursuant to 28 U.S.C. § 1367, this Court has supplemental

16 | jurisdiction over Activision's state law claims for intentional interference with

17 | contract and unfair competition, which are so related to Activision's federal claims

18 | as to be part of the same case or controversy.

19 |      8.     This Court has personal jurisdiction over each of the Defendants, and

20 | over the Enterprise as a whole, because Defendants and the Enterprise have

21 | purposefully directed their activities at the United States, and at California in

22 | particular, have purposefully availed themselves of the benefits of doing business

23 | in California, and have established a continued presence in California. Activision

24 | is informed and believes, and on that basis alleges, that, without limitation:

25 |          (a)     The *only* purpose of the Cheating Software is to harm a video

26 | game developed and published by Activision in the State of California. Thus, the

27 | Cheating Software was developed and designed to target Activision and its

28 | products, to devalue the massive investment Activision has made in the COD

Mitchell
Silberberg &
Knupp LLP

14793462.1

4

1   Games, and to degrade the work of developers, programmers, artists, game

2   designers, software engineers, online security experts, and others who worked on

3   the COD Games.  Indeed, the Cheating Software is parasitic in nature, in that it

4   derives value only from the COD Games and its very existence relies on

5   Activision's continued support for the COD Games, which were created in

6   California and published by a California company.

7          (b)    Defendants conduct extensive and ongoing business with users

8   in the State of California and the United States.  Among the customers of the

9   Cheating Software are high-profile streamers of the COD Games who reside in the

10  United States.

11         (c)    Defendants target the Cheating Software to users in the United

12  States, including in the State of California, knowing that a substantial market exists

13  for their Cheating Software in the United States.  For example, Defendants display

14  all of the text of their website in "English (US)," offer special sales around U.S.

15  holidays (such as Halloween and Black Friday), and provide customer service in

16  English.  Defendants know that the COD Games have an enormous audience in the

17  United States, and thus have taken steps to ensure that the Cheating Software is

18  readily available and accessible to U.S. users.

19         (d)    Defendants distribute the Cheating Software in the State of

20  California, advertise and market the Cheating Software in the United States and the

21  State of California, and communicate directly with users in the United States and

22  in the State of California, including for the purposes of soliciting purchases of the

23  Cheating Software by such users and providing technical support for the Cheating

24  Software;

25         (e)    Defendants recruit individuals in the United States to distribute

26  the Cheating Software in (and from) the United States, and specifically, California,

27  by reselling it to consumers located there, resulting in revenue for EO in an amount

28  to be determined at trial;

Mitchell
Silberberg &
Knupp LLP

14793462.1

5

**Exhibit A
Page 20**

1     (f)    Defendants have entered into, and continue to enter into,
2  contracts with individuals in the State of California, including contracts pursuant to
3  which these individuals license from Defendants the right to install and use the
4  Cheating Software.  In return for such licenses, Defendants receive ongoing
5  recurring daily, weekly, or monthly payments from individuals in the United States
6  and the State of California;

7     (g)    Defendants create online "groups" or "chat rooms" using
8  services and platforms based in the United States, such as California-based Discord
9  and Seattle-based Valve Corporation.  Activision is informed and believes, and on
10  that basis alleges, that these groups and chat rooms conduct conversations in
11  English and are comprised of a large number of users located in the United States.

12     (h)    Defendants contract with entities located in the State of
13  California in connection with their businesses.  This includes, for example, domain
14  name registries, hosting or content delivery services, as well as credit card
15  processors and merchant banks.  In fact, Defendants boast on their website that
16  they maintain at least two servers in the United States, including one in Los
17  Angeles, California and another in New Jersey:

18
19
20
21
22
23
24
25
26
27



28

Mitchell
Silberberg &
Knupp LLP
14793462.1

6

Case 2:22-cv-00051-MWF-JC   Document 102   Filed 04/05/23   Page 22 of 129   Page ID
Case 2:22-cv-00051-MWF-JC   Document 27 Filed 09/16/22   Page 7 of 48   Page ID #:447
#:2990

1    These servers are necessary for Defendants' customers to activate and use the

2    Cheating Software.

3            (i)      Defendants engage in conduct that they know is likely to cause

4    harm to Activision in the State of California, including in this District, where

5    Activision is located and has its principal place of business.  In fact, Defendants

6    have engaged in a pattern of online "trolling" of Activision and its counsel, such as

7    by creating fake accounts in the name of Activision's counsel, posting fake

8    messages that purport to be from Activision's counsel, or using the names of

9    Activision's counsel in their advertising.

10          9.       In undertaking the conduct described herein, each of the Defendants

11   has acted as an agent or representative of the EO Enterprise.  All of the Defendants

12   have worked jointly and in cooperation with each other to effectuate the purposes

13   and aims of the EO Enterprise.  Accordingly, the conduct of each agent of the

14   Enterprise should be imputed to all of the other agents and representatives, and

15   Defendants are jointly and severally liable for the conduct alleged herein.

16          10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)

17   because this is a judicial district in which a substantial part of the events giving rise

18   to the claims occurred, and/or in which Activision's injuries were suffered.

19

20                          **THE PARTIES**

21          11.      Activision is a corporation duly organized and existing under the laws

22   of the State of Delaware, with its principal place of business in Santa Monica,

23   California.

24          12.      Activision is informed and believes, and on that basis alleges, that the

25   Defendants in this action have worked or currently are working in concert as an

26   organization or enterprise called "EngineOwning" ("EO" or the "Enterprise").  The

27   purpose of the Enterprise is to develop, promote, distribute, sell, traffic in, and/or

28   maintain or offer support for Cheating Software, which allows users to circumvent

Mitchell
Silberberg &
Knupp LLP

14793462.1

7

1   anti-cheating measures and gain authorized access to Activision's servers even if

2   they have been previously banned for cheating.  The Defendants work jointly and

3   collectively towards this common goal and purpose.

4        13.   Activision is informed and believes, and on that basis alleges, that the

5   Defendants function in a number of different roles in furtherance of the Enterprise.

6   For example, some defendants manage and oversee the Enterprise, while others

7   provide and supply the necessary software technology to be sold by the Enterprise.

8   Others act as sales or customer support agents, who support and facilitate the

9   common Enterprise by helping to distribute the product or ensuring that customers

10  are able to successfully use the product.  Accordingly, Activision has grouped the

11  defendants into categories, as set forth below.

12       **<u>Corporate Defendants</u>**

13       14.   Activision is informed and believes, and on that basis alleges, that

14  Defendants CMM Holdings S.A. and EngineOwning Software UG are German

15  business entities headquartered in Pfaffenhofen an der Ilm, and that Defendant

16  Garnatz Enterprise Ltd is a business entity registered in the country of Belize.

17  (collectively, CMM Holdings S.A., EngineOwning Software UG, and Garnatz

18  Enterprise Ltd. are referred to as the "Corporate Defendants").  Activision is

19  informed and believes, and on that basis alleges, that the individual defendants

20  purport to engage in many of the activities described herein (including

21  development, maintenance, marketing, distribution, sale, and support for the

22  Cheating Software) through one or more of the Corporate Defendants.

23       15.   Activision is informed and believes, and on that basis alleges, that the

24  Corporate Defendants are not independent corporate entities, but instead are shell

25  companies created to shield the activities of the individual defendants, including

26  Defendants Valentin Rick, Leon Schlender, and "Crotle."  There exists a unity of

27  interest and ownership between the Corporate Defendants and the aforementioned

28  individual defendants, such that no separateness between these entities exists and

Mitchell
Silberberg &
Knupp LLP

14793462.1

8

1    they are alter egos of one another.  Adherence to the fiction of the separate

2    existence of the Corporate Defendants would sanction a fraud or promote injustice,

3    including by enabling certain of the individual defendants to hide behind corporate

4    shell companies, divert assets from such companies, or raise jurisdictional defenses

5    based on the existence of such companies.  As a result, the Court should pierce the

6    corporate veil and find the individual defendants jointly and severally liable for

7    acts of infringement undertaken in the name of the Corporate Defendants.

8                              **Owners, Founders, and Leadership**

9         16.    Activision is informed and believes, and on that basis alleges, that EO

10   was founded by, and currently is owned, run, overseen, managed, and primarily

11   operated by, a group of individuals, including those set forth below:

12        17.    Activision is informed and believes, and on that basis alleges, that

13   Defendant Valentin Rick a/k/a Skyfail ("Valentin") is an individual residing in

14   Germany who founded and created the Corporate Defendants, is the sole managing

15   director and shareholder of the Corporate Defendants, and historically has been the

16   primary administrator of the EO Website.  Activision is further informed and

17   believes, and on that basis alleges, that Valentin has been and continues to be the

18   de facto leader of EO, and in that capacity has directed and/or been responsible for

19   developing, maintaining, marketing, distributing, and selling the Cheating

20   Software.  Activision previously contacted Valentin in 2018 and 2020 regarding

21   his involvement with EO and the EO Website, and in response he claimed to have

22   sold the EO Website to an unknown purchaser.  Valentin has never provided any

23   evidence that such a sale took place, and Activision is informed and believes, and

24   on that basis alleges, that Valentin has continued to manage and operate EO and

25   the EO Website at all times relevant to this lawsuit.

26        18.    Activision is informed and believes, and on that basis alleges, that

27   Defendant Leon Schlender a/k/a Balkan, Lion, x7ion, LionV1, lionz0r,

28   moneyskyy, bcrypt, and s14 ("Schlender") is an individual residing in Germany

Mitchell
Silberberg &
Knupp LLP

14793462.1

9

1  who is a co-creator/co-founder of EO along with Valentin.  Activision is further

2  informed and believes, and on that basis alleges, that Schlender has directed and/or

3  been responsible for developing, maintaining, marketing, distributing, and selling

4  the Cheating Software.

5        19.    Activision is informed and believes, and on that basis alleges, that

6  Defendant Erick Pfeifer, a/k/a Speedi13, Speedi, Spdy, and Speedy0407 ("Pfeifer")

7  is an individual residing in Germany.  Pfeifer is one of the founders and original

8  members of the Enterprise, and has acted as a coder and developer of the Cheating

9  Software since at least 2014 or 2015.

10       20.    Activision is informed and believes, and on that basis alleges, that

11  Defendant Bennet Huch, a/k/a TheBigBen, thebigben123, tbb123, tazzthebigben,

12  Benno, Benno1308, B3nn0, and vb2010helper ("Huch"), is an individual residing

13  in Germany.  Huch at one time purported to be the owner of the EO website and

14  has acted as one of the primary administrators of the EO Website.  Activision is

15  further informed and believes, and on that basis alleges, that Huch was among the

16  people primarily responsible for the development, maintenance, distribution, and

17  sale of the Cheating Software.

18       21.    Activision is informed and believes, and on that basis alleges, that

19  Defendant Leonard Bugla, a/k/a Reganmian and Noodleman ("Bugla"), is an

20  individual residing in Germany who is listed as, and appeared to act as, an

21  operations administrator of the EO Website in 2019 and 2020.  Activision is

22  further informed and believes, and on that basis alleges, that in this role Bugla

23  enabled the development, maintenance, distribution, and sale of the Cheating

24  Software.  Activision is further informed and believes, and on that basis alleges,

25  that Valentin and Bugla have a long-standing personal relationship dating back to

26  before EO and the EO Website were created (*i.e.*, before 2012) and for many years

27  worked together to ensure the continued operation and profitability of EO and the

28  EO Website.

Mitchell
Silberberg &
Knupp LLP

14793462.1

10

1         22.    Activision is informed and believes, and on that basis alleges, that

2   Defendant Marc-Alexander Richts a/k/a x0000x and Twenty ("Richts") is an

3   individual residing in Germany who has been involved with distributing and

4   selling the Cheating Software through EO and the EO Website, and has acted as

5   one of the primary moderators on the EO Website forums.  In that role, Richts

6   ensured the continuing operation of the EO Website and regularly communicated

7   with both the developers and the purchasers of the Cheating Software.

8   **<u>Software Developers</u>**

9         23.    Certain of the individual defendants were and are responsible for

10   creating and developing the Cheating Software, as well as updating and modifying

11   the Cheating Software to overcome Activision's efforts to detect the Cheating

12   Software.

13         24.    Activision is informed and believes, and on that basis alleges, that

14   Defendant Ignacio Gayduchenko, a/k/a Weather and Kokole ("Gayduchenko"), is

15   an individual residing in Spain who has acted as a coder and developer of the

16   Cheating Software, and who has provided technical support for the Cheating

17   Software through, among other venues, the EO Website.

18         25.    Activision is informed and believes, and on that basis alleges, that

19   Defendant Zain Jondah, a/k/a Zain, Reciate, zinbrownman, superzainny, and

20   DepressedToenail ("Jondah") is an individual residing in the United Kingdom who

21   has acted as a coder and developer of the Cheating Software.

22         26.    Activision is informed and believes, and on that basis alleges, that

23   Defendant Ricky Szameitat a/k/a Requi, requi_dev, RequiDev, and Requiii

24   ("Szameitat") is an individual residing in Germany who has acted as a coder and

25   developer of the Cheating Software.

26         27.    Activision is informed and believes, and on that basis alleges, that

27   Defendant Marcel Bindemann, a/k/a Kifferking, kifferking951, kifferking hacks,

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

**Exhibit A
Page 26**

1 kifferking1337, and 1337fameboy ("Bindemann") is an individual residing in

2 Germany who has acted as a coder and developer of the Cheating Software.

3 **Moderators, Administrators, and Support Representatives**

4   28. Certain of the individual defendants knowingly facilitated and enabled

5 the operation of EO by maintaining, administering, updating, and otherwise

6 supporting various online message boards, chat rooms, or other online locations

7 relating to the Cheating Software. These online locations include the EO Website

8 and the EO "official" Discord server, both of which serve as the primary location

9 for members of the public (including those in the United States) to learn about,

10 purchase, discuss, and obtain the Cheating Software. These individuals facilitated,

11 enabled, induced and otherwise supported the marketing, sale, and use of the

12 Cheating Software by providing customer support, payment support, and technical

13 support for the Cheating Software. These individuals also worked to market and

14 advertise the Cheating Software and to encourage and assist members of the

15 public, including individuals located in the United States, in purchasing and using

16 the Cheating Software.

17   29. Activision is informed and believes, and on that basis alleges, that

18 Defendant Leon Frisch a/k/a Kraisie ("Frisch") is an individual residing in

19 Germany who has acted as a lead moderator on the EO Website forums.

20 Activision is further informed and believes, and on that basis alleges, that in this

21 role Frisch assists with the sale of the Cheating Software, including without

22 limitation by providing technical support for cheats and communicating with

23 customers regarding payment for the Cheating Software.

24   30. Activision is informed and believes, and on that basis alleges, that

25 Defendant Alexander Kleemann a/k/a A200k ("Kleemann") is an individual

26 residing in Veitshöchheim, Germany, who has been involved in distributing the

27 Cheating Software and providing various administrative functions with regard to

28 the EO Website, including by acting as a moderator on the EO Website forums.

Mitchell
Silberberg &
Knupp LLP

14793462.1

12

1      31.    Activision is informed and believes, and on that basis alleges, that

2   Defendant Remo Löffler a/k/a AimBRoT, KE xAimBRoT, KE AimBRoT, EO

3   Aimbrot, _AimBRoT, xAimBRoTHDx, Pappenpeter, and MrTimeWarpxxx

4   ("Löffler"), is an individual residing in Germany who has been involved in

5   providing various administrative functions with regard to the EO Website,

6   including by acting as a moderator on the EO Website forums.

7      32.    Activision is informed and believes, and on that basis alleges, that

8   Defendant Marvin Baotic Neumeyer a/k/a Bonser, m0t0rb3s1tz3n, Bonsai,

9   DieKakao, Austriaball, AustriaballÖ, xlRaizzerz, and Zhaviaa ("Neumeyer") is an

10   individual residing in Germany who has acted as an administrator for EO's

11   Discord account, and in that capacity has been responsible for assisting in the

12   development, updating, marketing, distribution, and sale of the Cheating Software,

13   and has provided support for the Cheating Software.  Activision is further informed

14   and believes, and based thereon alleges, that Neumeyer also has acted as a Lead

15   Moderator for the EO Website forums.

16      33.    Activision is informed and believes, and on that basis alleges, that

17   Defendant Hendrik Smaal a/k/a logixx, Sniker, sniker_de, SnikerDE, and

18   Snikerberry21 ("Smaal") is an individual residing in Germany who has provided

19   technical support for the Cheating Software through, among other venues, the EO

20   Website.  Activision is further informed and believes, and on that basis alleges,

21   that Smaal also has acted as a moderator for the EO Website forums.

22      34.    Activision is informed and believes, and on that basis alleges, that

23   Defendant Charlie Wiest a/k/a Apollo, n0t_apollo, notapollo, and ApolloEO

24   ("Wiest") is an individual residing in Germany who has provided technical support

25   for the Cheating Software through, among other venues, the EO Website.

26   Activision is further informed and believes, and on that basis alleges, that Chronos

27   also has acted as a moderator for the EO Website forums.

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

13

35.     Activision is informed and believes, and on that basis alleges, that
Defendant Dennis Reissleich a/k/a Koyz, KOYZRk, and koyz420 ("Reissleich") is
an individual residing in Germany who has provided technical support for the
Cheating Software through, among other venues, the EO Website.  Activision is
further informed and believes, and on that basis alleges, that Chronos also has
acted as a moderator for the EO Website forums.

36.     Activision is informed and believes, and on that basis alleges, that the
foregoing defendants overtly display and communicate a deep knowledge of the
COD Games and the Cheating Software that could only be the result of their
extensive play of the COD Games.  Accordingly, each of these defendants
necessarily created online accounts with Activision and assented to Activision's
Terms of Service and other related agreements.  Only by doing so were they able
to access and download the COD Games, join multiplayer servers, and play the
COD Games.

### Sellers and Resellers

37.     Certain of the individual defendants are engaged in selling the
Cheating Software on behalf of the Enterprise.  These defendants processed
purchase orders made via the EO Website and sold the Cheating Software on
behalf of the other Defendants.  Activision is informed and believes, and on that
basis alleges, that the following individuals intended to and did distribute and sell
the Cheating Software to users in the United States as agents or representatives of
the Enterprise.

38.     Activision is informed and believes, and on that basis alleges, that
Defendant Tyler Byrd a/k/a ByrdGaming, ECGx Byrd, tylerbyrd2000,
thereal_ghostd, and lGhostdl ("Byrd") is an individual residing in North Carolina
who has been involved in direct sales of the Cheating Software, including via the
EO Website and the EO Discord, using the payment platform known as Stripe.

Mitchell
Silberberg &
Knupp LLP

14793462.1

14

Case 2:22-cv-00051-MWF-JC  Document 102  Filed 04/05/23  Page 30 of 129  Page ID
Case 2:22-cv-00051-MWF-JC  Document 22-9 Filed 09/16/22  Page 15 of 48  Page ID #:455
#:298

1   Activision is further informed and believes, and on that basis alleges, that Byrd has
2   acted as a moderator for the EO Website forums.

3       39.    Activision is informed and believes, and on that basis alleges, that
4   Defendant Simon Masias a/k/a Jagr034, jagr0399, _obeysimon, and masiassimon
5   ("Masias") is an individual residing in New Jersey who has acted as a reseller for
6   the EO Cheating Software.

7       40.    Activision is informed and believes, and on that basis alleges, that
8   Defendant Nicholas James Baldwin a/k/a Kamay, getclonedbyfeds, and
9   clonedbyfeds ("Baldwin") is an individual residing in Florida who has acted as a
10  reseller for the EO Cheating Software.

11      41.    Activision is informed and believes, and on that basis alleges, that
12  Defendant Antonio Median a/k/a DiscountDash, realdiscountdash, RappiFood, and
13  Berlin ("Median") is an individual residing in Massachusetts who has acted as a
14  reseller for the EO Cheating Software.

15      42.    Activision is informed and believes, and on that basis alleges, that
16  Defendant Remy Cartigny a/k/a remzziecodservices, remzzie, Deez Nuts,
17  Frikandel, and TwistlinesZ ("Cartigny") is an individual residing in the
18  Netherlands who has acted as a reseller for the EO Cheating Software.

19      43.    Activision is informed and believes, and on that basis alleges, that
20  Defendant Pascal Classen, a/k/a Proton, Proton1001, P1001, Proton909, and
21  Proton007 ("Classen") is an individual residing in Germany who has acted as a
22  reseller for the EO Cheating Software.

23      44.    Activision is informed and believes, and on that basis alleges, that
24  Defendant Manuel T. Santiago a/k/a Hoodie, EOHoodie, hoodie1337, Hoodieee,
25  teamxcbs, xCantBeStopped, stendoh617, stendoh, and oSpahzy ("Santiago") is an
26  individual residing in Massachusetts who has acted as a reseller for the EO
27  Cheating Software.

28

Mitchell
Silberberg &
Knupp LLP
14793462.1

45.     Activision is informed and believes, and on that basis alleges, that Defendant Katerina Disdle a/k/a sweetkatato and _sweetkatato ("Disdle") is an individual residing in the United Kingdom who has acted as a reseller for the EO Cheating Software.

## Doe Defendants

46.     Activision is informed and believes, and on that basis alleges, that the following individuals, whose true names are yet unknown, are developers of the Cheating Software, administrators of the EO Website, resellers and distributors of the Cheating Software, and/or otherwise involved in the creation, marketing, and distribution of the Cheating Software.  Among the Doe defendants are the individuals set forth below:

47.     Activision is informed and believes, and on that basis alleges, that Defendant "Crotle" (referred to as "Boss" on the EO Website forums) is a high-level member of EO whose location is unknown, who has a leadership role within the organization, through which he or she participates and/or assists in the development, maintenance, distribution and sale of the Cheating Software, including as an administrator of the EO Website.

48.     Activision is informed and believes, and on that basis alleges, that Defendant "Ben Garnatz" is an individual whose location is unknown.  "Ben Garnatz" may be an alias for one or more individuals actively engaged in the creation and distribution of the Cheating Software, and the administration of the EO Website.

49.     Activision is informed and believes, and on that basis alleges, that Defendant "Enceladus" is an individual whose location is unknown, and who has acted as an administrator of the EO Website.  Activision is further informed and believes, and on that basis alleges, that in this role Enceladus has enabled the development, maintenance, distribution, and sale of the Cheating Software.

Mitchell
Silberberg &
Knupp LLP

14793462.1

16

**Exhibit A
Page 31**

1    50.    Activision is informed and believes, and on that basis alleges, that

2  Defendant "Mortyy" is an individual residing in Europe who has acted as an

3  administrator of the EO Website.  Activision is further informed and believes, and

4  on that basis alleges, that in this role Mortyy has enabled the development,

5  maintenance, distribution, and sale of the Cheating Software.

6    51.    Activision is informed and believes, and on that basis alleges, that

7  Defendant "SlapstiK" a/k/a b1g slap, is an individual residing in France who has

8  acted as an administrator of the EO Website.  Activision is further informed and

9  believes, and on that basis alleges, that in this role SlapstiK has enabled the

10  development, maintenance, distribution, and sale of the Cheating Software.

11    52.    Activision is informed and believes, and on that basis alleges, that

12  Defendant "Ubervisor" is an individual residing in Europe who has acted as a

13  coder and developer of the Cheating Software, and who has provided technical

14  support for the Cheating Software through, among other venues, the EO Website.

15  Activision is further informed and believes, and on that basis alleges, that

16  Ubervisor also has acted as an administrator of the EO Website.

17    53.    Activision is informed and believes, and on that basis alleges, that

18  Defendant "Homie123" a/k/a Homie is an individual residing in Germany who has

19  acted as a Lead Moderator on the EO Website forums.

20    54.    Activision is informed and believes, and on that basis alleges, that

21  Defendant "LuoZheng" is an individual residing in Germany who has acted as a

22  coder and developer of the Cheating Software.

23    55.    Activision is informed and believes, and on that basis alleges, that

24  Defendant "jeuwifghue," whose location is unknown, has acted as a coder and

25  developer of the Cheating Software.

26    56.    Activision is informed and believes, and on that basis alleges, that

27  Defendant "WhiteObama" is an individual residing in Europe who has acted as a

28  coder and developer of the Cheating Software.

Mitchell
Silberberg &
Knupp LLP
14793462.1

17

1    57.    Activision is informed and believes, and on that basis alleges, that
2 Defendant "Chronos" a/k/a Chronus, and eo_chronos is an individual whose
3 location is unknown, and who has provided technical support for the Cheating
4 Software through, among other venues, the EO Website.  Activision is further
5 informed and believes, and on that basis alleges, that Chronos also has acted as a
6 moderator for the EO Website forums.

7    58.    Activision is informed and believes, and on that basis alleges, that
8 Defendant "HAM" a/k/a aboutHAM, burrskurr, nytroza, SkirrSkirr, bakaara,
9 Curren$y, spacetime, Arschpollo, and Yayoo ("HAM") is an individual residing in
10 Germany who has provided technical support for the Cheating Software through,
11 among other venues, the EO Website.  Activision is further informed and believes,
12 and on that basis alleges, that Chronos also has acted as a moderator for the EO
13 Website forums.

14    59.    Activision is informed and believes, and on that basis alleges, that
15 Defendant "Zhavia" is an individual whose location is unknown and who has acted
16 as a reseller for the EO Cheating Software.

17    60.    Activision is informed and believes, and on that basis alleges, that
18 Defendant "Snafu" a/k/a Snafubar1337 and snafu.alit is an individual residing in
19 Germany who has acted as a reseller for the EO Cheating Software.

20    61.    Activision is informed and believes, and on that basis alleges, that
21 Defendant ".0" a/k/a .0 0x1337, Not0x1337, NutChamp, PepegaChamp,
22 WZACCBTC is an individual residing in Germany who has acted as a reseller for
23 the EO Cheating Software.  Activision is further informed and believes, and on that
24 basis alleges, that .0 has acted as a Lead Moderator on the EO Website forums.

25    62.    Activision is informed and believes, and on that basis alleges, that
26 Defendant "Big Pile of Poop" is an individual residing in Europe who has acted as
27 an administrator for EO's Discord account, and in that capacity has been
28 responsible for assisting in the development, updating, marketing, distribution and

Mitchell
Silberberg &
Knupp LLP

14793462.1

18

Case 2:22-cv-00051-MWF-JC   Document 102   Filed 04/05/23   Page 34 of 129   Page ID
Case 2:22-cv-00051-MWF-JC   Document 27-30Filed 09/16/22   Page 19 of 48   Page ID #:459
#:709

1  sale of the Cheating Software, and also has provided support for the Cheating

2  Software.

3      63.    Activision is informed and believes, and on that basis alleges, that

4  Defendant Alex a/k/a Alex0r and alexaeo ("Alex") is an individual residing in

5  Europe who has acted as an administrator for EO's Discord account, and in that

6  capacity has been responsible for assisting in the development, updating,

7  marketing, distribution, and sale of the Cheating Software, and also has provided

8  support for the Cheating Software.

9      64.    In addition to the foregoing, Activision is informed and believes, and

10  on that basis alleges, that individuals using the aliases "Bonsai," "Agriolo,"

11  "Deutschlander," "LogicX," and "NOL3X" acted as developers, moderators, or

12  resellers of the Cheating Software.

13      65.    Activision is informed and believes, and on that basis alleges, that

14  several of the Doe defendants may be aliases of EO staffers, including some of the

15  named Defendants in this case, who have sought to mask their identities after

16  previously being contacted by Activision in connection with their involvement in

17  EO.

18      66.    The true names and capacities, whether individual, corporate,

19  associate, or otherwise, of the Doe defendants are unknown to Activision, which

20  has therefore sued said defendants by such aliases and fictitious names.  These

21  defendants include individuals whose real identities are not yet known to

22  Activision, but who are acting in concert with one another, often under the guise of

23  Internet aliases, in committing the unlawful acts alleged herein.  Among the Doe

24  defendants are developers, resellers, technical support staff, and other individuals

25  who have participated in the development, sale, and distribution of the Cheating

26  Software.  Activision will seek leave to amend this complaint to state their true

27  names and capacities once said defendants' identities and capacities are

28  ascertained.  Activision is informed and believes, and on that basis alleges, that all

Mitchell
Silberberg &
Knupp LLP
14793462.1

19

1   defendants sued herein are liable to Activision as a result of their participation in

2   all or some of the acts set forth in this Amended Complaint.  (All of the

3   aforementioned defendants, both the named defendants and the Doe defendants,

4   are referred to herein collectively as "Defendants.")

5        67.     Activision is informed and believes, and on that basis alleges, that at

6   all times mentioned in this Amended Complaint, each of the Defendants was the

7   agent of each of the other Defendants and, in doing the things alleged in this

8   complaint, was acting within the course and scope of such agency.

9

10                   **FACTS APPLICABLE TO ALL CLAIMS**

11                  **Activision's Intellectual Property Rights**

12        68.     Activision is the publisher and owner of all rights, title, and interest in

13   the copyrights in the COD Games, which consist of over 15 video games released

14   since 2003 on various video game platforms.  Activision's copyrights in the COD

15   Games include, without limitation, rights in and to the COD Games' computer

16   software and the audiovisual works and screen displays that are created when the

17   COD Game software interacts with a user's computer.  Activision's copyrights in

18   the COD Games also include the dynamic non-literal elements created when the

19   COD Game software interacts with the COD online multiplayer game servers.  *See*

20   *MDY Indus. v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010).

21   Activision possesses valid, registered copyrights in each of the COD Games.

22                                **The COD Games**

23        69.     The COD Games are released annually, with live operations and with

24   additional downloadable content released regularly, and are consistently among the

25   best-selling games in a given year, having sold hundreds of millions of copies to

26   date.  In December 2020, Activision announced that the COD Games generated

27   over $3 billion in net bookings in the prior 12 months.

28

**Exhibit A
Page 35**

70.     The COD Games are "first-person shooter" video games that allow players to step into the shoes of soldiers and elite operators in combat throughout history, ranging from World War I to modern day and into the future.  Nearly all of the COD Games include single player campaign story modes which place players within a fictional narrative.  However, all COD Games include the popular competitive online multiplayer modes, where players join online to play together in real-time.  Each of the COD Games offers as many as a dozen or more different online multiplayer game types, all of which are extremely intense as players compete to earn experience points, increase their rankings and statistics, and acquire various rewards for winning matches and achieving certain goals and objectives.

71.     The COD Games' online multiplayer modes are so popular that they have given rise to multiple competitive "esports" leagues and tournaments which attract several million viewers on streaming platforms such as Twitch and YouTube.

### The COD Games' Business Model

72.     Given the popularity and replayability of the COD Games' online multiplayer modes, Activision works very hard to ensure that the COD Games offer consistently compelling player experiences so that customers will remain engaged in the COD Games, continue to play them for sustained periods of time, and be excited about future releases.

73.     In March 2020, Activision released *Call of Duty: Warzone* ("Warzone"), a free standalone multiplayer game that is offered to the public without requiring that the customer purchase a copy of any *Call of Duty* game.  In order to play *Call of Duty: Warzone*, a member of the public must register an account with Activision, download the *Call of Duty: Warzone* software, and connect to Activision's online multiplayer servers.  Accordingly, the revenue Activision generates through *Call of Duty: Warzone* comes exclusively from sales

Mitchell
Silberberg &
Knupp LLP

14793462.1

21

1  of "virtual goods" (*i.e.*, weapons, skins, etc.) or seasonal "battle passes" that enable

2  the player to receive in-game rewards for accomplishments within the game.

3      74.    Revenue generated by the COD Games in turn helps pay for the

4  enormous cost of updating, improving, maintaining, and serving the COD Games

5  and their competitive online modes.  If players perceive that a game is unfair,

6  including because others are cheating or have an unfair advantage, players may

7  grow frustrated with the COD Games, become less interested in playing and

8  supporting them (including by purchasing new games and items) and may even

9  stop playing entirely.  Cheating therefore not only harms (and could even destroy)

10  COD player communities, but also impacts Activision's ability to offer the fast-

11  paced, stable, high-quality online gameplay to which millions of fans have become

12  accustomed.

13      **Activision's Efforts To Protect Against Hackers And Cheaters**

14      75.    Because the COD Games are so popular, unscrupulous individuals

15  and companies such as Defendants frequently seek to exploit the games for their

16  own personal gain and profit by selling cheats, hacks, and other malicious

17  software, knowing full well that they are ruining the experience for other players

18  and harming Activision.  For this reason, Activision undertakes significant efforts

19  to protect the integrity of the COD Games through both technical and contractual

20  means.

21      Technical Protection

22      76.    One way that Activision seeks to protect the COD Games from

23  cheating or unauthorized exploitation is by developing and employing anti-cheat

24  technologies.  These technologies help detect when players are using third party

25  cheating software, and prevents unauthorized access to the COD Games by those

26  players.  It is not possible to play the COD Games' online multiplayer modes (or to

27  play *Call of Duty: Warzone* at all) without installing Activision's anti-cheat

28

Mitchell
Silberberg &
Knupp LLP
14793462.1

22

1   technologies.  Activision has been able to identify and ban hundreds of thousands

2   of accounts using cheating software in the COD Games in just over the past year.

3        77.    Additionally, when Activision identifies or detects that a player is

4   using cheating software, the player's account may be suspended or "banned," such

5   that the player may no longer access the game and its remote server.  Depending

6   upon the player's conduct, Plaintiffs may also implement a "Hardware ID"

7   ("HWID") ban against players engaged in hacking or cheating.  To implement a

8   HWID ban, Activision obtains configuration data from the offending player's

9   personal computer or other gaming device and denies subsequent access to the

10  game by players using that computer.  This ensures that players who have lost

11  access to the game cannot re-obtain such access merely by creating a new account

12  or using a different email address.  HWID bans can be a very effective ways to

13  prevent those who have lost access to Activision's COD Game servers from

14  fraudulently accessing those servers.

15       78.    In order for any hack or cheat software to operate, it must be designed

16  to prevent or avoid detection by the anti-cheat software, such as by concealing

17  itself or by disabling the anti-cheat technology.  Otherwise, the cheat will be

18  detected and the user will be denied access to the particular game's online

19  multiplayer community, and may be permanently banned from playing the game at

20  all.

21                          Contractual Protection

22       79.    In order to access, download, or play the COD Games, users must

23  create and register accounts with Activision.  Upon first playing the COD Games

24  and beginning installation, users must expressly manifest their assent to

25  Activision's Terms of Use (collectively, the "TOU") by clicking through them.  If

26  the user refuses to consent to the TOU, they cannot proceed and play the game.

27       80.    The TOU includes a limited license agreement between Activision

28  and its users.  Under the TOU, Activision grants to users a "personal, limited, non-

Mitchell
Silberberg &
Knupp LLP
14793462.1

23

**Exhibit A
Page 38**

1  exclusive license" to use its games for "non-commercial use," expressly

2  conditioned upon the user's compliance with the TOU.  Among other provisions,

3  by assenting to the TOU, users expressly agree not to "use, develop, host or

4  distribute cheats, automation software (bots), modded lobbies, hacks, mods or any

5  other unauthorized third-party software" in connection with Activision's games "or

6  engage in any form of cheating, boosting, or booting."

7      81.   The COD Games' online multiplayer modes (as well as the entire *Call*

8  *of Duty: Warzone* game) are made available to the public through Activision's

9  proprietary servers and matchmaking systems.  It is not possible for a user to

10  lawfully obtain access to or play the COD Games' online multiplayer modes (or

11  *Call of Duty: Warzone*) without expressly consenting to the TOU.

12  **Defendants' Development, Marketing, and Sale of the Cheating Software**

13      82.   Activision is informed and believes, and on that basis alleges, that

14  Defendants are all participants in the common EO Enterprise.  As such, Defendants

15  are engaged in various activities related to developing, updating, marketing,

16  distributing, selling, and supporting the Cheating Software.  At all times relevant

17  herein, Defendants have developed, updated, marketed, distributed, sold, and

18  supported the Cheating Software.  They have done so, and continue to do so, via

19  the EO Website, email, and other communication platforms such as Discord.

20      83.   Activision is informed and believes, and on that basis alleges, that EO

21  was founded by Defendants Valentin Rick, Leon Schlender, and "Croatle."  These

22  individuals have acted and continue to act as the masterminds and the driving force

23  behind EO and are responsible for the overall operation of EO, the EO Website,

24  EO's finances, and the development and maintenance of the Cheating Software

25  and the online servers used to authenticate licenses for the Cheating Software.

26  Additionally, Valentin Rick's mother, Regina Rick, has provided administrative,

27  financial, legal, and other consulting services for the EO Enterprise.

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

24

**Exhibit A
Page 39**

1    84.    As set forth herein, each of the other individual Defendants played a

2  particular role (or multiple roles) in supporting and furthering the EO Enterprise.

3  For example:

4          (a)    Some of the Defendants are software developers.  These

5  Defendants were or are engaged in developing, updating, patching, and improving

6  the Cheating Software.  These developers then supply the software to EO for sale

7  of the public and are paid by the EO Enterprise for their work.

8          (b)    Some of the Defendants are engaged in selling licenses for the

9  Cheating Software.  They do so either by processing payments directly from the

10  EO Website and EO Discord server, or by "reselling" licenses for the Cheating

11  Software.  To become an EO reseller, the individual must submit an application to

12  EO.  Individuals who are selected to become resellers may purchase licenses for

13  the Cheating Software in bulk, and then advertise and sell the Cheating Software

14  via online advertisements or message board posts on websites dedicated to video

15  game cheating, such as "OwnedCore."  Resellers then remit their revenue to EO,

16  while retaining a portion of that revenue for themselves.

17          (c)    Some of the Defendants act as administrators, moderators, or

18  support representatives.  These individuals operate and maintain the EO Website,

19  oversee the EO Discord server, monitor and review message board postings,

20  provide updates concerning the Cheating Software, communicate with purchasers

21  of the Cheating Software, offer technical support to purchasers of the Cheating

22  Software, create tutorials or instruction manuals, and help promote the Cheating

23  Software.

24    85.    All of the Defendants work collectively in furtherance of a single

25  goal: namely, to ensure, encourage, enable, or otherwise facilitate the widespread

26  distribution and sale of the Cheating Software.  As such, Defendants are jointly and

27  severally liable for the unlawful conduct engaged in by the EO Enterprise, are

28  active participants in the trafficking of circumvention software, are collectively

Mitchell
Silberberg &
Knupp LLP
14793462.1

25

1   responsible for the ongoing contractual breaches engaged in by users of the
2   Cheating Software, are collectively responsible for the California unfair
3   competition law violations alleged herein, and are participants in the RICO
4   enterprise described herein.

5       86.   The central vehicle for the marketing and distribution of the Cheating
6   Software is the EO Website.  The EO Website claims to sell "high quality cheats"
7   based on a belief that "everyone should have the ability to win and enjoy online
8   matches."  Currently, the EO Website offers cheats for *Call of Duty: Warzone*;
9   *Call of Duty: Modern Warfare (2019)*; *Call of Duty World War II*; *Call of Duty:*
10  *Modern Warfare 3*; *Call of Duty Black Ops*; *Call of Duty Black Ops II*; and *Call of*
11  *Duty Black Ops III*.  Defendants also have developed and released a cheat for the
12  game *Overwatch*, developed and published by Activision's affiliate Blizzard
13  Entertainment, Inc.

14      87.   Visitors to the EO Website are able to purchase access to the Cheating
15  Software in various bundles for each of the offered COD Games.  Access to the
16  cheats is offered in various increments at prices ranging from 4.49€ for three days
17  of access to 19.99€ for thirty days of access, as well as 39.99€ for a full ninety
18  days of access to cheats for *Call of Duty: Modern Warfare (2019)* and *Call of*
19  *Duty: Warzone*.  The following "features" are offered for each of the cheats:

20      • Various methods and exploits designed to avoid detection by anti-
21          cheat software, as well as the ability to hide cheats from video
22          recording software (*i.e.*, in order to prevent cheats from being
23          discovered by other players recording and reviewing gameplay).
24      • Aimbots, which automatically "snap" the cheating player's aim to an
25          opponent when the opponent is visible onscreen, thereby allowing for
26          quick and precise shots.
27      • Triggerbots, which cause cheating players to automatically fire their
28          weapon when aiming at another player.

Mitchell
Silberberg &
Knupp LLP
14793462.1

26

1

      • ESP and 2D/3D Radar, which allow the cheating player to visualize

2

      opponents within the game in ways that destroy the integrity of the

3

      game, such as by allowing the cheater to see other players through

4

      walls and other obstacles.

5      88.    Defendants also either sell or bundle with the Cheating Software a

6 companion product called the "EngineOwning Spoofer" (the "EO Spoofer").  The

7 EO Spoofer is intended to circumvent and overcome HWID bans by generating

8 counterfeit digital computer access devices or "signatures."  Similar to the digital

9 "signatures" generated as part of a counterfeit credit card or other fake account

10 number, counterfeit computer signatures enable users who have been denied access

11 to the COD Game servers to fraudulently obtain unauthorized access to those

12 servers.  As described by Defendants:

13

      Our HWID (Hardware ID) Spoofer is needed, if your

14

      current computer is hardware-banned or you just want to
      prevent a hardware ban in future. It is the easiest HWID

15

      Spoofer on the market to use and due to its seamingless

16

      [*sic.*] integration with the EngineOwning Loader, you
      just need to check a box to have your hardware hidden

17

      from anti cheats.

18 The EO Spoofer is specifically advertised for use with the COD Games.

19      89.    Defendants also market and advertise the Cheating Software through

20 online social media services such as Twitter.  The "official" Engine Owning

21 Twitter account (@engineowningto) issued no fewer than 500 marketing-related

22 tweets since May 2021, and boasts more than 8,000 followers.  Activision is

23 informed and believes, and on that basis alleges, that many (if not most) of these

24 followers are located in the United States.

25      90.    Activision is informed and believes, and on that basis alleges, that in

26 addition to marketing and distributing cheats (including but not limited to the

27 Cheating Software), Defendants provide extensive and ongoing customer support

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

27

1   and technical assistance, including through the forums on the EO Website, as well
2   as by other means such as email, Telegram, and Discord.

3          91.    Activision is informed and believes, and on that basis alleges, that the
4   Cheating Software has been downloaded and used by players of the COD Games
5   thousands of times by players residing in the United States.  Activision also is
6   informed and believes that Defendants have made hundreds of thousands of
7   dollars, or more, from their distribution and sale of the Cheating Software.

8                      **Defendants' Unlawful Activities**

9          92.    Activision is informed and believes, and on that basis alleges, that in
10  order for the Cheating Software to operate with the COD Games, the Cheating
11  Software necessarily includes technology that primarily is designed to avoid,
12  bypass, evade, or otherwise circumvent Activision's anti-cheat technologies.
13  Accordingly, each time Defendants sell a license to the Cheating Software, they
14  are trafficking in technology that controls access to the COD Games.

15         93.    Defendants specifically and aggressively advertise and promote the
16  Cheating Software as having been designed to circumvent Activision's anti-cheat
17  software.  Product listings on the EO Website advertise that the Cheating Software
18  offers "multiple protection layers against anti-cheats."  The listings also include
19  certifications that the cheats will bypass and avoid detection by Activision's anti-
20  cheat software:[1]

21

22              Supported Anti Cheats

23
              • Battle.net - Supported
24            • Call of Duty Anti-Cheat - Secure
25            • Warning: You can get manually banned for cheating obvious

26

27
    _____
28  [1] *See* https://www.engineowning.to/shop/product/21/engineowning-for-call-of-
    duty-modern-warfare-2019

Mitchell
Silberberg &
Knupp LLP

14793462.1

1    94.    Each time a player uses the Cheating Software to cheat in the COD

2  Games, he or she also violates Activision's TOU, including those provisions that

3  specifically prohibit players from "us[ing], develop[ing], host[ing] or distribut[ing]

4  cheats, automation software (bots), modded lobbies, hacks, mods or any other

5  unauthorized third-party software" in connection with Activision's games "or

6  engag[ing] in any form of cheating, boosting, or booting."  Accordingly, Activision

7  is informed and believes, and on that basis alleges, that as a result of Defendants'

8  conduct, at least tens of thousands of breaches of these contracts have occurred.

9    95.    Activision is informed and believes, and on that basis alleges, that

10  Defendants are fully aware that the use of the Cheating Software violates the TOU.

11  For example, the EO Website prominently warns users that they can be "manually

12  banned" by Activision for "obvious" cheating.  This is a concern for players

13  seeking to use the Cheating Software, because some advantages conferred by the

14  Cheating Software may make players' characters do things that appear unnatural or

15  even physically impossible within the world of the game, such as quickly

16  "snapping" aim to an opposing player with speed and accuracy beyond what even

17  the most skilled player could achieve.  Consequently, the EO Website stresses that

18  the Cheating Software contains features designed to help avoid detection by the

19  naked eye, including "Smooth Aim," which slows down aim movement to make a

20  player using an Aimbot appear to be moving naturally, and "Fire Delay," which

21  causes a player using a Triggerbot to wait before automatically shooting.

22    96.    The Cheating Software has no purpose or function other than to

23  enable players to gain unauthorized access to Activision's servers and violate the

24  TOU by using cheats and exploits.  Thus, Defendants' goal is to ensure that their

25  customers continue to receive the benefits of their contracts with Activision while

26  they simultaneously engage in continuing breaches of their obligations under these

27  contracts.

28

Mitchell
Silberberg &
Knupp LLP
14793462.1

97.   On multiple occasions over the past few years, Activision has contacted or sought to contact some of the individuals suspected to be involved with EO and demanded that they cease and desist from any further development, maintenance, marketing, distribution, and sale of the Cheating Software. Activision is informed and believes, and on that basis alleges, that the Defendants in this action are and have been fully aware that their conduct violates Activision's rights but nevertheless have brazenly continued their activities.

98.   By their conduct, Defendants have caused and continue to cause serious harm to the COD Games and to Activision.  Such harm is immediate, massive and irreparable, and includes (but is not limited to) the following:

(a)   Defendants irreparably harm the ability of Activision's legitimate customers to enjoy and participate in the online experiences carefully created by Activision.  That, in turn, may cause users to grow dissatisfied with the COD Games, lose interest, and stop playing.  As a result, Activision has suffered, and continues to suffer, loss of player revenues as a result.

(b)   Defendants' knowing and willful misconduct has forced Activision to expend substantial resources attempting to remediate the damage caused by the Cheating Software.  This includes creating and releasing updates to the COD Games that counteract the Cheating Software, responding to player complaints, employing personnel to police the games to detect the use of the Cheating Software, and "banning" users who are using the Cheating Software.

(c)   Defendants' conduct harms Activision's reputation and results in the loss of significant customer goodwill.

99.   Defendants' conduct has resulted in damage to Activision in an amount to be proven at trial.  By Activision's estimation, such damage may amount to millions of dollars.  Unless and until Defendants are preliminarily or permanently enjoined, Activision will continue to suffer severe harm from the Cheating Software.

Mitchell
Silberberg &
Knupp LLP

14793462.1

30

1

2 <u>**COUNT I**</u>

3 <u>**Trafficking In Circumvention Devices**</u>

4      100.   Activision re-alleges and incorporates by reference the allegations in

5 paragraphs 1 through 99, as if set forth fully herein.

6      101.   The COD Games, including but not limited to their source code and

7 audiovisual game play environments, are copyrighted works.

8      102.   Activision has incorporated into the COD Games technological

9 measures that effectively control access to the COD Games, including access to the

10 dynamic audiovisual elements that comprise the game.

11      103.   The Cheating Software is comprised of or contains technologies,

12 products, services, devices, components, or parts thereof that primarily are

13 designed or produced for the purpose of circumventing technological measures that

14 effectively control access to the COD Games.

15      104.   The Cheating Software (and the portions thereof that circumvent

16 Activision's anti-cheat technologies) have no commercially significant purpose or

17 use other than to circumvent a technological measure that effectively controls

18 access to a copyrighted work and that protects the exclusive rights of a copyright

19 owner.

20      105.   Defendants market the Cheating Software in the United States with

21 knowledge of their use to circumvent Activision's technological access controls.

22      106.   As a result of the foregoing, Defendants are offering to the public,

23 providing, importing, or otherwise trafficking in technology that violates 17 U.S.C.

24 § 1201(a)(2).  Alternatively, Defendants are knowingly aiding and abetting or

25 contributing to the trafficking in circumvention technology by other Defendants or

26 by the Enterprise.

27

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

1       107.  Defendants' acts constituting DMCA violations have been and

2   continue to be performed without the permission, authorization, or consent of

3   Activision.

4       108.  Defendants have violated Section 1201 of the DMCA willfully and for

5   private commercial gain.

6       109.  Defendants' conduct has caused damage to Activision and has

7   unjustly enriched Defendants, in an amount to be proven at trial.

8       110.  As a result of Defendants' acts and conduct, Activision has sustained

9   and will continue to sustain substantial, immediate, and irreparable injury, for

10  which there is no adequate remedy at law.  Activision is informed and believes,

11  and on that basis alleges, that, unless enjoined and restrained by this Court,

12  Defendants will continue to violate Section 1201 of the DMCA.  Activision is

13  entitled to injunctive relief to restrain and enjoin Defendants' continuing unlawful

14  conduct.

15      111.  As a direct and proximate result of Defendants' conduct, pursuant to

16  17 U.S.C. § 1203(c), Activision is entitled to Defendants' profits attributable to

17  their violations of 17 U.S.C § 1201.

18      112.  Alternatively, Activision is entitled to the maximum statutory

19  damages, pursuant to 17 U.S.C. § 1203(c)(A), in the amount of $2,500 with respect

20  to each violation by Defendants.

21      113.  Activision further is entitled to its attorneys' fees and full costs

22  pursuant to 17 U.S.C. § 1203(b).

23

24                          **COUNT II**

25      **False Designation of Origin, 15 U.S.C. § 1125(a)**

26      114.  Activision re-alleges and incorporates by reference the allegations in

27  paragraphs 1 through 113, as if set forth fully herein.

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

32

115.   By virtue of Activision's continuous and extensive use in commerce of the COD Marks, the COD Marks have acquired secondary meaning in the marketplace in connection with Activision's goods and services.

116.   By using the COD Marks on the EO Website and otherwise in connection with Defendants' Cheating Software, Defendants' actions constitute the use in interstate commerce of a false designation of origin, false or misleading description of fact, or false or misleading representations of fact that are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of Defendants' products and services with Activision, or as to the origin, sponsorship, or approval of the goods and services provided by Defendants in violation of 15 U.S.C. § 1125(a).

117.   Activision is entitled to the relief provided by 15 U.S.C. § 1117(a), including, but not limited to, Defendants' profits, Activision's damages, and the costs of this action.

118.   Defendants knew of Activision's rights, and their infringement has been knowing, willful, and deliberate, such that the Court should award Activision its attorneys' fees pursuant to 15 U.S.C. § 1117.

119.   Defendants' activities have damaged, and threaten to continue damaging, Activision's reputation and goodwill.

120.   Activision has been, and continues to be, damaged by such acts in a manner that cannot be fully measured or compensated in economic terms and therefore has no adequate remedy at law.  Furthermore, upon showing a violation of 15 U.S.C. § 1125(a), Activision is entitled to a rebuttable presumption of irreparable harm from that violation, and seeks permanent injunctive relief pursuant to 15 U.S.C. § 1116.

Mitchell
Silberberg &
Knupp LLP
14793462.1

33

## COUNT III

**<u>Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*</u>**

121. Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 120, as if set forth fully herein.

122. Activision's COD Game Servers (the "Game Servers") are computer servers used by Activision to engage in interstate and foreign commerce. The Game Servers are protected computers under 18 U.S.C. § 1030(e)(2).

123. By developing, marketing, distributing and encouraging the use of the Cheating Software, and particularly the EO Spoofer, Defendants have knowingly aided and abetted, conspired with, or otherwise caused players of the COD Games to intentionally access the Game Servers without Activision's authorization. Specifically, Defendants have caused the EO Spoofer to be used to obtain access to the Game Servers by players that have been specifically prohibited from accessing the Game Servers. Such conduct has caused damage and/or loss to the Game Servers.

124. As a result of Defendants' conduct, Activision has suffered damages in excess of the $5,000 statutory minimum. Activision has been damaged by Defendants' actions, including in the form of decreased participation by players in the Games, investigative costs and legal fees, and the expenditure of resources to detect players who access the Game Servers without authorization.

125. Activision has also suffered irreparable and incalculable harm and injuries resulting from Defendants' conduct in the form of damages to their customers' goodwill and trust.

126. On information and belief, Defendants have continued to conspire to obtain unauthorized access to the Game Servers with the intent of harming Activision and will continue to do so unless enjoined.

**COUNT IV**

**<u>Intentional Interference With Contractual Relations</u>**

127.   Activision re-alleges and incorporates by reference the allegations in paragraphs 1 through 126, as if set forth fully herein.

128.   As described herein, in order to install and play the COD Games, licensed users in the United States first must assent to Activision's TOU.

129.   Activision's contracts with its users are valid and enforceable.

130.   Each time a purchaser of the Cheating Software uses the Cheating Software in connection with the COD Games, he or she breaches the TOU. Activision is informed and believes, and on that basis alleges, that thousands of such breaches have taken place by Defendants' customers.

131.   Activision is informed and believes, and on that basis alleges, that Defendants are aware of both the existence and specific relevant terms of contracts between Activision and its users in the United States, including the TOU. Specifically, Defendants are aware that the TOU prohibits players from using the Cheating Software and that players are at risk of being banned from the COD Games should they be caught using the Cheating Software.  Nevertheless, Defendants intentionally encourage and induce users of the COD Games to purchase and use the Cheating Software, knowing that the use of these products by their customers is a breach of these customers' contracts with Activision.

132.   By inducing Activision's users to breach their contracts with Activision, Defendants have intentionally interfered, and continue to interfere, with the contracts between Activision and its users.

133.   As a direct and proximate result of Defendants' actions, Activision has suffered damages in an amount to be proven at trial, including but not limited to a loss of goodwill among users of Activision's games, diversion of Activision's resources to attempt to detect and prevent the use of the Cheating Software,

Mitchell
Silberberg &
Knupp LLP
14793462.1

35

**Exhibit A
Page 50**

1   decreased profits, and a loss of profits from users whose accounts Activision has

2   terminated for violation of the TOU in the United States.

3       134.   As a further result of Defendants' actions, Defendants have unjustly

4   obtained specifically identifiable property, consisting of all of the proceeds

5   attributable to the sale of the Cheating Software in the United States, and any other

6   products or services that violate any of Activision's rights, and any additional

7   property traceable to those proceeds.  Those proceeds, which are directly

8   attributable to Defendants' manipulation and misuse of the COD Games and

9   intentional interference with Activision's contracts, rightfully and equitably belong

10  to Activision.

11      135.   Defendants' intentional interference with the contracts between

12  Activision and its licensed users in the United States entitles Activision to

13  injunctive relief and compensatory damages, the imposition of a constructive trust

14  over Defendants' wrongfully obtained proceeds, and other available relief.

15      136.   Defendants are guilty of oppression, fraud, or malice, and Activision,

16  in addition to its actual damages, by reason thereof, is entitled to recover

17  exemplary and punitive damages against Defendants.

18

19                        **COUNT V**

20                    **Unfair Competition**

21      137.   Activision re-alleges and incorporates by reference the allegations in

22  paragraphs 1 through 136, as if set forth fully herein.

23      138.   The acts and conduct of Defendants constitute unfair competition in

24  the United States under California Business & Professions Code § 17200 *et seq.*

25  and under California common law.

26      139.   As a direct and proximate result of Defendants' unfair competition in

27  the United States, Activision has been damaged, and Defendants have been

28  unjustly enriched, in an amount to be proven at trial for which damages and/or

Mitchell
Silberberg &
Knupp LLP

14793462.1

1   restitution and disgorgement is appropriate.  Such damages and/or restitution and
2   disgorgement should include a declaration by this Court that Defendants are
3   constructive trustees for the benefit of Activision, and an order that Defendants
4   convey to Activision the gross receipts received or to be received that are
5   attributable to the sale of the Cheating Software in the United States.

6       140.   Defendants are guilty of oppression, fraud or malice, and Activision,
7   in addition to its actual damages, by reason thereof, is entitled to recover
8   exemplary and punitive damages against Defendants.

9       141.   As a result of Defendants' acts and conduct in the United States,
10  Activision has sustained and will continue to sustain substantial, immediate, and
11  irreparable injury, for which there is no adequate remedy at law.  Activision is
12  informed and believes, and on that basis alleges, that unless enjoined and
13  restrained by this Court, Defendants will continue to engage in unfair competition.
14  Pursuant to California Business & Professions Code § 17203, Activision is entitled
15  to temporary, preliminary and permanent injunctions prohibiting further acts of
16  unfair competition.

17

18                              **COUNT VI**

19   **FEDERAL CIVIL RICO – Conduct or Participation in an Enterprise**
20                        **(18 U.S.C. § 1962(c))**

21       142.   Activision re-alleges and incorporates by reference the allegations in
22  paragraphs 1 through 141, as if set forth fully herein.

23       143.   Each individual or corporate Defendant is a "person" capable of
24  holding legal or beneficial interest in property within the meaning of 18 U.S.C. §
25  1961(3).

26       144.   Each Defendant violated 18 U.S.C. § 1962(c) by the acts and conduct
27  described above, and further described below, and Activision was injured as a
28  result.

Mitchell
Silberberg &
Knupp LLP
14793462.1

1       145.   Defendants had the specific intent to engage in the substantive RICO

2  violations alleged herein.

3                                    The Enterprise

4       146.   Defendants together form an association-in-fact enterprise in the

5  pursuit of a common and continuing purpose, *i.e.*, the development, marketing, sale

6  and distribution of the Cheating Software, which allows users to gain unauthorized

7  access to Activision's game servers in violation of Activision's TOU.

8       147.   Defendants are members of a sales and trafficking enterprise, *i.e.*, "the

9  Enterprise" as described above and herein, through which the Cheating Software is

10  marketed, sold and distributed.  Defendants coordinate and work together in order

11  to pursue and carry out the Enterprise's purpose.

12       148.   In order to choreograph and carry out the conduct of the Enterprise,

13  Defendants necessarily must, and do, establish relationships among their group as

14  members of the Enterprise in order to carry out a common course of conduct, *i.e.*, a

15  complex and multi-stage development and sales operation.  Defendants coordinate

16  their efforts to recruit individuals in the United States to market and distribute the

17  Cheating Software.  Defendants create online "groups" or "chat rooms" using

18  services and platforms based in the United States in order to coordinate their

19  promotion and sales of the Cheating Software.  Defendants coordinate efforts to

20  provide consistent and aligned "customer support" and "technical support" in the

21  United States and to U.S. users of the Cheating Software.

22       149.   The Defendants have operated the enterprise with the longevity

23  sufficient for them to form and pursue a common and consistent purpose of

24  distributing and selling tools to allow scores of banned users to break into

25  Activision's protected servers.  The Defendants have together operated and acted

26  through the Enterprise for at least three years, selling the Cheating Software to

27  many thousands of users during that time.

28

Mitchell
Silberberg &
Knupp LLP
14793462.1

38

1    150.   The Enterprise described herein thus constitutes an enterprise within
2    the meaning of 18 U.S.C. § 1961(4).

3    151.   The Enterprise has engaged in, and their activities have affected,
4    interstate, and even foreign, commerce.  Defendants include resellers located in
5    across the United States, including in North Carolina, Florida, New Jersey, and
6    Massachusetts who utilize payment platforms to undertake thousands of sales
7    transactions across multiple state lines in order to distribute the Cheating Software
8    to users all over the United States.  These U.S.-located sellers, resellers, marketers,
9    promoters, and providers of customer and technical support coordinate their sales
10   activity with their counterparts located in, *inter alia*, Germany, Spain and the
11   Netherlands.

12                     Pattern of Racketeering Activity

13   152.   The Enterprise is engaged in the conduct of Defendants' affairs
14   through a continuing pattern of racketeering activity.  Defendants, each of whom
15   are separate persons associated with, or employed by, the Enterprise, have and
16   continue to knowingly, willfully and unlawfully conduct or participate in, directly
17   or indirectly, the affairs of the Enterprise through this racketeering activity within
18   the meaning of 18 U.S.C. § 1961(1), 1961(5) and 1962(c).

19   153.   The racketeering activity was effectuated, carried out and/or made
20   possible by Defendants' regular and repeated use of the resources of the Enterprise.
21   Those resources include the creation of, and access to, Cheating Software licenses
22   for distribution and sale, a common reseller "application," a trove of marketing and
23   promotional materials, group chat and message board accounts, shared, common
24   instructions and educational materials sufficient to allow resellers and moderators
25   alike to provide uniform technical, customer, and payment support to the many
26   thousands of purchasers of the Cheating Software, both in the U.S. and abroad.
27   The resources of the Enterprise also include multiple U.S.-located servers utilized

28

Mitchell
Silberberg &
Knupp LLP
14793462.1

1  by the members of the Enterprise to access and distribute the above-enumerated

2  items.

3       154.  Defendants' acts of racketeering activity were, and are, related and

4  continuous; the Enterprise is a well-coordinated multi-level marketing machine.

5  Defendants work together to continuously sell Cheating Software licenses directly,

6  as well as recruit reseller Defendants.  A network of seller and reseller Defendants

7  have perpetuated the same steps as across thousands of instances of marketing,

8  sales, distribution, and support regarding the Cheating Software vis-à-vis numerous

9  separate U.S. customers.

10      155.  Defendants operate according to a common set of norms and rules.

11  Resellers purchase Cheating Software licenses in bulk, and then proliferate

12  Cheating Software marketing and sales through their own advertisements.  After

13  selling their bulk stock, Reseller Defendants follow the same pattern of remitting

14  revenue back to the Enterprise, while retaining a portion of revenue for themselves.

15  As described herein, Defendants carried out numerous, and certainly more than

16  two, instances of Cheating Software distribution and sales with the same or similar

17  purpose and result, participants, and methods of commission.  Indeed, thousands of

18  these instances have occurred in the United States, and thousands more have

19  occurred abroad.

20      156.  Defendants' repeated conduct has occurred during a period of time

21  beginning at least as early as 2019, and upon information and belief, as far back as

22  2012, and continuing to the present.  The conduct is ongoing, and there is a

23  continued threat of repetition of such conduct.

24                   Predicate Act of Racketeering Activity

25      157.  Defendants' conduct constitutes predicate acts of racketeering activity

26  within the meaning of indictable offenses listed within 18 U.S.C. § 1961(1)(B), as

27  more specifically alleged below.  Defendants each committed at least two such acts

28  or assisted, aided and abetted such acts.

Mitchell
Silberberg &
Knupp LLP
14793462.1

**Wire Fraud, 18 U.S.C. § 1343**

158.   Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1343.  They devised a detailed scam to defraud Activision by knowingly and intentionally gaining access to Activision's game servers and licenses under false and fraudulent pretenses, representations, and promises.  Defendants acted with the intention to gain, by fraudulent means, a limited license to use Activision's games and exploit the value of Activision's multiplayer-game server platform for Defendants' own financial gain (and to the detriment and financial injury of Activision).

159.   As alleged herein, these false and fraudulent pretenses, representations and promises include the willful, knowingly and intentionally false representation and promise Defendants made when they signed Activision's TOU.

160.   The TOU includes that Activision will grant the signatory a "personal, limited, non-exclusive license" to use its games for "non-commercial use" *expressly conditioned upon the promise and representation by the signatory* that they will not "use, develop, host or distribute cheats, automation software (bots), modded lobbies, hacks, mods or any other unauthorized third-party software" in connection with Activision's games "or engage in any form of cheating, boosting, or booting."

161.   Upon information and belief, Defendants each signed Activision's TOU under false pretenses in order to gain the benefit of the contract, while already knowing and planning to use those benefits in order to use, develop, host and distribute cheats and otherwise engage in cheating.  Defendants have been operating the Enterprise for many years, in some cases as far back as 2012, and necessarily have assented (and re-assented to updated versions of) Activision's TOU during that time in order to maintain access to the COD game servers.  Defendants fraudulently intended to continue the work of the Enterprise in

Mitchell
Silberberg &
Knupp LLP

14793462.1

41

Case 2:22-cv-00051-MWF-JC   Document 102   Filed 04/05/23   Page 57 of 129   Page ID
Case 2:22-cv-00051-MWF-JC   Document 27-3  Filed 09/16/22   Page 42 of 48   Page ID #:482
#:805

1  derogation of the false promises and representations they made in assenting to the

2  TOU.

3       162.   Defendants intended to, and did, use the representations and promises

4  contained within the wire transmission of the TOU to fraudulently hold out to

5  Activision they would not misuse the licenses granted to them, and thereafter used

6  wire transmissions to misuse those licenses.

7       163.   Activision has been, and continues to be, damaged as a direct and

8  proximate result of Defendants' participation in such conduct.  Defendants' misuse

9  of game licenses, and provision of counterfeit access devices to banned users, has

10  caused and continues to cause Activision to suffer a reduction in engaged players

11  and game revenues.

12       164.   As alleged herein, Activision has suffered harm, and been injured in,

13  the United States.  Activision's principal place of business is in California, and the

14  realization and receipt of revenues lost by the proliferation of misuse of game

15  licenses would have been realized in California.

16       165.   Activision has also been injured by the loss of COD player activity in

17  the United States specifically, and the loss of game revenue that would have been

18  obtained from U.S. players but for Defendants' fraudulent receipt of licenses to use

19  COD.  Activision has suffered injury to its business reputation and U.S. player

20  market gains, specifically in the United States.

21       **Trafficking in and Use of Counterfeit Access Devices, 18 U.S.C. § 1029**

22       166.   Defendants committed acts constituting indictable offenses under 18

23  U.S.C. § 1029.

24       167.   In violation of section 1029(a)(1), Defendants have knowingly and

25  with intent to defraud Activision, produced, used and trafficked in counterfeit

26  access devices.

27       168.   As alleged herein, the EO Spoofer includes the generation and

28  provision of counterfeit HWID personal computer "signatures," which are

Mitchell
Silberberg &
Knupp LLP

14793462.1

42

1   identification numbers, equipment and instrument identifiers, and means of

2   account access – and thus "access devices" – within the meaning of section

3   1029(e).  Similar to a credit card or other traditional account number or "key" card,

4   these HWID "signatures" can, and do, commonly serve as a digital key in today's

5   virtual marketplace to unlock various online servers restricted by paywalls,

6   memberships, etc.  These HWID "signatures" often dictate whether, and to what

7   extent, individual customers can access goods, services or other things of value

8   hosted by online servers.

9        169.   The EO Spoofer trafficked by Defendants is used to circumvent

10   Activision's anti-cheating software and, in particular, "spoof" legitimate HWID

11   number signatures with the provision of counterfeits.  Using the counterfeit

12   identification numbers (*i.e.* access devices) trafficked by Defendants, previously

13   banned player accounts can, and do, obtain unauthorized (and valuable) access to

14   Activision's COD game servers – and with it the unauthorized benefit of the

15   gameplay and entertainment services provided therein.

16        170.   Access to the services and other valuable benefits hosted by

17   Activision's game servers constitutes "goods, services, or any other thing of value"

18   within the meaning of section 1029(e).  Hundreds, if not thousands, of banned

19   players pay substantial sums of money for the valuable consideration of

20   unauthorized access to Activision's game servers every year.

21        171.   Activision has been, and continues to be, damaged as a direct and

22   proximate result of Defendants' trafficking in, and production and use of,

23   counterfeit access devices.  Defendants' misuse of game licenses, and provision of

24   counterfeit access devices to banned users, has caused and continues to cause a

25   substantial reduction in Activision game revenues.

26        172.   As alleged herein, Activision has suffered harm, and been injured in,

27   the United States.  Activision's principal place of business is in California, and the

28   realization and receipt of revenues lost by the proliferation of counterfeit access

Mitchell
Silberberg &
Knupp LLP
14793462.1

43

**Exhibit A
Page 58**

1  devices, both worldwide and in the United States, would have been realized in

2  California.

3      173.   Activision has also been injured by the loss of COD player activity in

4  the United States specifically, and the loss of game revenue that would have been

5  obtained from U.S. players but for Defendants' large-scale trafficking in, and sales

6  of, counterfeit access devices.  Hundreds, if not thousands, of previously banned

7  U.S. players have used counterfeit access devices provided by Defendants to

8  access COD game servers.  And, hundreds, if not thousands, of non-cheating U.S.

9  players have stopped playing (and making in-game purchases) because of the

10  presence of cheating players.  Activision has suffered injury to its business

11  reputation and U.S. player market gains, specifically in the United States.

12      174.   Activision maintains U.S.-located game servers.  These servers have

13  all been improperly accessed by players using counterfeit access devices trafficked

14  and sold by Defendants.

15

16                    **COUNT VII**

17           **FEDERAL CIVIL RICO – Conspiracy**

18                  **(18 U.S.C. § 1962(d))**

19      175.   Activision incorporates herein by reference the averments of

20  paragraphs 1 through 174, as though fully set forth herein.

21      176.   In violation of 18 U.S.C § 1962(d), Defendants knowingly, willfully

22  and unlawfully conspired and continue to conspire to facilitate and carry out the

23  above-described Enterprise, which includes the operation of the Enterprise through

24  a pattern of racketeering activity as alleged herein.

25      177.   The conspiracy commenced at least as early as 2019, and in some

26  instances 2012, and is ongoing.

27      178.   The purpose of Defendants' conspiracy was, and is, the development,

28  marketing, sale and distribution of the Cheating Software, which allows users to

Mitchell
Silberberg &
Knupp LLP

14793462.1

44

**Exhibit A
Page 59**

1  gain unauthorized access to Activision's game servers in violation of Activision's

2  TOU.

3      179.   Upon information and belief, each Defendant committed at least one

4  overt act in furtherance of the conspiracy, including *inter alia* recruiting and

5  serving as U.S. resellers of the Cheating Software, providing customer, sales and

6  technical support to U.S. users of the Cheating Software, and marketing and

7  promoting the Cheating Software.

8      180.   The purpose of Defendants' acts was to advance the overall object of

9  the conspiracy, which in turn was to fraudulently undertake and promote mass-

10  scale misuse of Activision's game licenses, as well as traffic counterfeit access

11  devices.

12      181.   Activision has been, and continues to be, damaged as a direct and

13  proximate result of Defendants' participation in such conduct.  Defendants' misuse

14  of game licenses, and provision of counterfeit access devices to banned users, has

15  caused and continues to cause damage to Activision's business reputation and a

16  reduction in Activision game revenues.

17      182.   Activision has also been injured by the loss of COD player activity in

18  the United States specifically, and the loss of game revenue that would have been

19  obtained from U.S. players but for Defendants' large-scale trafficking and sales of

20  counterfeit access devices. Hundreds, if not thousands, of previously banned U.S.

21  players have used counterfeit access devices provided by Defendants to access

22  COD game serves.  And, hundreds, if not thousands, of non-cheating U.S. players

23  have stopped playing (and making in-game purchases) because of the presence of

24  cheating players.  Activision has suffered injury to its business reputation and U.S.

25  player market gains specifically in the United States.

26      183.   Activision maintains game servers throughout the United States.

27  These servers have all been improperly accessed by players using counterfeit

28  access devices trafficked and sold by Defendants.

Mitchell
Silberberg &
Knupp LLP

14793462.1

45

## **PRAYER FOR RELIEF**

WHEREFORE, Activision prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including but not limited to an order:

1.    Preliminarily and permanently enjoining Defendants, their officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and all persons acting in concert or participation with Defendants from: (i) trafficking in circumvention devices in the United States; (ii) improperly accessing Activision's protected servers without authorization; (iii) intentionally interfering with Activision's or its affiliates' contracts with players in the United States; and (iv) engaging in unfair competition in the United States.

2.    Requiring Defendants to shut down the Cheating Software, any forthcoming software that allows players to cheat in any game published by Activision or its affiliates, and any colorable copies thereof, hosted at any domain, address, location, or ISP.

3.    Requiring Defendants to deliver to Activision for impoundment or destruction all copies of materials that infringe or violate any of Activision's rights, as described herein, including, without limitation, the source code for the Cheating Software.

4.    Requiring Defendants to provide Activision with an accounting of any and all sales of products or services in the United States that infringe or violate any of Activision's or affiliates' rights, as described herein.

5.    Awarding Activision actual or maximum statutory damages for violation of Section 1201 of the DMCA, as appropriate, pursuant to 17 U.S.C. § 1203(c).

6.    Awarding Activision exemplary and punitive damages against Defendants on Activision's cause of action for intentional interference with contractual relations.

Mitchell
Silberberg &
Knupp LLP

14793462.1

46

**Exhibit A
Page 61**

1     7.     Awarding Activision restitution of Defendants' unlawful proceeds,

2    including an accounting of any and all sales of the Cheating Software in the United

3    States, and/or any other products or services that violate any of Activision's rights

4    described herein.

5     8.     Imposing a constructive trust over the proceeds unjustly obtained by

6    Defendants through the sales of the Cheating Software in the United States, and/or

7    any other products or services that violate any of Activision's rights described

8    herein.

9     9.     Awarding such other and further relief as this Court may deem just

10   and appropriate.

11

12  DATED:  September 16, 2022     MARC E. MAYER

13                           MARK C. HUMPHREY
                               GENEVIEVE L. JAVIDZAD

14                           MITCHELL SILBERBERG & KNUPP LLP

15

16                     By: */s/ Marc E. Mayer*
                            Marc E. Mayer (SBN 190969)
                            Attorneys for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

47

1

## JURY DEMAND

2            Activision demands a trial by jury on all issues so triable.

3

4   DATED:  September 16, 2022      MARC E. MAYER
                              MARK C. HUMPHREY

5                              GENEVIEVE L. JAVIDZAD
                              MITCHELL SILBERBERG & KNUPP LLP

6

7                      By:   */s/ Marc E. Mayer*

8                           Marc E. Mayer (SBN 190969)
                           Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

**Exhibit A
Page 63**

# ANTRAG
## AUF ZUSTELLUNG GERICHTLICHER UND AUSSERGERICHTLICHER SCHRIFTSTÜCKE IM AUSLAND

**Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965.**

| Identität und Anschrift des Antragstellers | Anschrift der Empfangsbehörde |
|---|---|
| **ABC Legal Services**<br>**633 Yesler Way**<br>**Seattle, WA 98104**<br>**USA**<br><br><br>Zugelassener Antragsteller gemäß dem öffentlichen Gesetz 97-351 vom 26. Februar 1983, das die Regel 4(c) 2(a) der Zivilprozessordnung änderte | **Ministerium der Justiz des Landes**<br>**Brandenburg**<br>**Heinrich-Mann-Allee 107**<br>**14473 Potsdam**<br>**Deutschland** |

Der unterzeichnete Antragsteller übermittelt in zweifacher Ausfertigung die unten bezeichneten Schriftstücke und ersucht in Übereinstimmung mit Artikel 5 des obengenannten Übereinkommens um die unverzügliche Zustellung einer Ausfertigung davon an den folgenden Adressaten:

    (Identität und Anschrift)
    **CHARLIE WIEST**
    **Friedenstraße 13C**
    **15741 Bestensee**
    **Deutschland**

    GEBURTSDATUM:            Telefon:

[x] (a) in Übereinstimmung mit den Bestimmungen von Unterabsatz (a) des ersten Absatzes von Artikel 5 des Übereinkommens.*

[ ] (b) in Übereinstimmung mit der folgenden spezifischen Methode (Unterabsatz (b) des ersten Absatzes von Artikel 5):*

_____

[ ] (c) durch Zustellung an den Adressaten, falls er diese freiwillig annimmt (zweiter Absatz von Artikel 5).*

Die Behörde wird darum ersucht, dem Antragsteller eine Ausfertigung der Schriftstücke – und der Anlagen* – zu senden oder dies zu veranlassen – mit einem Nachweis, wie dies auf der Rückseite vorgesehen ist.

| Datum der Anhörung:<br><br>Liste der Schriftstücke:<br>**LADUNG IN EINER ZIVILKLAGE ZU EINER ABGEÄNDERTEN KLAGE; ABGEÄNDERTE KLAGE WEGEN: (1) UNERLAUBTEM HANDEL VON UMGEHUNGSGERÄTEN; (2) FALSCHE BEZEICHNUNG DER HERKUNFT; (3) VERSTOSS GEGEN DEN COMPUTER FRAUD AND ABUSE ACT;  (4) VORSÄTZLICHEM EINGRIFF IN VERTRAGLICHE BEZIEHUNGEN; (5) UNLAUTEREN WETTBEWERB; (6) VERSTÖSSE GEGEN DAS RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C); VERSTÖSSE GEGEN DAS RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(D); SOWOHL AUF ENGLISCH ALS AUCH AUF DEUTSCH** | Geschehen in Seattle, Washington, USA am 26. September 2022<br>Unterschrift und/oder Stempel<br><br><br><br>[Logo: abclegal] |

Trackingnummer: **0093948117**
    [Barkode]

USM-94 (VOM 22.11.1977)
(Ehemals OBD-116, was offiziell LAA-116 war, wobei beides möglicherweise noch verwendet wird)
* Nichtzutreffendes streichen

## BESCHEINIGUNG

**Der Unterzeichnete bescheinigt in Übereinstimmung mit Artikel 6 des Übereinkommens,**

1) Dass das Schriftstück zugestellt wurde*
   am (Datum) _____
   an der Adresse (Ort, Straße, Nummer) _____
   _____

   auf eine der folgenden, von Artikel 5 zugelassenen Weisen:
   [ ] (a) in Übereinstimmung mit den Bestimmungen des Unterabschnitts (a)
   des ersten Paragrafen von Artikel 5 des Übereinkommens.*

   [ ] (b) in Übereinstimmung mit der folgenden Methode:*
   _____
   _____

   [ ] (c) durch Zustellung an den Empfänger, der es freiwillig angenommen hat.*

   Die in diesem Antrag genannten Schriftstücke wurden geliefert an:
   (Identität und Beschreibung der Person)
   _____

   Beziehung zum Empfänger (Familienangehöriger, Unternehmen oder sonstiges)
   _____

2) Dass das Schriftstück nicht zugestellt wurde aufgrund der folgenden Fakten:*
   _____
   _____


**In Übereinstimmung mit dem zweiten Abschnitt von Artikel 12 des Übereinkommens muss der Antragsteller die in der beigefügten Erklärung aufgeführten Kosten zahlen oder wiedererstatten.***


Anlagen

Zurückgesandte Schriftstücke:

_____          Geschehen in _____, am _____

_____          Unterschrift und/oder Stempel
_____

In entsprechenden Fällen, Schriftstücke, die die
Zustellung begründen:                      _____

_____
_____
_____
_____

Trackingnummer: **0093948117**
[Barkode]

USM-94 (VOM 22.11.1977)
(Ehemals OBD-116, was offiziell LAA-116 war, wobei
beides möglicherweise noch verwendet wird)
* Nichtzutreffendes streichen

**Exhibit A**
**Page 65**

## ZUSAMMENFASSUNG DES ZUZUSTELLENDEN SCHRIFTSTÜCKS

**Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965.**

### (Artikel 5, 4. Absatz)

Name und Anschrift der ersuchenden Behörde:　　**ABC Legal Services**
**633 Yesler Way**
**Seattle, WA 98104**
**USA**

Angaben zu den Parteien:
**ACTIVISION PUBLISHING, INC., ein**　　gegen　　**ENGINEOWNING UG, ein deutsches**
**Unternehmen von Delaware**　　　　　　　　　　**Unternehmen; und Andere**

## GERICHTSDOKUMENT*

Art des Dokuments:
**Benachrichtigung des Beklagten über die Einleitung eines Zivilverfahrens gegen ihn.**

Art und Zweck des Verfahrens und ggf. Angabe des Streitwerts:
**Der Kläger ersucht um die gerichtliche Erlangung von zivilrechtlichem Schadenersatz und anderen Rechtsbehelfen, in einer bei Gericht festzulegenden Höhe.**

Datum und Ort der Einlassung:*
**Der Beklagte hat 21 Tage nach Erhalt der beiliegenden Ladung, um sich schriftlich bei Gericht einzulassen. Die Anschrift ist auf der Ladung vermerkt.**

Gericht, das das Urteil erlassen hat:*
**k.A.**

Datum des Urteils:*
**k.A.**

Die in dem Schriftstück genannten Fristen:*
　　Datum der Anhörung:

## AUSSERGERICHTLICHES SCHRIFTSTÜCK*

Art des Dokuments:
**k.A.**

Die in dem Schriftstück genannten Fristen:*
**k.A.**

Trackingnummer: **0093948117**
　　[Barkode]

USM-94 (VOM 22.11.1977)
(Ehemals OBD-116, was offiziell LAA-116 war, wobei
beides möglicherweise noch verwendet wird)
* Nichtzutreffendes streichen.

**Exhibit A**
**Page 66**

**ACHTUNG**

Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil-
oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965.

**Identität und Anschrift des Empfängers:**

CHARLIE WIEST
Friedenstraße 13C
15741 Bestensee
Deutschland

**WICHTIG**

*DAS BEIGEFÜGTE SCHRIFTSTÜCK IST RECHTLICHER NATUR UND WIRKT SICH
MÖGLICHERWEISE AUF IHRE RECHTE UND PFLICHTEN AUS. DIE „ZUSAMMENFASSUNG
DES ZUZUSTELLENDEN SCHRIFTSTÜCKS" INFORMIERT SIE ÜBER DIE ART UND DEN
ZWECK DES SCHRIFTSTÜCKS. SIE SOLLTEN JEDOCH DAS SCHRIFTSTÜCK SELBST
GENAU DURCHLESEN. ES IST MÖGLICHERWEISE NOTWENDIG, EINEN RECHTSANWALT
HINZUZUZIEHEN.*

*WENN IHRE FINANZIELLEN MITTEL UNZUREICHEND SIND, SOLLTEN SIE SICH DAZU
INFORMIEREN, OB ES IHNEN MÖGLICH IST, RECHTSBEIHILFE ODER JURISTISCHEN RAT
ZU ERHALTEN, ENTWEDER IN DEM LAND, IN DEM SIE LEBEN ODER IN DEM LAND, IN DEM
DAS SCHRIFTSTÜCK ERTEILT WURDE.*

*ANFRAGEN ZUR VERFÜGBARKEIT VON RECHTSBEIHILFE ODER JURISTISCHEN RAT IN
DEM LAND, IN DEM DAS SCHRIFTSTÜCK ERTEILT WURDE, KÖNNEN GERICHTET
WERDEN AN DAS:*

US-BEZIRKSGERICHT FÜR DEN ZENTRALEN BEZIRK VON KALIFORNIEN

*Es wird empfohlen, dass die Standardklauseln in der Mitteilung in englischer und französischer
Sprache verfasst werden, und wenn anwendbar, auch in der Amtssprache oder in einer der
Amtssprachen des Staates, in dem das Schriftstück verfasst wurde. Die Leerstellen können
entweder in der Sprache des Staates, an den die Schriftstücke zu schicken sind, ausgefüllt
werden oder in Englisch oder Französisch.*

Trackingnummer: **0093948117**
[Barkode]

USM-94 (VOM 22.11.1977)
(Ehemals OBD-116, was offiziell LAA-116
war, wobei beides möglicherweise noch verwendet wird)
* Nichtzutreffendes streichen.

US-BEZIRKSGERICHT FÜR DEN ZENTRALEN BEZIRK VON KALIFORNIEN

| | |
|---|---|
| **ACTIVISION PUBLISHING, INC., ein Unternehmen von Delaware** | Fall-Nr.   **2:22-cv-00051-MWF (JCx)** |
| Kläger/Antragsteller | |
| gegen | |
| **ENGINEOWNING UG, ein deutsches Unternehmen; und Andere** | ZUSTELLURKUNDE |
| Beklagter/Antragsgegner | |

Diese Zustellung wurde ausgeführt in Übereinstimmung mit dem Haager Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke in Zivil- oder Handelssachen ins Ausland (Geschehen in Den Haag am 15. November 1965) (Rechtswirksam für die USA seit 10. Februar 1969). Die beigefügte Zustellurkunde ist auch konform.

**ABC Legal Services,**
633 Yesler Way, Seattle WA 98104, USA
+1 206-521-9000
Trackingnummer **0093948117**
[Barkode]

**ORIGINAL
ZUSTELLURKUNDE**

**Mitchell Silberberg & Knupp LLP**
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
+1 310-312-2000

Seite 1 von 1

**Exhibit A
Page 68**

Rechtssache 2:22-cv-00051-MWF-JC   Dokument 36   Eingereicht am 19.9.2022   Seite 1 von 3   Seiten-ID Nr. 558

AO 440 (Fassung 06/12) Ladung in einem Zivilverfahren
=================================================================================================

# US-BEZIRKSGERICHT
für den
## ZENTRALEN BEZIRK VON KALIFORNIEN

|  |  |
|---|---|
| ACTIVISION PUBLISHING, INC., ein Unternehmen von Delaware,<br><br>*Kläger*<br>gegen<br><br>ENGINEOWNING UG, ein deutsches Unternehmen,<br>[siehe Beilage]<br><br>*Beklagte(r)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Zivilklagenr. 2:22-cv-00051-MWF (JCx) |

### LADUNG IN EINEM ZIVILVERFAHREN ZU EINER ABGEÄNDERTEN KLAGE

An: *(Name und Anschrift des Beklagten)*
Charlie Wiest
Puschkinstraße 13c, 15711 Königs Wusterhausen
Friedenstraße 12C, 15741 Bestensee

Gegen Sie wurde ein Gerichtsverfahren eingeleitet.

Sie müssen innerhalb von 21 Tagen nach der Zustellung dieser Ladung an Sie (ausgenommen dem Tag, an dem Sie sie erhalten haben) --- oder 60 Tage, wenn Sie die Vereinigten Staaten von Amerika sind oder eine Behörde der Vereinigten Staaten von Amerika, oder ein Beamter oder Mitarbeiter der Vereinigten Staaten von Amerika, wie beschrieben in Fed. R. Civ. P. 12 (a)(2) oder (3) --- dem Kläger eine Erwiderung zu der beigefügten Klage oder einen Antrag nach Regel 12 der Federal Rules of Civil Procedure (FRCP) zustellen. Die Erwiderung oder der Antrag müssen dem Kläger oder dem Rechtsanwalt des Klägers zugestellt werden, dessen Name und Anschrift folgende(r) ist:
Marc E. Mayer (SBN 190969)
Mitchell Silberberg & Knupp LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067, USA
Tel. +1 (310) 312-2000

Wenn Sie die Klage nicht erwidern, wird gegen Sie ein Versäumnisurteil gefällt für den in der Klage geforderten Rechtsbehelf. Sie müssen Ihre Erwiderung oder Ihren Antrag auch bei Gericht einreichen.

Datum:   19. September 2022

*URKUNDBEAMTER DES GERICHTS*
[Unterschrift]                    [Siegel]

*Unterschrift des Urkundsbeamten oder des
Stellvertreters des Urkundsbeamten*

American LegalNet, Inc.
www.FormsWorkFlow

Rechtssache 2:22-cv-00051-MWF-JC   Dokument 36   Eingereicht am 19.9.2022   Seite 2 von 3   Seiten-ID Nr. 559

Formular AO 440 (Fassung 06/12) Ladung in einem Zivilverfahren (Seite 2)

Zivilklagenr.

## ZUSTELLNACHWEIS
*(Dieser Abschnitt ist nicht bei Gericht einzureichen, es sei denn dies wird von Fed. R. Civ. P. 4 (l) verlangt)*

Diese Ladung für (*Name der Person und ggf. Titel*) _____

wurde von mir erhalten am (*Datum*) _____ .

☐ Ich habe die Ladung persönlich dem Beklagten zugestellt. Ort, an dem zugestellt wurde: _____
_____ am (*Datum*) _____ ; oder

☐ Kopien bei der Wohnadresse des Beklagten oder beim gewöhnlichen Aufenthaltsort des Beklagten hinterlassen
bei (*Name*) _____ , eine Person ausreichenden Alters und Geschäftsfähigkeit,
die damals dort gewohnt hat, und zwar am (*Datum*) _____ , und eine Kopie an die zuletzt bekannte Adresse der
Person zugesandt; oder

☐ Ich habe die Ladung (*Name der Person*) _____ zugestellt, der/die per Gesetz
bestimmt ist, die Zustellung der Gerichtsdokumente im Namen von (*Name der Organisation*) _____
_____ anzunehmen, und zwar am (Datum) _____ ; oder

☐ Ich habe die Ladung als „Nicht zugestellt" zurückgeschickt, weil _____ ; oder

☐ Sonstiges (*bitte angeben*): _____

Meine Gebühren belaufen sich auf US$ _____ für Reisekosten und US$ _____ für Dienste, auf insgesamt
US$ 0,00.

Ich erkläre unter Androhung einer Strafe für Meineid, dass diese Angaben wahr sind.

Datum: _____

_____
*Unterschrift des Zustellers*

_____
*Name und Titel in Druckschrift*

_____
*Adresse des Zustellers*

Weitere Angaben zu der versuchten Zustellung usw.:

American LegalNet, Inc.
www.FormsWorkFlow.com



Rechtssache 2:22-cv-00051-MWF-JC  Dokument 36 Eingereicht am 19.9.2022  Seite 3 von 3  Seiten-ID Nr. 560

1  MARC E. MAYER (SBN 190969)
   mem@msk.com
2  MARK C. HUMPHREY (SBN 291718)
   mxh@msk.com
3  GENEVIEVE L. JAVIDZAD (SBN 336138)
   glj@msk.com
4  MITCHELL SILBERBERG & KNUPP LLP
5  2049 Century Park East, 18. Etage
   Los Angeles, CA  90067-3120, USA
6  Tel. +1 (310) 312-2000
   Fax +1 (310) 312-3100
7
   Rechtsanwälte für den Kläger
8
                    US-BEZIRKSGERICHT
9          ZENTRALER BEZIRK VON KALIFORNIEN
10
11  ACTIVISION PUBLISHING, INC., ein          ZIVILKLAGENR. 2:22-cv-00051-MWF (JCx)
    Unternehmen von Delaware,                 [Zugeteilt an Richter Michael W. Fitzgerald]
12                                            ABGEÄNDERTE KLAGE WEGEN:
13             Kläger,
                                                (1) UNERLAUBTEM HANDEL VON
14         gegen                                    UMGEHUNGSGERÄTEN

15  ENGINEOWNING UG, ein deutsches
    Unternehmen, CMM HOLDINGS S.A., ein
16  deutsches Unternehmen, GARNATZ
    ENTERPRISE LTD, ein Unternehmen von        (2) VERSTOSS GEGEN DEN COMPUTER
17  Belize, VALENTIN RICK, LEONARD BUGLA,          FRAUD AND ABUSE ACT
    LEON FRISCH, IGNACIO GAYDUCHENKO,
18  MARC-ALEXANDER RICHTS, ALEXANDER           (3) VORSÄTZLICHEM EINGRIFF IN
    KLEEMAN, LEON SCHLENDER, ERICK                VERTRAGLICHE BEZIEHUNGEN
19  PFEIFER, BENNET HUCH, ZAIN JONDAH,
    RICKY SZAMEITAT, MARCEL BINDEMANN,         (4) UNLAUTEREN WETTBEWERB
20  ALEXANDER KLEEMANN, REMO LÖFFLER,
    MARVIN BAOTIC NEUMEYER, HENDRIK            (5) VERSTÖSSE GEGEN DAS
21  SMAAL, CHARLIE WIEST, DENNIS REISSLEICH,       RACKETEERING INFLUENCED AND
    TYLER BYRD, SIMON MASIAS, NICHOLAS             CORRUPT ORGANIZATIONS ACT,
22  JAMES BALDWIN, ANTONIO MEDIAN, REMY            18 U.S.C. § 1962(C)
    CARTIGNY, PASCAL CLASSEN, MANUEL
23  T. SANTIAGO UND KATERINA DISDLE, und       (6) VERSTÖSSE GEGEN DAS
    DOE-BEKLAGTE 1 bis einschließlich 50;          RACKETEERING INFLUENCED AND
24                                                 CORRUPT ORGANIZATIONS ACT,
                                                   18 U.S.C. § 1962(D)
25             Beklagte.
                                              Forderung eines Geschworenenprozesses
26
27
28
Mitchell
Silberberg &
Knupp LLP

14793462.1

1  MARC E. MAYER (SBN 190969)
   mem@msk.com
2  MARK C. HUMPHREY (SBN 291718)
   mxh@msk.com
3  GENEVIEVE L. JAVIDZAD (SBN 336138)
   glj@msk.com
4  MITCHELL SILBERBERG & KNUPP LLP
   2049 Century Park East, 18. Etage
5  Los Angeles, CA  90067-3120, USA
   Tel. +1 (310) 312-2000
6  Fax +1 (310) 312-3100
7
8  Rechtsanwälte für den Kläger

9                    US-BEZIRKSGERICHT

10           ZENTRALER BEZIRK VON KALIFORNIEN

11  ACTIVISION PUBLISHING, INC., ein       ZIVILKLAGENR. 2:22-cv-00051-MWF (JCx)
    Unternehmen von Delaware,
12                                          [Zugeteilt an Richter Michael W. Fitzgerald]

13                                          ABGEÄNDERTE KLAGE WEGEN:
              Kläger,
14                                          (1) UNERLAUBTEM HANDEL VON
         gegen                                  UMGEHUNGSGERÄTEN
15
16  ENGINEOWNING UG, ein deutsches          (2) FALSCHE BEZEICHNUNG DER
    Unternehmen, CMM HOLDINGS S.A., ein         HERKUNFT
    deutsches Unternehmen, GARNATZ
17  ENTERPRISE LTD, ein Unternehmen von     (3) VERSTOSS GEGEN DEN COMPUTER
    Belize, VALENTIN RICK, LEONARD BUGLA,       FRAUD AND ABUSE ACT;
18  LEON FRISCH, IGNACIO GAYDUCHENKO,
    MARC-ALEXANDER RICHTS, ALEXANDER      (4) VORSÄTZLICHEM EINGRIFF IN
19  KLEEMAN, LEON SCHLENDER, ERICK            VERTRAGLICHE BEZIEHUNGEN;
    PFEIFFER, BENNET HUCH, ZAIN JONDAH,
20  RICKY SZAMEITAT, MARCEL BINDEMANN,     (5) UNLAUTEREM WETTBEWERB;
    ALEXANDER KLEEMANN, REMO LÖFFLER,
21  MARVIN BAOTIC NEUMEYER, HENDRIK        (6) VERSTÖSSE GEGEN DEN
    SMAAL, CHARLIE WIEST, DENNIS REISSLEICH,    RACKETEERING INFLUENCED
22  TYLER BYRD, SIMON MASIAS, NICHOLAS         AND CORRUPT ORGANIZATIONS ACT,
    JAMES BALDWIN, ANTONIO MEDIAN, REMY        18. U.S.C. § 1962(C);
23  CARTIGNY, PASCAL CLASSEN, MANUEL T.
    SANTIAGO UND KATERINA DISDLE, und      (7) VERSTÖSSE GEGEN DEN
24  DOE-Beklagte 1 bis einschließlich 50,      RACKETEERING INFLUENCED AND
                                               CORRUPT ORGANIZATIONS ACT,
25            Beklagte.                        18. U.S.C. § 1962(D);

26                                             Forderung eines Geschworenenprozesses

27

Mitchell   28
Silberberg &
Knupp LLP

14793462.1

Activision Publishing, Inc. („Activision" oder „Kläger") behauptet Folgendes:

### EINLEITENDE AUSFÜHRUNGEN

1.      Activision ist der Eigentümer und Herausgeber der *Call of Duty* Serie von Videospielen (die „COD-Spiele"). Durch dieses Gerichtsverfahren beabsichtigt Activision das unrechtmäßige Verhalten eines multinationalen Unternehmens zu stoppen, das zahlreiche schädliche Softwareprodukte für Profit verteilt und verkauft, welche es Mitgliedern der Öffentlichkeit erlauben sollen, unfaire Wettbewerbsvorteile (*d. h.* Cheaten) in COD-Spielen zu erlangen. Diese fortlaufenden Aktivitäten schaden Activisions Spielen, seinem gesamten Geschäft und dem Erlebnis der COD-Spielegemeinschaft.

2.      EngineOwning („EO" oder das „Unternehmen") ist ein gewerbliches Unternehmen, das aus einer deutschen Geschäftseinheit und mehr als einem Dutzend Privatpersonen (zusammen, „Bekagte") besteht. Die Beklagten sind gemeinsam und zusammen tätig mit der Entwicklung, Verkauf, Vertrieb, Vermarktung und Ausnutzung eines Portfolios an böswilligen Cheats und Hacks für beliebte Online-Multiplayer-Spiele, insbesondere die COD-Spiele. Über ihre offizielle Website (www.engineowning.to) (die „EO-Website") und andere damit verbundene Websites und Social-Media-Accounts verkaufen EO und zahlreiche angegliederte Einzelpersonen und Wiederverkäufer Cheats für zahlreiche COD-Spiele, darunter u. a. *Call of Duty: Warzone, Call of Duty: Modern Warfare (2019), Call of Duty World War II, Call of Duty: Modern Warfare III; Call of Duty Black Ops, Call of Duty Black Ops II* und *Call of Duty Black Ops III* (gemeinsam, die „Cheating-Software"). EO hat auch kürzlich neue Cheating-Software für das beliebte Multiplayer-Spiel *Overwatch* herausgegeben, das von dem verbundenen Unternehmen von Activision, Blizzard Entertainment, Inc., herausgegeben wird. Die Cheating-Software ermöglicht es den Spielern, die COD-Spiele zu ihrem persönlichen Vorteil zu manipulieren, wie zum Beispiel das automatische Zielen von Waffen, die Preisgabe der Orte von Gegnern, und die Möglichkeit für den Spieler Infomationen zu sehen, die den Spielern üblicherweise nicht zur Verfügung stehen, weil dies ihnen einen unfairen Wettbewerbsvorteil im Spiel geben würde.

Mitchell Silberberg & Knupp LLP

14793462.1

**Exhibit A
Page 73**

3.    Die COD-Spiele sind so gestaltet, das sie von allen Spielern genossen werden können und für alle Spieler fair sind. Wenn Spieler Exploits wie die Cheating-Software verwenden, beeinträchtigt dieses Verhalten das Spiele-Gleichgewicht, und in vielen Fällen führt es dazu, dass Spieler, die nicht schummeln, die Matche frustriert verlassen. Weitverbreitetes Cheating kann auch negative Posts in den Social Medien und negative Schlagzeilen in den Medien zur Folge haben, was sich negativ auf das Verbrauchervertrauen auswirkt. Dementsprechend hat Activision enorme Mengen an Ressourcen ausgegeben, und wird dies auch weiterhin tun, um das Cheating in seinen Spielen zu bekämpfen. Ungeachtet all dieser Bemühungen hat der Verkauf und der Vertrieb der Cheating-Software durch die Beklagten Activision massiven und nicht wieder gutzumachenden Schaden an seinem Firmenwert und Ruf angerichtet und dazu geführt, dass Activision wesentliche Einnahmensverluste erlitten hat.

4.    Durch die Erstellung, die Vermarktung, den Verkauf, die Wartung und den Vertrieb von Cheating-Software haben die Beklagten nach dem US-Recht und den Gesetzen von Kalifornien zahlreiche rechtswidrige Handlungen vorgenommen. Die Beklagten haben den Paragrafen 1201 des Digital Millennium Copyright Act („DMCA"), 17 U.S.C. § 1201(b)(1) verletzt, und dies durch den Verkauf, die Einfuhr, das Angebot, die Bereitstellung und anderweitigen rechtswidrigen Handel von Technologien, die die von Activision zum Schutz der Integrität von COD-Spielen verwendeten Anti-Cheat-Technologien umgehen oder ihnen ausweichen. Darüberhinaus ermöglichen die Beklagten durch den Verkauf (oder Aufnahme in ihren Produkten) von sogenannter „Hardware-ID" („HWID") Spoofer der Öffentlichkeit den Zugriff auf beschränkte Services, auf die sie vorher keinen Zugriff hatten. Die Beklagten haben auch wissentlich, vorsätzlich und böswillig in die Verträge eingegriffen oder sie beeinträchtigt, die Activision mit seinen Kunden in den USA hat, die explizit die genaue Art von Cheating, die die Beklagten durch die Vermarktung und den Verkauf ihrer Cheating-Software ermöglichen, dazu ermutigen und erbitten, verbieten.

Mitchell Silberberg & Knupp LLP

14793462.1

3

1  Die Beklagten haben unlauteren Wettbewerb begangen gemäß dem California Business &

2  Professions Code § 17200 ff. und nach dem allgemeinen Recht von Kalifornien, durch das

3  Betreiben eines rechtswidrigen, unfairen und/oder betrügerischen Geschäfts. Letzlich haben

4  die Beklagten das Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18

5  U.S.C. §§ 1962(c) und 1962(d) verletzt durch das Betreiben und die Beteiligung an einem

6  Unternehmen, das illegale Geschäfte tätigt.

7        5.        Die Beklagten wissen nicht nur, dass ihr Verhalten rechtswidrig ist, sondern

8  sie nehmen diese Handlungen mit der vorsätzlichen Absicht vor, Activision, Activisions

9  Geschäften und dessen Spielergemeinschaft zu schaden. Dieses Gericht muss das

10  Fehlverhalten der Beklagten stoppen, und Activision hat Anspruch auf finanziellen

11  Schadenersatz, Unterlassungs- und andere billigkeitsrechtliche Ansprüche und Anspruch

12  auf Strafschadenersatz gegen die Beklagten.

13

14              **ZUSTÄNDIGKEIT UND GERICHTSSTAND**

15        6.        Dies ist eine Zivilklage auf Schadenersatz, Unterlassungs- und andere

16  billigkeitsrechtliche Ansprüche nach den Umgehungsverbotsbestimmungen von DMCA, 17

17  U.S.C. § 1201 und den Gesetzen des US-Bundesstaates Kalifornien.

18        7.        Dieses Gericht ist sachlich für die Ansprüche von Activision wegen der

19  Verletzung von Umgehungsverbotsbestimmungen von DMCA nach 28 U.S.C. § 1331 und §

20  1338(a) zuständig. Gemäß 28 U.S.C. § 1367 hat dieses Gericht die ergänzende

21  Zuständigkeit für auf einzelstaatliches Recht gestützte Ansprüche von Activision wegen

22  vorsätzlichem Eingriff in vertragliche Beziehungen und unlauterem Wettbewerb, die mit

23  Acitvisions bundesstaatlichen Ansprüchen derart verbunden sind, dass sie ein Teil

24  desselben Falls oder derselben Kontroverse sind.

25        8.        Dieses Gericht ist für die Beklagten und für das Unternehmen als Ganzes

26  personenbezogen zuständig, weil die Beklagten und das Unternehmen vorsätzlich ihre

27  Aktivitäten auf die USA gerichtet haben, und auf Kalifornien insbesondere, sie vorsätzlich die

28

Mitchell
Silberberg &
Knupp LLP

14793462.1                                    4

1  Nutzen der Geschäftsbetreibung in Kalifornien in Anspruch genommen haben und eine

2  fortdauernde Präsenz in Kalifornien gegründet haben. Activision ist unterrichtet und glaubt,

3  und behauptet auf dieser Grundlage, dass ohne Beschränkung Folgendes geschah:

4        (a)     Der *einzige* Zweck der Cheating-Software ist einem von Activision im

5  Bundesstaat Kalifornien entwickelten und veröffentlichten Videospiel zu schaden. Daher

6  wurde die Cheating-Software entwickelt und konzipiert, um auf Activision und seine Produkte

7  abzuzielen, die massive Investition von Activision in die COD-Spiele zu entwerten, und die

8  Arbeit von Entwicklern, Programmierern, Künstlern, Game-Designern, Softwareentwicklern,

9  Online-Sicherheitsexperten und Anderen, die an COD-Spielen arbeiteten, zu degradieren. In

10  der Tat ist die Cheating-Software ihrer Art nach parasitär, insofern sie nur von den COD-

11  Spielen Wert ableitet und sich ihre Existenz auf den fortgesetzten Support von Activision für

12  die COD-Spiele stützt, die in Kalifornien erstellt wurden und von einem kalifornischen

13  Unternehmen veröffentlicht wurden.

14

15        (b)     Die Beklagten betreiben im US-Bundesstaat Kalifornien und in den

16  USA umfangreiche und fortdauernde Geschäfte mit Usern. Zu den Kunden der Cheating-

17  Software zählen namhafte Streamer der COD-Spiele, die in den USA leben.

18        (c)     Die Beklagten richten die Cheating-Software auf User in den USA ,

19  darunter den US-Bundesstaat Kalifornien, aus, und dies in dem Wissen, dass für ihre

20  Cheating-Software in den USA ein wesentlicher Markt besteht. Zum Beispiel zeigen die

21  Beklagten ihren gesamten Text auf ihrer Website auf „Englisch (USA)", bieten

22  Sonderverkäufe um die Feiertage in den USA (z. B. Halloween und Schwarzer Freitag)

23  herum an und stellen Kundendienst auf Englisch bereit. Die Beklagten wissen, dass die

24  COD-Spiele ein enormes Publikum in den USA haben, und haben daher Maßnahmen

25  ergriffen, dass die Cheating-Software US-Usern leicht verfügbar sind und für diese leicht

26  zugänglich sind.

27

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

1         (d)      Die Beklagten vertreiben die Cheating-Software im US-Bundesstaat

2  Kalifornien, bewerben und vermarkten die Cheating-Software in den USA und im US-

3  Bundesstaat Kalifornien und kommunizieren direkt mit den Usern in den USA und im US-

4  Bundesstaat Kalifornien, darunter zum Zweck des Erbittens von Käufen der Cheating-

5  Software durch diese User und zur Bereitstellung von technischem Support für die Cheating-

6  Software;

7         (e)      Die Beklagten rekrutieren Einzelpersonen in den USA für den Vertrieb

8  der Cheating-Software in (und aus) den USA, und insbesondere in Kalifornien, durch den

9

10  Wiederverkauf davon an dort ansässige Konsumenten, was für EO Erlöse zur Folge haben,

11  dessen Höhe in der Gerichtsverhandlung zu bestimmen ist;

12         (f)      Die Beklagten schloßen mit Einzelpersonen im US-Bundesstaat

13  Kalifornien Verträge, und werden dies auch weiterhin tun, darunter Verträge, nach denen

14  diese Einzelpersonen von den Beklagten Lizenzen für das Recht erhalten, die Cheating-

15  Software zu installieren und verwenden. Als Gegenleistung für diese Lizenzen erhalten die

16  Beklagten von Personen in den USA und im US-Bundesstaat Kalifornien laufende,

17  wiederkehrende tägliche, wöchentliche oder monatliche Zahlungen;

18         (g)      Die Beklagten bilden Online-„Gruppen" oder „Chat-Rooms" unter

19  Verwendung der sich in den USA befindlichen Services und Plattformen, wie z. B. die in

20  Kalifornien ansässige Discord und die in Seattle ansässige Valve Corporation. Activision ist

21  informiert und glaubt und behauptet auf dieser Grundlage, dass die Gruppen und Chat-

22  Rooms Gespräche auf Englisch führen und aus einer großen Anzahl von in den USA

23  befindlichen Usern bestehen.

24

25         (h)      Die Beklagten schließen mit Entitäten im US-Bundesstaat Kalifornien

26  im Zusammenhang mit ihren Geschäften Verträge ab. Dies beinhaltet z. B. Domain-Name-

27  6

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

1  Register, Hosting-Dienste, Content Delivery Services sowie Kreditkartenverarbeiter und

2  Handelsbanken. In der Tat prahlten die Beklagten auf ihrer Website, dass sie in den USA

3  mindestens zwei Server unterhalten, darunter einen in Los Angeles, Kalifornien, und einen in

4  New Jersey:

5  Server-Status [Abbildung von Landkarte]

6  Diese Server sind für die Kunden der Beklagten notwendig, um die Cheating-Software zu

7  aktivieren und zu nutzen.

8  (i)   Die Beklagten üben Tätigkeiten aus, von denen sie wissen, dass sie

9  wahrscheinlich Activision im US-Bundesstaat Kalifornien, darunter in diesem Bezirk, wo sich

10  Activision befindet und seinen Hauptgeschäftssitz hat, Schaden zufügen. In der Tat waren

11  die Beklagten mit einem Verhaltensmuster von Online-„Trolling" von Activision und seinem

12  Rechtsbeistand beschäftigt, wie z. B. durch die Erstellung von Scheinkonten im Namen des

13  Rechtsbeistands von Activision, durch das Posten von Schein-Messages, die vorgaben,

14  dass sie von dem Rechtsbeistand von Activision gemacht wurden, oder durch die

15  Verwendung von Namen des Rechtsbeistands von Activision in ihrer Werbung.

16

17  9.   Durch das in dieser Klageschrift dargelegte Verhalten handelte jeder der

18  Beklagten als ein Beauftragter oder Vertreter des EO-Unternehmens. Alle Beklagten

19  arbeiteten gemeinsam und in Zusammenarbeit mit jedem anderen Beklagten, um die

20  Zwecke und Ziele des EO-Unternehmens zu bewirken. Dementsprechend sollte das

21  Verhalten von jedem Beauftragten des Unternehmens allen anderen Beauftragten und

22  Vertretern zugeschrieben werden, und die Beklagten haften gesamtschuldnerisch für das

23  hierin ausgeführte Verhalten.

24  10.  Dieser Bezirk ist der ordentliche Gerichtsstand gemäß 28 U.S.C. § 1391(b),

25  weil dies ein Gerichtsbezirk ist, in dem ein wesentlicher Teil der Ereignisse stattfand, die zu

26  den Ansprüchen führen und/oder in dem die Schäden von Activision erlitten wurden.

27  **DIE PARTEIEN**

28  Mitchell
Silberberg &
Knupp LLP

7

14793462.1

11.   Activision ist ein Unternehmen, das nach den Gesetzen des US-Bundesstaates Delaware ordnungsgemäß errichtet wurde und besteht. Activision hat seinen Hauptgeschäftssitz in Santa Monica, Kalifornien, USA.

12.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Beklagten in dieser Klage gemeinsam als eine Organisation oder als ein Unternehmen arbeiteten, oder dies gegenwärtig tun, die bzw. das „EngineOwning" („EO" oder das „Unternehmen") heißt. Der Zweck des Unternehmens ist die Entwicklung, die Bewerbung, der Vertrieb, der Verkauf, der Verkehr in, und/oder die Wartung oder das Angebot von Support für die Cheating-Software, die Usern ermöglicht, Anti-Cheat-Maßnahmen zu umgehen und autorisierten Zugriff auf die Server von Activision zu erlangen, selbst wenn sie vorher wegen Cheating gesperrt worden waren. Die Beklagten arbeiten gemeinsam und kollektiv auf dieses gemeinsame Ziel und den gemeinsamen Zweck hin.

13.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Beklagten zur Förderung des Unternehmens in einer Mehrzahl von verschiedenen Rollen fungieren. Einige Beklagte managen und beaufsichtigen zum Beispiel das Unternehmen, während andere die notwendige Softwaretechnologie, die von dem Unternehmen verkauft wird, bereitstellen und liefern. Andere agieren als Verkaufsvertreter oder Kundendienstvertreter, die das gemeinsame Unternehmen unterstützen oder ermöglichen, indem sie das Produkt vertreiben oder sicherstellen, dass die Kunden das Produkt erfolgreich verwenden können. Dementsprechend hat Activision die Beklagten in Kategorien gruppiert, wie unten ausgeführt.

### Körperschaftliche Beklagte

14.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Beklagten CMM Holdings S.A. und EngineOwning Software UG deutsche Geschäftseinheiten mit Sitz in Pfaffenhofen an der Ilm sind, und dass der Beklagte Garnatz

Mitchell Silberberg & Knupp LLP

14793462.1

8

1 Enterprise Ltd eine Geschäftseinheit ist, die im Land Belize registriert ist (CMM Holdings

2 S.A., Engine Owning Software UG und Garnatz Enterprise Ltd. werden gemeinsam als

3 „körperschaftliche Beklagte" bezeichnet). Activision ist ferner informiert und glaubt und

4 behauptet auf dieser Grundlage, dass die einzelnen Beklagten behaupten, viele der hierin

5 beschriebenen Tätigkeiten zu verüben (darunter die Entwicklung, die Wartung, Vermarktung,

6

7 der Vertrieb, Verkauf und die Unterstützung der Cheating-Software) durch einen oder

8 mehrere körperschaftliche Beklagte.

9 15. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

10 die körperschaftlichen Beklagten nicht unabhängige Unternehmenseinheiten sind, sondern

11 stattdessen Mantelgesellschaften sind, die zur Abschirmung der Aktivitäten der Personen-

12 Beklagten, darunter die Beklagten Valentin Rick, Leon Schlender und „Crotle", geschaffen

13 wurden. Es besteht eine Verbundenheit an Interesse und Eigentümerschaft zwischen den

14 körperschaftlichen Beklagten und den oben genannten Personen-Beklagten, insofern dass

15 zwischen diesen Entitäten keine Trennung besteht und sie die Alter Egos von jedem

16 Anderen sind. Das Festhalten an der Fiktion der getrennten Existenz der körperschaftlichen

17 Beklagten würde einen Betrug billigen oder Ungerechtigkeit fördern, darunter dadurch, dass

18 gewissen Personen-Beklagten ermöglicht wird, sich hinter körperschaftlichen

19 Mantelgesellschaften zu verstecken, Vermögensgegenstände von diesen Unternehmen

20 umzulenken oder gerichtliche Einreden basierend auf der Existenz dieser Unternehmen zu

21 schaffen. Infolgedessen sollte das Gericht die Durchgriffshaftung geltend machen und

22 feststellen, dass die Personen-Beklagten gesamtschuldnerisch für die

23 Verletzungshandlungen, die im Namen der körperschaftlichen Beklagten verübt wurden,

24 haften.

25

26 **Eigentümer, Gründer und Leitung**

27

16. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass EO von einer Gruppe von Einzelpersonen, darunter die nachstehend Genannten, gegründet wurde und derzeit ihnen gehört, von ihnen betrieben wird, kontrolliert, gemanagt und hauptsächlich verwaltet wird:

17. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Valentin Rick, auch bekannt als Skyfail („Valentin") eine Privatperson ist, die in Deutschland lebt und die körperschaftlichen Beklagten gegründet und erschaffen hat, und der alleinige Managing Director und Aktionär der körperschaftlichen Beklagten ist, und historisch der Haupt-Administrator der EO-Website gewesen ist. Activision is desweiteren informiert und glaubt und behauptet auf dieser Grundlage, dass Valentin der tatsächliche Leiter von EO gewesen ist und dies weiterhin ist, und dass er in dieser Funktion die Entwicklung, Wartung, Vermarktung, den Vertrieb und den Verkauf der Cheating-Software geleitet hat und/oder dafür verantwortlich war. Activision hat Valentin vorher im Jahr 2018 und 2020 bezüglich seiner Beteiligung an EO und der EO-Website kontaktiert, und als Antwort darauf hat er behauptet, dass er die EO-Website an einen unbekannten Käufer verkauft hat. Valentin hat für einen derartigen Verkauf nie einen Beweis erbracht, und Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass Valentin zu jeder für dieses Gerichtsverfahren entscheidungserheblichen Zeit damit fortfuhr, EO und die EO-Website zu managen und zu betreiben.

18. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Leon Schlender, auch bekannt als Balkan, Lion, x7ion, LionV1, lionz0r, moneyskyy, bcrypt und s14 („Schlender") eine Privatperson ist, die in Deutschland lebt und zusammen mit Valentin ein Mitgestalter/Mitbegründer von EO ist. Activision ist ferner informiert und glaubt und behauptet auf dieser Grundlage, dass Schlender die Entwicklung,

1    Wartung, Vermarktung, den Vertrieb und den Verkauf der Cheating-Software geleitet hat

2    und/oder dafür verantwortlich war.

3        19.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

4    der Beklagte Erick Pfeifer, auch bekannt als Speedi13, Speedi, Spdy und Speedy0407

5    („Pfeifer") eine in Deutschland lebende Privatperson ist. Pfeifer ist einer der Gründer und

6    einer der ursprünglichen Mitgliedern des Unternehmens und fungierte seit mindestens 2014

7    oder 2015 als ein Kodierer und Entwickler der Cheating-Software.

8        20.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

9    der Beklagte Bennet Huch, auch bekannt als TheBigBen, thebigben123, tazzthebigben,

10   Benno, Benno1308, B3nn0 und vb2010helper („Huch") eine in Deutschland lebende

11   Privatperson ist. Huch gab zu einer Zeit vor, der Eigentümer der EO-Website zu sein und

12   fungierte als einer der Haupt-Administratoren der EO-Website. Activision ist ferner informiert

13   und glaubt und behauptet auf dieser Grundlage, dass Huch zu den Personen gehörte, die für

14   die Entwicklung, Wartung, den Vertrieb und den Verkauf der Cheating-Software

15   hauptsächlich verantwortlich war.

16       21.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

17   der Beklagte Leonard Bugla, auch bekannt als Reganmian und Noodleman („Bugla"), eine

18   Privatperson ist, die in Deutschland lebt und die als ein Operations Manager der EO-Website

19   im Jahre 2019 und 2020 gelistet ist und schien als solcher zu handeln. Activision ist ferner

20   informiert und glaubt und behauptet auf dieser Grundlage, dass Bugla in dieser Rolle die

21   Entwicklung, Wartung, den Vertrieb und den Verkauf der Cheating-Software ermöglichte.

22   Activision ist ferner informiert und glaubt und behauptet auf dieser Grundlage, dass Valentin

23   und Bugla eine lange persönliche Beziehung zueinander haben, die vor der Erschaffung von

24   EO und der EO-Website zurückdatiert (*d. h.* vor 2012) und sie viele Jahre lang

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

11

1 zusammengearbeitet haben, um den fortgesetzten Betrieb und die Profitabilität von EO und
2 der EO-Website sicherzustellen.
3       22.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass
4 der Beklagte Marc-Alexander Richts, auch bekannt als x0000x und Twenty („Richts") eine in
5
6 Deutschland lebende Person ist, die an dem Vertrieb und dem Verkauft der Cheating-
7 Software über EO und die EO-Website beteiligt war und als eine der Hauptmoderatoren in
8 EO-Website Foren fungiert hat. In dieser Rolle stellte Richts den fortgesetzten Betrieb der
9 EO-Website sicher und kommunizierte regelmäßig mit den Entwicklern und den Käufern der
10 Cheating-Software.
11                              **Softwareentwickler**
12       23.     Gewisse Privatperson-Beklagte waren und sind für die Erschaffung und
13 Entwicklung der Cheating-Software verantwortlich, sowie für das Updating und die
14 Modifizierung der Cheating-Software, um die Anstrengungen von Activision zu beseitigen,
15 die Cheating-Software zu erkennen.
16       24.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass
17 der Beklagte Ignacio Gayduchenko, auch bekannt als Weather und Kokole
18
19 („Gayduchenko"), eine Privatperson ist, die in Spanien lebt und die als ein Kodierer und
20 Entwickler der Cheating-Software fungiert hat, und die über die EO-Website und andere
21 Orte technischen Support bereitgestellt hat.
22       25.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass
23 der Beklagte Zain Jondah, auch bekannt als Zain, Reciate, zinbrownman, superzainny und
24 DepressedToenail („Jondah") eine Privatperson ist, die im Vereinigten Königreich lebt und
25 als ein Kodierer und Entwickler der Cheating-Software fungiert hat.
26
27                                     12
Mitchell 28
Silberberg &
Knupp LLP

14793462.1

26.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Ricky Szameitat, auch bekannt als Requi, requi_dev, RequiDev und Requiii („Szameitat") eine Privatperson ist, die in Deutschland lebt und als ein Kodierer und Entwickler der Cheating-Software fungiert hat.

27.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Marcel Bindemann, auch bekannt als Kifferking, kifferking951, kifferking hacks, kifferking1337 und 1337famesboy („Bindemann") eine Privatperson ist, die in Deutschland lebt und als ein Kodierer und Entwickler der Cheating-Software fungiert hat.

### **Moderatoren, Administratoren und Support-Vertreter**

28.     Gewisse Privatperson-Beklagte unterstützten und ermöglichten den Betrieb von EO wissentlich durch das Führen, die Verwaltung, die Aktualisierung und sonstigem Support verschiedener Online Message Boards, Chat-Rooms oder anderen Online-Lokalitäten in Bezug auf die Cheating-Software. Diese Online-Lokalitäten umfassen die EO-Website und die „offiziellen" Discord Server von EO, wobei beide für die Mitglieder der Öffentlichkeit (darunter jene in den USA) als die Hauptlokalität dienen, Informationen zum Kauf, zur Diskussion und zum Erwerb der Cheating-Software zu erlangen. Diese Privatpersonen erleichterten, ermöglichten, veranlassten und unterstützten die Vermarktung, den Verkauf und die Verwendung der Cheating-Software anderweitig, indem sie Kunden-Support, Zahlungs-Support und technischen Support für die Cheating-Software bereitstellten. Die Privatpersonen waren auch tätig mit der Vermarktung und der Bewerbung der Cheating-Software und mit der Ermutigung der und Hilfestellung für Mitglieder der Öffentlichkeit, darunter Privatpersonen in den USA, bei dem Kauf und der Verwendung der Cheating-Software.

29.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

Mitchell
Silberberg &
Knupp LLP

14793462.1

1  der Beklagte Leon Frisch, auch bekannt als Kraisie („Frisch"), eine Privatperson ist, die in

2  Deutschland lebt und die als ein Lead Moderator auf den EO-Website Foren fungiert hat.

3  Activision ist ferner informiert und glaubt und behauptet auf dieser Grundlage, dass Frisch in

4  dieser Rolle bei dem Verkauf der Cheating-Software hilft, darunter u. a. durch die

5  Bereitstellung von technischem Support für Cheats und durch Kommunizieren mit Kunden in

6  Bezug auf die Bezahlung für Cheating-Software.

7

8        30.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

9  der Beklagte Alexander Kleemann, auch bekannt als A200k („Kleemann") eine Privatperson

10  ist, die in Veitshöchheim, Deutschland, lebt und an dem Vertrieb der Cheating-Software

11  beteiligt war und verschiedene administrative Funktionen in Bezug auf die EO-Website

12  bereitstellt, darunter durch Fungieren als ein Moderator auf den EO-Website Foren.

13        31.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

14  der Beklagte Remo Löffler, auch bekannt als AimBroT, KE xAimBRot, KE AimBRoT, EO

15  Aimbrot, _AimBRoT, xAimBroTHDx, Pappenpeter und MrTimeWarpxxx („Löffler") eine

16  Privatperson ist, die in Deutschland lebt und an der Bereitstellung verschiedener

17  administrativer Funktionen in Bezug auf die EO-Website involviert war, darunter durch

18  Fungieren als ein Moderator auf EO-Website Foren.

19

20        32.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

21  der Beklagte Marvin Baotic Neumeyer, auch bekannt als Bonser, m0t0rb3s1tz3n, Bonsai,

22  DieKakao, Austriaball, AustriaballÖ, xlRaizzerz und Zhaviaa („Neumeyer") eine Privatperson

23  ist, die in Deutschland lebt und als ein Administrator für das Discord Konto von EO fungierte

24  und in dieser Rolle für die Unterstützung der Entwicklung, Aktualisierung, Vermarktung, des

25  Vertriebs und Verkaufs der Cheating-Software verantwortlich war und Support für die

26  Cheating-Software bereitgestellt hat. Activision ist ferner informiert und glaubt und behauptet

27

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

14

1  auf dieser Grundlage, dass Neumeyer auch als ein Lead Moderator für die EO-Website

2  Foren fungiert hat.

3      33.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

4  der Beklagte Hendrik Smaal, auch bekannt als logixx, Sniker, sniker_de, SnikerDE und

5  Snikerberry21 („Smaal") eine Privatperson ist, die in Deutschland lebt und technischen

6  Support für die Cheating-Software bereitgestellt hat, und dies u. a. über die EO-Website.

7  Activision ist ferner informiert und glaubt und behauptet auf dieser Grundlage, dass Smaal

8  auch ein Moderator für die EO-Website Foren fungiert hat.

9

10      34.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

11  der Beklagte Charlie Wiest, auch bekannt als Apollo, n0t_apollo, notapollo und ApolloEO

12  („Wiest") eine Privatperson ist, die in Deutschland lebt und technischen Support für die

13  Cheating-Software bereitgestellt hat, und dies u. a. über die EO-Website. Activision ist ferner

14  informiert und glaubt und behauptet auf dieser Grundlage, dass Chronos auch als ein

15  Moderator für die EO-Website Foren fungiert hat.

16      35.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

17  der Beklagte Dennis Reissleich, auch bekannt als Koyz, KOYZRk und koyz420 („Reissleich")

18  eine Privatperson ist, die in Deutschland lebt und technischen Support für die Cheating-

19  Software bereitgestellt hat, und dies u. a. über die EO-Website. Activision ist ferner informiert

20  und glaubt und behauptet auf dieser Grundlage, dass Chronos auch als ein Moderator für

21  die EO-Website Foren fungiert hat.

22      36.   Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

23  die oben genannten Beklagten offen fundierte Kenntnisse der COD-Spiele und der Cheating-

24  Software zeigen und kommunizieren, die nur das Resultat ihres umfangreichen Spiels der

25  COD-Spiele sein können. Dementsprechend erstellte jeder dieser Beklagten

26

27

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

notwendigerweise Online-Konten bei Activision und stimmte den Nutzungsbestimmungen von Activision und anderen damit zusammenhängenden Vereinbarungen zu. Nur so konnten sie auf die COD-Spiele zugreifen und sie herunterladen, Multiplayer-Servern beitreten und die COD-Spiele spielen.

### Verkäufer und Wiederverkäufer

37.     Gewisse Privatperson-Beklagte sind am Verkauf der Cheating-Software im Namen des Unternehmens beteiligt. Diese Beklagten bearbeiteten Bestellungen, die über die EO-Website gemacht wurden, und verkauften die Cheating-Software im Namen von anderen Beklagten. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die folgenden Privatpersonen die Cheating-Software an User in den USA als Bevollmächtigte oder Vertreter des Unternehmens vertrieben und verkauften und dies beabsichtigten.

38.     Activision is informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Tyler Byrd, auch bekannt als ByrdGaming, ECGx Byrd, tylerbyrd2000, thereal_ghostd und IGhostdl („Byrd") eine Privatperson ist, die in North Carolina lebt und am direkten Verkauf der Cheating-Software, darunter über die EO-Website und EO Discord, unter Verwendung der Zahlungsplattform Stripe, beteiligt war. Activision ist ferner informiert und glaubt und behauptet auf dieser Grundlage, dass Byrd als ein Moderator für die EO-Website Foren fungiert hat.

39.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Simon Masias, auch bekannt als Jagr034, gagr0399, _obeysimon und masiassimon („Masias") eine Privatperson ist, die in New Jersey lebt und als ein Wiederverkäufer für die EO Cheating-Software agiert hat.

16

40.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Nicholas James Baldwin, auch bekannt als Kamay, getclonedbyfeds und clonedbyfeds („Baldwin") eine Privatperson ist, die in Florida lebt und als ein Wiederverkäufer für die EO Cheating-Software agiert hat.

41.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Antonio Median, auch bekannt als DiscountDash, realdiscountdash, RappiFood und Berlin („Median") eine Privatperson ist, die in Massachusetts lebt und als ein Wiederverkäufer für die EO Cheating-Software agiert hat.

42.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Remy Cartigny, auch bekannt als remzziecodservices, remzzie, Deez Nuts, Frikandel und TwistlinesZ („Cartigny") eine Privatperson ist, die in den Niederlanden lebt und als ein Wiederverkäufer für die EO Cheating-Software agiert hat.

43.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Pascal Classen, auch bekannt als Proton, Proton1001, P1001, Proton909 und Proton007 („Classen") eine Privatperson ist, die in Deutschland lebt und als ein Wiederverkäufer für die EO Cheating-Software agiert hat.

44.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Manuel T. Santiago, auch bekannt als Hoodie, EOHoodie, hoddie1337, Hoddieee, teamxcbs, xCantBeStopped, stendoh617, stendoh und oSpahzy („Santiago") eine Privatperson ist, die in Masschusetts lebt und als ein Wiederverkäufer für die EO Cheating Software agiert hat.

45.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Beklagte Katerina Disdle, auch bekannt als sweetkatato und _sweetkatato („Disdle") eine Privatperson ist, die im Vereinigten Königreich lebt und als ein Wiederverkäufer für die EO

17

Mitchell
Silberberg &
Knupp LLP

14793462.1

1  Cheating-Software agiert hat.

2  **DOE-Beklagte**

3  46.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

4  die folgenden Privatpersonen, deren wahre Namen noch nicht bekannt sind, die Entwickler

5  der Cheating-Software, EO Websiteadministratoren, Wiederverkäufer und Vertreiber der

6  Cheating-Software sind und/oder anderweitig an der Erstellung, Vermarktung und dem

7  Vertrieb der Cheating-Software beteiligt sind. Zu den DOE-Beklagten zählen die unten

8  genannten Privatpersonen:

9

10  47.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

11  der Beklagte „Crotle" (bezeichnet als „Boss" auf den EO-Website Foren) ein hochrangiges

12  Mitglied von EO ist, dessen Standort nicht bekannt ist und der innerhalb der Organisation

13  eine Führungsrolle innehat, über die er oder sie an der Entwicklung, Wartung, den Vertrieb

14  und Verkauf der Cheating-Software, darunter als ein Administrator der EO-Website, beteiligt

15  ist und/oder dabei hilft.

16  48.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

17  der Beklagte „Ben Garnatz" eine Privatperson ist, deren Standort nicht bekannt ist. „Ben

18  Garnatz" kann ein Alias-Name für eine oder mehrere Privatpersonen sein, die aktiv mit der

19  Erstellung und dem Vertrieb der Cheating-Software beschäftigt ist bzw. sind sowie mit der

20  Verwaltung der EO-Website.

21

22  49.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

23  der Beklagte „Enceladus" eine Privatperson ist, deren Standort nicht bekannt ist und die als

24  ein Administrator der EO-Website agiert hat. Activision ist ferner informiert und glaubt und

25  behauptet auf dieser Grundlage, dass Enceladus in dieser Rolle die Entwicklung, Wartung,

26  den Vertrieb und den Verkauf der Cheating-Software ermöglicht hat.

27

28  Mitchell Silberberg & Knupp LLP

14793462.1

18

50.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte „Mortyy" eine Privatperson ist, die in Europa lebt und als ein Administrator der EO-Website agiert hat. Activision ist ferner informiert und glaubt und behauptet auf dieser Grundlage, dass Mortyy in dieser Rolle die Entwicklung, Wartung, den Vertrieb und den Verkauf der Cheating-Software ermöglicht hat.

51.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte „SlapstiK", auch bekannt als B1g slap, eine Privatperson ist, die in Frankreich lebt und als ein Administrator der EO-Website agiert hat. Activision ist ferner informiert und glaubt und behauptet auf dieser Grundlage, dass SlapstiK in dieser Rolle die Entwicklung, Wartung, den Vertrieb und den Verkauf der Cheating-Software ermöglicht hat.

52.    Activision ist Informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte „Ubervisor" eine Privatperson, ist, die in Europa lebt und als ein Kodierer und Entwickler der Cheating-Software agiert hat und technischen Support für die Cheating-Support bereitgestellt hat, und zwar u. a. über die EO-Website. Activision ist ferner informiert und glaubt und behauptet auf dieser Grundlage, dass Ubervisor auch als ein Administrator der EO-Website agiert hat.

53.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte „Homie123", auch bekannt als Homie, eine Privatperson ist, die in Deutschland lebt und als ein Lead Moderator auf den EO-Website Foren agiert hat.

54.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte „LuoZheng" eine Privatperson ist, die in Deutschland lebt und als ein Kodierer und Entwickler der Cheating-Software agiert hat.

55.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

19

Mitchell Silberberg & Knupp LLP

14793462.1

der Beklagte „jeuwifghue", dessen Standort nicht bekannt ist, als ein Kodierer und Entwickler
der Cheating-Software agiert hat.

56.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass
der Beklagte „WhiteObama" eine Privatperson ist, die in Europa lebt und als ein Kodierer
und Entwickler der Cheating-Software agiert hat.

57.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass
der Beklagte „Chronos", auch bekannt als Chronus und eo_chronos, eine Privatperson ist,
deren Standort nicht bekannt ist, und die technischen Support für die Cheating-Software
bereitgestellt hat, und zwar u. a. über die EO-Website. Activision ist ferner informiert und
glaubt und behauptet auf dieser Grundlage, dass Chronos auch als ein Moderator für die
EO-Website Foren agiert hat.

58.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass
der Beklagte „HAM", auch bekannt als aboutHAM, burrskurr, nytroza, SkirrSkirr, bakaara,
Curren$y, spacetime, Arschpollo und Yayoo („HAM") eine Privatperson ist, die in
Deutschland lebt und technischen Support für die Cheating-Support bereitgestellt hat, und
dies u. a. über die EO-Website. Activision ist ferner informiert und glaubt und behauptet auf
dieser Grundlage, dass Chronos auch als ein Moderator für die EO-Website Foren agiert
hat.

59.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass
der Beklagte „Zhavia" eine Privatperson ist, deren Standort nicht bekannt ist, und die als ein
Wiederverkäufer für die EO Cheating-Software agiert hat.

60.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass
der Beklagte „Snafu", auch bekannt als Snafubar1337 und snafu.alit eine Privatperson ist,
die in Deutschland lebt und als ein Wiederverkäufer für die EO Cheating-Software agiert hat.

20

Mitchell
Silberberg &
Knupp LLP

14793462.1

61.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte „.0", auch bekannt als .0 0x1337, Not0x1337, NutChamp, PepegaChamp, WZACCBTC, eine Privatperson ist, die in Deutschland lebt und als ein Wiederverkäufer für die EO Cheating-Software agiert hat. Activision ist ferner informiert und glaubt und behauptet auf dieser Grundlage, dass .0 als ein Lead Moderator auf den EO-Website Foren agiert hat.

62.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklage „Big Pile of Poop" eine Privatperson ist, die in Europa lebt und als ein Administrator für das Discort Konto von EO agiert hat, und in dieser Rolle für die Unterstützung der Entwicklung, Aktualisierung, Vermarktung, des Vertriebs und Verkaufs der Cheating-Software verantwortlich war, und auch Support für die Cheating-Software bereitgestellt hat.

63.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass der Beklagte Alex, auch bekannt als Alex0r und alexaeo („Alex") eine Privatperson ist, die in Europa lebt und als ein Administrator für das Discord Konto von EO agiert hat, und in dieser Rolle für die Unterstützung der Entwicklung, Aktualisierung, Vermarktung, des Vertriebs und Verkaufs der Cheating-Software verantwortlich war, und auch Support für die Cheating-Software bereitgestellt hat.

64.    Zusätzlich zu dem Vorstehenden ist Activision informiert und glaubt und behauptet auf dieser Grundlage, dass die Privatpersonen, die die Aliasnamen „Bonsai", „Agriolo", „Deutschlander", „LogicX" und „NOL3X" verwenden, als Entwickler, Moderatoren oder Wiederverkäufer der Cheating-Software agiert haben.

65.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass mehrere DOE-Beklagte möglicherweise Aliases der EO-Staffers, darunter einige der in dieser Gerichtssache genannten Beklagten, sind, die versucht haben, ihre Identität zu

21

Mitchell
Silberberg &
Knupp LLP

14793462.1

verschleiern, nachdem sie zuvor von Activision in Verbindung mit ihrer Beteiligung an EO kontaktiert wurden.

66. Die wahren Namen und Funktionen, gleich ob Privatpersonen, Unternehmen, beteiligte Unternehmen oder andere, der DOE-Beklagten sind Activision nicht bekannt. Activision hat diese Beklagten daher unter Aliasnamen und fiktiven Namen verklagt. Diese Beklagten umfassen Privatpersonen, deren wirkliche Identitäten Aktivision noch nicht bekannt sind, die jedoch bei dem Begehen von in dieser Klage genannten rechtswidrigen Handlungen zusammen mit dem jeweils anderen handeln, oft unter dem Deckmantel von Aliasnamen. Unter den DOE-Beklagten befinden sich Entwickler, Wiederverkäufer, Mitarbeiter des technischen Support, und andere Personen, die an der Entwicklung, dem Verkauf und dem Vertrieb der Cheating-Software beteiligt waren. Activision wird um Erlaubnis bitten, diese Klage mit ihren wahren Namen und Funktionen zu ergänzen, sobald diese Identitäten und Funktionen der Beklagten festgestellt wurden. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass alle hierin verklagten Beklagten gegenüber Activision infolge ihrer Beteiligung an allen oder einigen in dieser Klage ausgeführten Handlung haftbar sind. (Alle oben genannten Beklagten, sowohl die Beklagten mit Namen und die DOE-Beklagten, werden hierin gemeinsam als „Beklagte" bezeichnet).

67. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass jeder der Beklagten zu jeder in dieser abgeänderten Klage genannten Zeit der Bevollmächtigte von jeweils der anderen Beklagten war und bei dem Begehen der in dieser Klage behaupteten Handlungen im Laufe und im Rahmen dieser Bevollmächtigung handelte.

## AUF ALLE ANSPRÜCHE ANWENDBARER SACHVERHALT

### Geistige Eigentumsrechte von Activision

68. Activision ist der Herausgeber und Eigentümer alle Rechte, Rechtsansprüche

22

Mitchell
Silberberg &
Knupp LLP

14793462.1

1  und Interessen an den Urheberrechten der COD-Spiele, die aus mehr als 15 Videospielen

2  bestehen, die seit dem Jahr 2003 auf verschiedenen Videospielplattformen erstveröffentlicht

3  wurden. Zu den Urheberrechten von Activision an den COD-Spielen zählen, ohne

4  Beschränkung, Rechte an der Computersoftware der COD-Spiele und audiovisuelle Arbeiten

5  und Bildschirmdarstellungen, die erstellt werden, wenn die COD-Spiel-Software mit einem

6
7  User-Computer interagiert. Die Urheberrechte von Activision an den COD-Spielen beinhalten

8  auch die dynamischen nichtliteralen Elemente, die erstellt werden, wenn die COD-Spiel-

9  Software mit den COD Online Multiplayer Game Servern interagieren. *Siehe MDY Indus. v.*

10  *Blizzard Entertainment, Inc.*, 629 F.3d 928 (9. Cir. 2010). Activision besitzt gültige,

11  eingetragene Urheberrechte an jedem COD-Spiel.

## Die COD-Spiele

13  69.  Die COD-Spiele werden jährlich erstveröffentlicht, mit Echtbetrieb und

14  zusätzlichem herunterladbarem Content, der regelmäßig erstveröffentlicht wird. Die COD-

15  Spiele sind beständig unter den meistverkauften Spielen in einem gegebenen Jahr, mit

16  insgesamt mehr als hunderten von Millionen Kopien, die bis dato verkauft wurden. Im

17  Dezember 2020 verkündete Activision, dass die COD-Spiele in den vorangegangenen 12

18  Monaten mehr als $3 Mrd. an Netto-Bookings generierten.

20  70.  Die COD-Spiele sind „Ego-Shooter"-Computerspiele, die den Spielern

21  ermöglichen, in die Schuhe von Soldaten und Elite-Operateuren in Schlachten im Laufe der

22  Geschichte, vom Ersten Weltkrieg bis zur modernen Gegenwart und den ganzen Weg in die

23  Zukunft, zu schlüpfen. Fast alle COD-Spiele beinhalten Einzelspieler-Kampagne-Modi, die

24  die Spieler in eine fiktionale Geschichte setzen. Alle COD-Spiele enthalten jedoch die

25  populären kompetitiven Multiplayer-Spielmodi, in denen sich Spieler Online zuschalten, um

26
27

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

23

in Echtzeit live zusammen zu spielen. Jedes COD-Spiel bietet so viele wie ein Dutzend oder mehr verschiedene Online Multiplayer-Spielarten, wobei alle von ihnen hochintensiv sind, da Spieler gegeneinander antreten, um Erfahrungspunkte zu verdienen, um ihre Rankings und Statistiken zu verbessern und um verschiedene Rewards für siegreiche Matche und die Erreichung bestimmter Ziele und Zielsetzungen zu gewinnen.

71.  Die Online Multiplayer-Modi der COD-Spiele sind so beliebt, dass sie zu mehreren kompetitiven „eSports" Ligen und Turniere geführt haben, die auf Streaming-Plattformen wie z. B. Twitch und YouTube mehrere Millionen Zuschauer anziehen.

**Das Geschäftsmodell der COD-Spiele**

72.  In Anbetracht der Beliebtheit und Wiederspielbarkeit der Online Multiplayer-Modi der COD-Spiele arbeitet Activision sehr hart daran, sicherzustellen, dass die COD-Spiele beständig spannende Spielererfahrungen bieten, damit Kunden in den COD-Spielen engagiert bleiben, sie weiterhin lang anhaltende Zeiträume spielen und auf zukünftige Erstveröffentlichungen gespannt sind.

73.  Im März 2020 veröffentlichte Activision zum ersten Mal *Call of Duty: Warzone* („Warzone"), ein kostenloses Standalone-Multiplayer-Spiel, das der Öffentlichkeit angeboten wird, ohne den Kunden zu verpflichten, eine Kopie irgendeines *Call of Duty*-Spiels zu kaufen. Um *Call of Duty: Warzone* spielen zu können, muss ein Mitglied der Öffentlichkeit bei Activision ein Account anmelden, die *Call of Duty: Warzone*-Software herunterladen und sich mit den Online-Multiplayer-Servern von Activision verbinden. Dementsprechend kommen die von Activision durch *Call of Duty: Warzone* erzielten Einnahmen ausschließlich von Verkäufen von „virtuellen Waren" (d. h. Waffen, Häuten usw.) oder saisonalen „Gefechtspässen (battle passes)", die den Spielern ermöglichen, Belohnungen im Spiel für Errungenschaften im Spiel zu erhalten.

24

Mitchell Silberberg & Knupp LLP

14793462.1

74.   Die durch die COD-Spiele erzielten Einnahmen helfen wiederum die enormen Kosten für Updates, Verbesserung, Wartung und Bedienung der COD-Spiele und ihrer kompetitiven Online-Modi zu zahlen. Wenn Spieler wahrnehmen, dass ein Spiel unfair ist, darunter weil Andere schummeln oder einen unfairen Vorteil haben, können die Spieler mit den COD-Spielen zunehmend frustriert werden, weniger Interesse am Spielen und an der Unterstützung der Spiele haben (darunter durch Kaufen neuer Spiele und Objekte) und können sogar vollkommen aufhören, sie zu spielen. Das Cheating schadet daher nicht nur COD-Spielergemeinschaften (und könnten sie sogar vernichten), es wirkt sich auch schlecht auf die Fähigkeit von Activision aus, ein schnelles, stabiles, qualitativ hohes Online-Spiel zu bieten, an das Millionen von Fans gewöhnt sind.

**Die Bemühungen von Activision, sich vor Hackern und Cheatern zu schützen**

75.   Da die COD-Spiele so beliebt sind, versuchen skrupellose Personen und Unternehmen, wie z. B. die Beklagten, oft die Spiele für ihren eigenen persönlichen Vorteil und Profit auszubeuten, durch den Verkauf von Cheats, Hacks und anderer bösartiger Software, wobei sie genau wissen, dass sie für die anderen Spieler das Spielerlebnis verderben und Activision schaden. Aus diesem Grund unternimmt Activision wesentliche Anstrengungen, um die Integrität der COD-Spiele durch technische und vertragliche Mittel zu schützen.

Technischer Schutz

76.   Ein Weg, auf dem Activision versucht die COD-Spiele vor Cheating und unauthorisierter Ausbeutung zu schützen, ist durch die Entwicklung und den Einsatz von Anti-Cheat-Technologien. Diese Technologien helfen dabei zu entdecken, wenn Spieler Cheating-Software Dritter verwenden, und verhindern unauthorisierte Zugriffe auf die COD-Spiele durch diese Spieler. Es ist nicht möglich, Online-Multiplayer-Modi von COD-Spielen

25

Mitchell Silberberg & Knupp LLP

14793462.1

zu spielen (oder *Call of Duty: Warzone* überhaupt zu spielen), ohne die Anti-Cheat-Technologien von Activision zu installieren. Activision konnte mithilfe der Cheating-Software in den COD-Spielen im Verlauf des letzten Jahres allein hundertausende von Konten identifizieren und sperren.

77.    Zusätzlich, wenn Activision feststellt oder erkennt, dass ein Spieler Cheating-Software verwendet, kann das Konto des Spielers suspendiert oder „gesperrt" werden, so dass der Spieler keinen Zugang zum Spiel und dessen Remote Server mehr hat. Je nach Verhalten des Spielers kann der Kläger auch einen „Hardware-ID" („HWID") Ausschluss gegen Spieler, die hacken oder cheaten, verhängen. Um einen HWID-Ausschluss zu implementieren, erlangt Activision Konfigurationsdaten von dem PC oder sonstigen Gaming-Einrichtung des verletzenden Spielers und verweigert den anschließen Zugriff auf das Spiel von Spielern, die den Computer benutzen. Dies stellt sicher, dass Spieler, die den Zugang zum Spiel verloren haben, den Zugang zum Spiel nicht einfach wiederlangen können durch die Erstellung eines neuen Kontos oder die Verwendung einer anderen Email Adresse. HWID-Ausschlüsse können ein sehr effektiver Weg sein, um alle, die den Zugang zu den COD-Spiel Servern von Activision verloren haben, davon abzuhalten, auf diese Server betrügerisch zuzugreifen.

78.    Damit eine Hack- oder Cheat-Software laufen kann, muss sie so konzipiert sein, dass sie die Entdeckung durch eine Anti-Cheat-Software verhindert oder vermeidet, wie z. B. durch ihre eigene Verbergung oder durch das Unfähigmachen der Anti-Cheat-Technologie. Ansonsten wird der Cheat entdeckt, und dem User wird der Zugriff Online-Multiplayer des bestimmen Spiels verweigert, und er kann permanent vom Spielen überhaupt ausgeschlossen werden.

<u>Vertraglicher Schutz</u>

Mitchell
Silberberg &
Knupp LLP

14793462.1

79. Um auf die COD-Spiele zugreifen zu können und sie herunterladen oder spielen zu können, müssen User ein Account bei Activision erstellen und registrieren. Beim ersten Spielen der COD-Spiele und bei Beginn der Installation müssen User ausdrücklich durch Anklicken ihre Zustimmung zu den Nutzungsbedingungen (Terms of Use) von Activision (gemeinsam, die „TOU") bekunden. Wenn der User die Zustimmung zu den TOU verweigert, kann er nicht fortfahren und das Spiel nicht spielen.

80. Die TOU beinhalten eine eingeschränkte Lizenzvereinbarung zwischen Activsion und seinen Usern. Nach den TOU gewährt Activision den Usern eine „persönliche, begrenzte, nichtausschließliche Lizenz", seine Spiele für „nicht-kommerzielle Zwecke" zu verwenden, die ausdrücklich von der Befolgung der TOU durch den User abhängt. Neben anderen Bestimmungen stimmen die User durch Zustimmung zu den TOU ausdrücklich zu, „Cheats, Automatisierungssoftware (Bots), gemoddete Lobbies, Hacks, Mods oder irgendeine andere nicht authorisierte Drittsoftware" in Verbindung mit Activisions Spielen „nicht zu verwenden, entwickeln, hosten oder verteilen" oder „ sich and irgendeiner Art von Cheating, Boosting oder Booting beteiligen wird."

81. Die Online Multiplayer-Modi der COD-Spiele (sowie das gesamte *Call of Duty: Warzone* Spiel) werden der Öffentlichkeit verfügbar gemacht über die proprietären Server und Matchmaking-Systeme von Activision. Es ist für einen User nicht möglich ohne ausdrückliche Zustimmung zu den TOU, zu den Online Multiplayer-Modi der COD-Spiele (oder *Call of Duty: Warzone*) rechtmäßig Zugang zu erhalten oder sie zu spielen.

**Die Entwicklung, Vermarktung und der Verkauf der Cheating-Software durch die Beklagten**

82. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Beklagten alle Teilnehmer an dem gemeinsamen EO Unternehmen sind. Als solche sind die Beklagten mit verschiedenen Handlungen in Bezug auf die Entwicklung, die

1  Aktualisierung, die Vermarktung, den Vertrieb, den Verkauf und dem Support der Cheating-

2  Software beschäftigt. Zu jeder hier entscheidungsrelevanten Zeit haben die Beklagten die

3  Cheating-Software entwickelt, aktualisiert, vermarktet, vertrieben, verkauft und unterstützt.

4  Sie taten dies, und tun dies weiterhin, über die EO-Website, Email und andere

5  Kommunikationsplattformen, wie z. B. Discord.

6

7        83.      Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass

8  EO von den Beklagten Valentin Rick, Leon Schlender und „Croatle" gegründet wurde. Diese

9  Personen haben als die Vordenker und die Hauptantriebskraft hinter EO agiert und werden

10  dies auch weiterhin tun, und sie sind für den allgemeinen Betrieb von EO, der EO-Website,

11  den Finanzen von EO und der Entwicklung und der Wartung der Cheating-Software und der

12  Online-Servern, die zur Autentifizierung der Lizenzen für die Cheating-Software verwendet

13  werden, verantwortlich. Desweiteren hat die Mutter von Valentin Rick, Regina Rick,

14  verwaltungstechnische, finanzielle, rechtliche und sonstige Beratungdienste für das EO-

15  Unternehmen geleistet.

16        84.      Wie hierin dargelegt ist, spielte jeder der anderen einzelnen Beklagten eine

17  besondere Rolle (oder mehrere Rollen) beim dem Support und der Förderung des EO-

18  Unternehmens. Zum Beispiel:

19

20        (a)      Einige Beklagte waren Softwareentwickler. Diese Beklagten waren

21  oder sind mit der Entwicklung, der Aktualisierung, dem Patchen und der Verbesserung der

22  Cheating-Software beschäftigt. Diese Entwickler liefern dann die Software an EO zum

23  Verkauf an die Öffentlichkeit und werden von dem EO-Unternehmen für ihre Arbeit bezahlt.

24        (b)      Einige Beklagte sind mit dem Verkauf von Lizenzen für die Cheating-

25  Software beschäftigt. Sie tun dies entweder durch die Abwicklung von Zahlungen direkt von

26  der EO-Website und dem EO Discord Server, oder durch „Wiederverkauf" der Lizenzen für

27  die Cheating-Software. Um ein EO-Wiederverkäufer zu werden muss sich die Person bei EO

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

1   bewerben. Personen, die zu Wiederverkäufern ausgewählt werden, können Lizenzen für die

2   Cheating-Software in Massen kaufen und dann die Cheating-Software über Online-

3   Bewerbung oder Posts auf Message Boards auf Websites für Videospiel-Cheating, wie z. B

4   „OwnedCore", bewerben und verkaufen. Die Wiederverkäufer überweisen dann ihre

5   Einnahmen an EO, während sie einen Teil dieser Einnahmen für sich selbst behalten.

6
7           (c)      Einige Beklagte agieren als Administratoren, Moderatoren oder

8   Support-Vertreter. Diese Personen betreiben und warten die EO-Website, kontrollieren den

9   EO Discord Server, überwachen und prüfen die Posts auf den Message Boards, stellen

10  Updates hinsichtlich der Cheating-Software bereit, kommunizieren mit Käufern der Cheating-

11  Software, bieten Käufern der Cheating-Software technischen Support, erstellen Tutorials und

12  Handbücher und unterstützen die Verkaufsförderung für die Cheating-Software.

13          85.      Alle Beklagte arbeiten gemeinsam an der Förderung eines einzigen Ziels,

14  nämlich die Sicherstellung, Unterstützung, Ermöglichung ode sonstige Erleichterung des

15  weitverbreiteten Vertriebs und Verkaufs der Cheating-Software. Als solche haften die

16  Beklagten gesamtschuldnerisch für das rechtswidrige Verhalten des EO-Unternehmens, sie

17  sind aktive Beteiligte an dem unerlaubten Handel von Umgehungssoftware, sie sind

18  gesamtschuldnerisch haftbar für die fortgesetzten Vertragsverletzungen durch die User der

19  Cheating-Software, sie sind gesamtschuldnerisch haftbar für die Verstöße gegen das Unfair

20  Competition Law von Kalifornien, die hierin ausgeführt sind, und sie sind Beteiligte an dem

21  hierin dargelegten RICO-Unternehmen.

22

23          86.      Der zentrale Antrieb für die Vermarktung und den Vertrieb der Cheating-

24  Software ist die EO-Website. Die EO-Website behauptet „hochqualitative Cheats" zu

25  verkaufen basierend auf der Überzeugung, dass „jeder die Möglichkeit haben sollte, zu

26  gewinnen und Online-Matche zu genießen". Derzeit bietet die EO-Website Cheats für *Call of*

27
                                29

Mitchell
Silberberg &
Knupp LLP

14793462.1

28

*Duty: Warzone; Call of Duty: Modern Warfare (2019); Call of Duty World War II; Call of Duty: Modern Warfare 3; Call of Duty Black Ops; Call of Duty Black Ops II und Call of Duty Black Ops III.* Die Beklagten haben auch einen Cheat für das Spiel *Overwatch*, das von dem verbundenen Unternehmen von Activision, Blizzard Entertainment, Inc. entwickelt und veröffentlicht wird, entwickelt und veröffentlicht.

87.     Besucher der EO-Website können Zugang zu der Cheating-Software erwerben in verschiedenen Bündeln für jedes der angebotenen COD-Spiele. Zugang zu den Cheats wird angeboten in verschiedenen Stufungen zu Preisen von 4,49 Euro für drei Tage Zugang bis 19,99 Euro für dreißig Tage Zugang, sowie 39,99 Euro für volle neunzig Tage Zugang zu Cheats für *Call of Duty: Modern Warfare (2019)* und *Call of Duty: Warzone.* Die folgenden „Features" werden für jeden der Cheats angeboten:

- Verschiedene Methoden und Exploits für die Vermeidung der Entdeckung durch Anti-Cheat-Software sowie die Fähigkeit, Cheats vor Videoaufnahmesoftware zu verbergen (*d. h.* um die Entdeckung der Cheats durch andere Spieler, die das Spiel aufzeichnen und prüfen, zu verhindern).

- Aimbots, die automatisch das Zielen des schummelnden Spielers auf einen Gegner „einschnappen", wenn der Gegner auf dem Bildschirm sichtbar ist, wodurch schnelle und präzise Schüsse möglich sind.

- Triggerbots, die veranlassen, dass schummelnde Spieler ihre Waffe automatisch abfeuern, wenn sie auf einen anderen Spieler zielen.

- ESP und 2D/3D Radar, die dem schummelnden Spieler ermöglichen, Gegner im Spiel zu visualisieren, so dass die Integrität des Spiels zerstört wird, z. B. durch Erlauben des Cheaters, andere Spieler durch Wände und andere Hindernisse zu sehen.

30

Mitchell
Silberberg &
Knupp LLP

14793462.1

88.     Die Beklagten verkaufen oder bündeln mit der Cheating-Software auch ein begleitendes Produkt namens „EngineOwning Spoofer" (der „EO-Spoofer"). Der EO-Spoofer soll die HWID-Ausschlüsse umgehen und aussetzen durch die Generierung von gefälschten digitalen Computerunterschriftengeräten oder „Unterschriften". Ähnlich zu den digitalen „Unterschriften", die als Teil einer gefälschten Kreditkarte oder einer gefälschten Kontonummer generiert werden, ermöglichen gefälschte Computerunterschriften Usern, denen der Zugang zu den COD-Spiele Servern verweigert wurde, betrügerisch unautorisierten Zugang zu diesen Servern zu erlangen. Wie von den Bekagten beschrieben wurde:

> Unser HWID (Hardware ID) Spoofer wird benötigt, wenn Ihr derzeitiger Computer Hardware-ausgeschlossen ist oder Sie einfach in Zukunft einen Ausschluss Ihrer Hardware verhindern wollen. Er ist der einfachste HWID-Spoofer auf dem Markt, und aufgrund seiner nahtlosen [sic.] Integration mit dem EngineOwning Loader, müssen Sie nur ein Kästchen ankreuzen, um Ihre Hardware vor Anti-Cheats zu verbergen.

Der EO-Spoofer wird ausdrücklich für die Verwendung mit COD-Spielen beworben.

89.     Die Beklagten vermarkten und bewerben die Cheating-Software auch über Online Sozialmediendienste wie z. B. Twitter. Das „offizielle" Engine Owning Twitterkonto (@engineowningto) veröffentlichte seit Mai 2021 nicht weniger als 50 vermartungsbezogene Tweets und hat mehr als 8000 Follower. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass viele (wenn nicht gar die meisten) dieser Follower in den USA ansässig sind.

90.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass zusätzlich zu den Vermarktungs- und Vertriebs-Cheats (darunter u. a. die Cheating-Software), die Beklagten umfangreichen und fortgesetzten Kundensupport und technische Unterstützung bereitstellen, darunter über die Foren der EO-Website sowie durch andere Mittel, wie z. B. Email, Telegram und Discord.

31

91.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Cheating-Software tausendmal von in den USA ansässigen Spielern der COD-Spiele heruntergeladen und verwendet wurde. Activision ist auch informiert und glaubt und behauptet auf dieser Grundlage, dass die Beklagten hunderttausende von Dollar, oder mehr, aus ihrem Vertrieb und dem Verkauf der Cheating-Software erwirtschaftet haben.

**Das rechtswidrige Verhalten der Beklagten**

92.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Cheating-Software - damit die Cheating-Software mit den COD-Spielen arbeiten kann - notwendigerweise Technologie beinhaltet, die hauptsächlich derart gestaltet ist, Anti-Cheat-Technologien von Activision zu vermeiden, umzuleiten, ihnen auszuweichen oder anderweitig zu umgehen. Dementsprechend handeln die Beklagten jedes Mal, wenn sie eine Lizenz für die Cheating-Software verkaufen, rechtswidrig mit Technologie, die den Zugriff auf die COD-Spiele kontrolliert.

93.     Die Beklagten bewerben und promoten spezifisch und aggressiv die Cheating-Software als eine Software, die dafür konzipiert wurde, um die Anti-Cheat-Software von Activision zu umgehen. Produktlistings auf der EO-Website werben damit, dass die Cheating-Software „mehrere Schutzschichten gegen Anti-Cheats" bietet. Die Listings auf der EO-Website umfassen auch Zertifizierungen, dass die Cheats der Entdeckung durch die Anti-Cheat-Software von Activision entgehen und sie umgehen werden:[1]

## Unterstützte Anti-Cheats

- Battle.net – Unterstützt
- Anti-Cheat von Call of Duty – Sicher
- Warnung: Sie können für offenkundiges Cheaten manuell ausgeschlossen werden

[1] *Siehe* https://www.engineowning.to/shop/product/21/engineowning-for-call-of-duty-modern-warfare-2019.

32

Mitchell Silberberg & Knupp LLP

14793462.1

94.     Jedes Mal, wenn ein Spieler die Cheating-Software verwendet, um in den COD-Spielen zu schummeln, verstößt er oder sie gegen die TOU von Activision, darunter gegen die Bestimmungen, die den Spielern ausdrücklich verbieten „Cheats, Automatisierungssoftware (Bots), gemoddete Lobbies, Hacks, Mods oder irgendeine andere nicht autorisierte Drittsoftware" in Verbindung mit Activisions Spielen „zu verwenden, entwickeln, hosten oder verteilen" oder „irgendeine Art von Cheating, Boosting oder Booting zu unternehmen". Dementsprechend ist Activision informiert und glaubt und behauptet auf dieser Grundlage, dass sich mindestens zehntausende Verletzungen dieser Verträge ereignet haben.

95.     Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass sich die Beklagten im Vollem darüber im Klaren sind, dass die Verwendung der Cheating-Software die TOU verletzt. Zum Beispiel warnt die EO-Website User deutlich davor, dass sie von Activision „manuell ausgeschlossen" werden können wegen „offenkundiges" Cheating. Dies ist eine Sorge der Spieler, die die Cheating-Software verwenden wollen, weil einige von der Cheating-Software vermittelte Vorteile Spielercharaktere möglicherweise Dinge machen lassen, die unnatürlich erscheinen oder in der Welt des Spiels sogar physisch unmöglich erscheinen, wie z. B. das schnelle „zuschnappende" Zielen auf einen gegnerischen Spieler mit einer Geschwindigkeit und Genauigkeit, die sogar darüber hinausgehen, was der geschickteste Spieler erreichen könnte. Daher betont die EO-Website, dass die Cheating-Software Features enthält, die dabei helfen sollen, der Entdeckung mit dem bloßem Auge zu entgehen, darunter „Smooth Aim", was die Zielbewegung verlangsamt, damit ein Spieler, der einen Aimbot verwendet, so erscheint, dass er sich natürlich bewegt, und „Fire Delay", dass einen Spieler, der Triggerbot verwendet, warten lässt, bevor automatisch geschossen wird.

96.     Die Cheating-Software hat keinen anderen Zweck und keine andere Funktion

33

Mitchell
Silberberg &
Knupp LLP

14793462.1

als Spielern zu ermöglichen, unautorisierten Zugang zu den Servern von Activision zu erlangen und durch die Verwendung von Cheats und Exploits gegen die TOU zu verstoßen. Daher ist es das Ziel der Beklagten sicherzustellen, dass ihre Kunden weiterhin die Nutzen ihrer Verträge mit Activision erhalten, während sie gleichzeitig fortgesetzte Verletzungen ihrer Verpflichtungen nach diesen Verträgen begehen.

97.     Zu mehreren Gelegenheiten in den letzten Jahren hat Activision zu einigen der Personen, von denen vermutet wurde, dass sie mit EO involviert sind, Kontakt aufgenommen oder versucht Kontakt aufzunehmen, und gefordert, dass sie mit einer weiteren Entwicklung, Wartung, Vermarktung, Vertrieb und Verkauf der Cheating-Software aufhören und davon ablassen. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass sich die Beklagten in diesem Gerichtsverfahren vollständig bewusst darüber sind und waren, dass ihr Verhalten die Rechte von Activision verletzt, jedoch nichtsdestotrotz ihre Tätigkeiten unverfroren fortgesetzt haben.

98.     Durch ihr Verhalten haben die Beklagten den COD-Spielen und Activision schwerwiegenden Schaden zugefügt und werden dies auch weiterhin tun. Dieser Schaden ist unmittelbar, enorm und irreparabel, und umfasst u. a. Folgendes:

(a)     Die Beklagten schädigen irreparabel die Fähigkeit von Activisions' legitimen Kunden, die von Activision sorfältig geschaffenen Online-Erfahrungen zu genießen, und an ihnen teilzuhaben. Dies kann wiederum dazu führen, dass die User mit den Spielen zunehmend unzufrieden werden, ihr Interesse daran verlieren und aufhören zu spielen. Infolgedessen erlitt Activision einen Verlust an Spielererlösen, und wird dies auch weiterhin tun.

(b)     Das wissentliche und vorsätzliche Fehlverhalten der Beklagten hat Activision dazu gezwungen, wesentliche Ressourcen auszugeben in dem Versuch, den von

34

Mitchell Silberberg & Knupp LLP

14793462.1

der Cheating-Software verursachten Schaden zu beheben. Dies umfasst die Erstellung und Erstveröffentlichung von Updates für die COD-Spiele, die der Cheating-Software entgegen-arbeiten, die Beantwortung von Spielerbeschwerden, das Einstellen von Mitarbeitern, um die Spiele zu überwachen, um die Verwendung von Cheating-Software aufzudecken sowie den „Ausschluss" von Usern, die die Cheating-Software verwenden.

(c)     Das Verhalten der Beklagten schädigt dem Ruf von Activision und führt zum Verlust an signifikantem Kunden-Goodwill.

99.     Das Verhalten der Beklagten hat zu Schaden an Activision geführt in einer Höhe, die in der Gerichtsverhandlung nachzuweisen ist. Nach Activisions' Schätzung beläuft sich dieser Betrag möglicherweise auf Millionen von Dollar. Bis den Beklagten dies nicht vorläufig und fortdauernd durch eine gerichtliche Verfügung untersagt wird, wird Activision weiterhin durch die Cheating-Software schwerwiegenden Schaden erleiden.

## ANKLAGEPUNKT I
### Unerlaubter Handel von Umgehungsgeräten

100.     Activision behauptet erneut die in den Punkten 1 bis einschließlich 99 enthaltenen Behauptungen und macht sie durch Bezugnahme zum Bestandteil dieses Punktes, als ob sie in Gänze aufgeführt werden.

101.     Die COD-Spiele, darunter u. a. ihr Quellcode und audiovisuelle Gameplay-Umgebungen, sind urheberrechtlich geschützte Werke.

102.     Activision hat in die COD-Spiele technologische Mittel eingefügt, die effektiv den Zugriff auf die COD-Spiele kontrollieren, darunter den Zugriff auf die dynamischen audiovisuellen Elemente, die das Spiel einbezieht.

Mitchell
Silberberg &
Knupp LLP

14793462.1

35

103.    Die Cheating-Software besteht aus oder enthält Technologien, Produkte, Dienste, Geräte, Bestandteile, oder Teile davon, die hauptsächlich zum Zweck der Umgehung technologischer Maßnahmen, die den Zugriff auf die COD-Spiele effektiv kontrollieren, konstruiert oder produziert sind.

104.    Die Cheating-Software (und die Teile davon, die Activisions' Anti-Cheat-Technologien umgehen) haben keinen anderen gewerblichen signifikanten Zweck oder Gebrauch, als dass sie eine technologische Maßnahme umgehen, die den Zugriff auf ein urheberrechtlich geschütztes Werk effektiv kontrolliert und die Exklusivrechte eines Eigentümers eines Urheberrechts schützt.

105.    Die Beklagten vermarkten die Cheating-Software in den USA mit dem Wissen ihrer Verwendung, die technologischen Zugriffkontrollen von Activision zu umgehen.

106.    Infolge von Vorstehendem bieten die Beklagten der Öffentlichkeit Technologie an, stellen sie bereit, importieren sie oder handeln unerlaubt mit ihr, was 17 U.S.C. § 1201(a)(2) verletzt. Hilfsweise leisteten die Beklagten wissentlich Beihilfe zur Tat oder trugen zum unerlaubten Handel mit Umgehungstechnologie durch die anderen Beklagten oder durch das Unternehmen bei.

107.   Die Handlungen der Beklagten, die Verstöße gegen DMCA darstellen, wurden ohne die Genehmigung, Authorisierung oder Zustimmung von Activision ausgeführt und werden auch weiterhin derart ausgeführt werden.

108.    Die Beklagten haben vorsätzlich und zur privaten kommerziellen Bereicherung gegen § 1201 von DMCA verstoßen.

109.   Das Verhalten der Beklagten hat Activision Schaden zugefügt und hat die Beklagten ungerechtfertigt bereichert, in einer Höhe, die in der Gerichtsverhandlung nachgewiesen wird.

36

Mitchell Silberberg & Knupp LLP

14793462.1

110.   Infolge der Handlungen und des Verhaltens der Beklagten hat Activision erheblichen, unmittelbaren und irreparablen Schaden erlitten, und wird dies auch weiterhin tun, für den es vom Gesetz her kein angemessenes Mittel zur Heilung gibt. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Beklagten weiterhin § 1201 von DMCA verletzen werden, wenn ihnen dies nicht von diesem Gericht verboten wird und sie von diesem Gericht davor nicht zurückgehalten werden. Activision hat ein Recht auf eine Unterlassungsverfügung, um das fortdauernde rechtswidrige Verhalten der Beklagten zu unterbinden und zu bändigen.

111.   Als eine direkte und unmittelbare Folge des Verhaltens der Beklagten, hat Activision nach 17 U.S.C. § 1203(c) ein Recht auf die Gewinne der Beklagten, die ihren Verstößen gegen 17 U.S.C. § 1201 zuschreibbar sind.

112.   Hilfsweise hat Activision ein Recht auf den Höchstsatz an gesetzlichem Schadenersatz nach 17 U.S.C. § 1203(c)(A), in Höhe von $2.500 in Hinblick auf jeden Verstoß durch die Beklagten.

113.   Activision hat ferner ein Recht auf seine Rechtsanwaltsgebühren und den gesamten Kosten nach 17 U.S.C. § 1203(b).

**ANKLAGEPUNKT II**

**Falsche Bezeichnung der Herkunft, 15 U.S.C. § 1125(a)**

114.   Activision behauptet erneut die in den Punkten 1 bis einschließlich 113 enthaltenen Behauptungen und macht sie durch Bezugnahme zum Bestandteil dieses Punktes, als ob sie in Gänze aufgeführt werden.

115.   Dank der fortgesetzten und umfangreichen Nutzung der COD-Marken im Handel durch Activision, haben die COD-Marken in Verbindung mit den Waren und Services von Activision eine sekundäre Bedeutung im Markt angenommen.

37

Mitchell Silberberg & Knupp LLP

14793462.1

116.   Durch die Verwendung der COD-Marken auf der EO-Website und sonstwie in Verbindung mit der Cheating-Software der Beklagten, stellen die Handlungen der Beklagten im innerstaatlichen Handel einer falschen Bezeichnung der Herkunft eine falsche oder irreführrende Beschreibung des Sachverhalts dar, die wahrscheinlich Verwirrung oder Verwechslung verursachen wird, oder hinsichtlich der Affiliierung, Verbindung oder Zusammenhang der Produkte und Services der Beklagten mit Activision irreführen wird, oder hinsichtlich der Herkunft, Förderung oder Genehmigung der Waren und Services durch die Beklagten, und all dies in Verletzung von 15 U.S.C. § 1125(a).

117.   Activision hat einen Anspruch auf einen Rechtsbehelf, der durch 15 U.S.C. § 1117(a) vorgesehen ist, einschließlich u. a. auf die Gewinne der Beklagten und Kosten für dieses Gerichtsverfahren.

118.   Die Beklagten kannten die Rechte der Beklagten, und deren Verletzung war wissentlich, absichtlich und vorsätzlich, so daß das Gericht gemäß 15 U.S.C. § 1117 Activision seine Rechtsanwaltsgebühren zusprechen soll.

119.   Die Aktivitäten der Beklagten haben dem Ruf und dem Goodwill von Activision Schaden zugefügt und drohen, dies weiterhin zu tun.

120.   Activision wurde und wird weiterhin durch diese Handlungen in einer Art und Weise geschädigt, die nicht voll bemessen werden kann oder in wirtschaftlicher Hinsicht ausgeglichen werden kann. Activision steht daher kein adäquates Rechtsmittel zur Verfügung. Desweiteren hat Activision, nach Nachweis einer Verletzung von 15 U.S.C. § 1125(a), ein Recht auf eine widerlegbare Vermutung von nicht wieder gutzumachenden Schaden infolge dieser Verletzung, und Activision ersucht um eine dauerhafte Unterlassung nach 15 U.S.C. § 1116.

38

Mitchell Silberberg & Knupp LLP

14793462.1

**ANKLAGEPUNKT III**

**Verstoß gegen den Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *ff.***

121.    Activision behauptet erneut die in den Punkten 1 bis einschließlich 120 enthaltenen Behauptungen und macht sie durch Bezugnahme zum Bestandteil dieses Punktes, als ob sie in Gänze aufgeführt werden.

122.    Die COD-Spielserver von Activision (die „Spielserver") sind Computerserver, die von Activision verwendet werden, um sich am innerstaatlichen und ausländischen Handel zu beteiligen. Die Spielserver sind geschützte Computer gemäß 18 U.S.C. § 1030(e)(2).

123.    Durch die Entwicklung, Vermarktung, den Vertrieb und die Ermuterung zur Verwendung der Cheating-Software, und insbesondere des EO-Spoofers, haben die Beklagten wissentlich begünstigt, konspiriert oder sonstwie die Spieler der COD-Spieler dazu veranlasst, auf die Spielserver vorsätzlich ohne Erlaubnis von Activision zuzugreifen. Insbesondere haben die Beklagten den EO-Spoofer dazu veranlasst, damit genutzt zu werden, Zugang zu den Spielservern zu erlangen durch Spieler, denen ausdrücklich verboten wurde, auf die Spielserver zuzugreifen. Dieses Verhalten hat den Spielservern Schaden und/oder Verluste zugefügt.

124.    Infolge des Verhaltens der Beklagten hat Activision Schaden erlitten i.H.v. mehr als dem gesetzlichen Mindestbetrag von $5.000. Activision wurde durch die Handlungen der Beklagten geschädigt, darunter in Form einer verminderten Teilnahme durch Spieler an den Spielen, investigative Kosten und Gerichtskosten sowie die Ausgaben für Ressourcen, um Spieler, die ohne Erlaubnis auf die Spielserver zugreifen, zu finden.

125.    Activision hat ferner irreparablen und nicht abschätzbaren Schaden erlitten infolge des Verhaltens der Beklagten in Form von Schaden an dem Goodwill und Vertrauen seiner Kunden.

39

Mitchell
Silberberg &
Knupp LLP

14793462.1

126.    Nach bestem Wissen und Gewissen haben die Beklagten damit fortgesetzt zu konspirieren, um unerlaubten Zugang zu den Spielservern zu erlangen, mit dem Vorsatz, Activision zu schaden, und werden dies auch weiterhin tun, wenn es ihnen nicht rechtlich verboten wird.

### ANKLAGEPUNKT IV

### Vorsätzlicher Eingriff in vertragliche Beziehungen

127.    Activision behauptet erneut die in den Punkten 1 bis einschließlich 126 enthaltenen Behauptungen und macht sie durch Bezugnahme zum Bestandteil dieses Punktes, als ob sie in Gänze aufgeführt werden.

128.    Wie hierin ausgeführt, müssen lizenzierte User in den USA zuerst den TOU von Activision zustimmen, bevor sie die COD-Spiele installieren und spielen können.

129.    Die Verträge von Activision mit seinen Usern sind gültig und durchsetzbar.

130.    Jedes Mal, wenn ein Käufer der Cheating-Software die Cheating-Software in Verbindung mit den COD-Spielen verwendet, verstößt er oder sie gegen die TOU. Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass tausende dieser Verstöße durch die Kunden der Beklagten stattgefunden haben.

131.    Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Beklagten von beidem Kenntnis haben, nämlich der Existenz und den spezifisch relevanten Bedingungen der Verträge zwischen Activision und seinen Usern in den USA, darunter die TOU. Insbesondere wissen die Beklagten, dass die TOU Spielern verbietet, die Cheating-Software zu verwenden und dass Spieler das Risiko eingehen von den COD-Spielen ausgeschlossen zu werden, wenn sie beim Gebrauch der Cheating-Software erwischt werden. Nichtsdestotrotz ermutigen die Beklagten die User vorsätzlich und verleiten die User der COD-Spiele dazu, die Cheating-Software zu kaufen und zu verwenden, und

40

dies in dem Wissen, dass die Verwendung dieser Produkte durch ihre Kunden eine Verletzung der Verträge dieser Kunden mit Activision darstellen.

132.    Durch Verleiten der User von Activision zur Verletzung ihrer Verträge mit Activision griffen die Beklagten vorsätzlich in die Verträge zwischen Activision und seinen Usern ein und werden dies auch weiterhin tun.

133.   Als eine direkte und unmittelbare Folge der Handlungen der Beklagten hat Activision Schäden erlitten in einer Höhe, die in der Gerichtsverhandlung nachgewiesen wird, darunter u. a. der Verlust an Goodwill unter den Usern der Spiele von Activision, die Umlenkung von Activisions Ressourcen zum Versuch, die Verwendung von Cheating-Software zu entdecken und verhindern, geminderte Gewinne und ein Verlust des Gewinnes von Usern, deren Accounts Activision beendigt hat wegen Verletzung der TOU in den USA.

134.    Als eine weitere Folge der Handlungen der Beklagten haben die Beklagten ungerechtfertigt spezifisch identifizierbares Eigentum eingenommen, das aus all den Erlösen besteht, die dem Verkauf der Cheating-Software in den USA zuschreibbar sind, und alle anderen Produkte oder Dienste, die ein Recht von Activision verletzen sowie weiteres Eigentum, das rückverfolgbar ist auf diese Erlöse. Diese Erlöse, die direkt der Manipulation und dem Fehlgebrauch der COD-Spiele durch die Beklagten und dem vorsätzlichem Eingriff der Beklagten in Activisions Verträgen zuschreibbar sind, gehören rechtmäßig und billigkeitsrechtlich Activision.

135.   Der vorsätzliche Eingriff der Beklagten in die Verträge zwischen Activision und seinen lizenzierten Usern in den USA gibt Activision ein Recht auf Unterlassungsansprüche und adäquaten Schadenersatz, die Verhängung eines gesetzlichen

41

Mitchell
Silberberg &
Knupp LLP

14793462.1

Treuhandverhältnisses über die unrechtmäßig erhaltenen Erlöse der Beklagten und sonstige

verfügbare Abhilfen.

136.    Die Beklagten sind schuldig der Unterdrückung, Betrugs oder böser Absicht,

und Activision hat daher zusätzlich zu seinem tatsächlichem Schadenersatz ein Recht auf

ein übernormal hohes Schadenersatzurteil und Strafschadenersatz gegen die Beklagten.

**ANKLAGEPUNKT V**

**Unlauterer Wettbewerb**

137.    Activision behauptet erneut die in den Punkten 1 bis einschließlich 136

enthaltenen Behauptungen und macht sie durch Bezugnahme zum Bestandteil dieses

Punktes, als ob sie in Gänze aufgeführt werden.

138.    Die Handlungen und das Verhalten der Beklagten stellen eine

Wettbewerbsverzerrung in den USA dar nach California Business & Professions Code §

17200 *ff.* und nach dem Gewohnheitsrecht von Kalifornien.

139.    Als eine direkte und unmittelbare Folge des unlauteren Wettwerbs der

Beklagten in den USA wurde Activision geschädigt, und die Beklagten haben sich

ungerechtfertigterweise anbereichert, in einer Höhe, die in der Gerichtsverhandlung

nachgewiesen wird, für das Schadenersatz und/oder Restitution und Abschöpfung

angemessen sind. Dieser Schadenersatz und/oder diese Restitution und Abschöpfung sollte

eine Erklärung durch dieses Gericht enthalten, dass die Beklagten gesetzliche Treuhänder

zum Gunsten von Activision sind, und eine Verfügung, dass die Beklagten Activision die

Bruttoeinnahmen, die erhalten wurden oder zu erhalten sind und dem Verkauf der Cheating-

Software in den USA zuschreibbar sind, übergeben.

140.    Die Beklagten sind schuldig der Unterdrückung, des Betrugs oder böser

Absicht, und Activision hat daher zusätzlich zu seinem tatsächlichem Schadenersatz ein

42

Mitchell Silberberg & Knupp LLP

14793462.1

1  Recht auf ein übernormal hohes Schadenersatzurteil und Strafschadenersatz gegen die
2  Beklagten.

3      141.   Infolge der Handlungen und des Verhaltens der Beklagten in den USA hat
4  Activision erheblichen, unmittelbaren und irreparablen Schaden erlitten, und wird dies auch
5  weiterhin tun, für den es vom Gesetz her kein angemessenes Mittel zur Heilung gibt.
6  Activision ist informiert und glaubt und behauptet auf dieser Grundlage, dass die Beklagten
7  weiterhin Wettbewerbsverzerrung betreiben werden, wenn ihnen dies nicht von diesem
8  Gericht verboten wird und sie von diesem Gericht davor nicht zurückgehalten werden. Nach
9  California Business & Professions Code § 17203 hat Activision ein Recht auf eine vorläufige,
10  einstweilige Verfügung auf Unterlassen und auf ein Unterlassungsurteil, die weitere
11  Wettbewerbsverzerrungshandlungen verbieten.

12        **ANKLAGEPUNKT VI**

13  **BUNDESSTAATLICHES ZIVILRECHTLICHES RICO – Führen oder Teilnahme an einem**
14  **Unternehmen**

15          **(18 U.S.C. § 1962(c))**

16      142.   Activision behauptet erneut die in den Punkten 1 bis einschließlich 141
17  enthaltenen Behauptungen und macht sie durch Bezugnahme zum Bestandteil dieses
18  Punktes, als ob sie in Gänze aufgeführt werden.

19      143.   Jede Privatperson oder körperschaftlicher Beklagter ist eine „Person", die
20  fähig ist, eine rechtliche oder nutzbringende Beteiligung an einem Eigentum im Sinne von 18
21  U.S.C. § 1961(3) zu halten.

22      144.   Jeder Beklagte verstieß gegen 18 U.S.C. § 1962(c) durch die oben und unten
23  genannten Handlungen oder Verhaltensweisen, und Activision wurde infolgedessen
24  geschädigt.

25                43

Mitchell
Silberberg &
Knupp LLP

14793462.1

145. Die Beklagten hatten den spezifischen Vorsatz, die hierin behaupteten substantiven RICO Verletzungen zu begehen.

Das Unternehmen

146. Die Beklagten bilden zusammen ein Unternehmen der Art Assoziierung-in-Faktum zur Verfolgung eines gemeinsamen und fortdauernden Zwecks, d. h. die Entwicklung, Vermarktung, der Verkauf und der Vertrieb der Cheating-Software, die Usern erlaubt, unerlaubten Zugang zu den Spielservern von Activision in Verletzung der TOU von Activision zu erlangen.

147. Die Beklagten sind Mitglieder eines Verkaufs- und Schwarzhandels-unternehmens, *d. h.* „das Unternehmen", wie oben und hierin ausgeführt, über das die Cheating-Software vermarktet, verkauft und vertrieben wird. Die Beklagten koordinieren und arbeiten zusammen, um den Zweck des Unternehmens zu verfolgen und auszuführen.

148. Um das Tun des Unternehmens zu choreografieren und auszuführen, müssen die Beklagten notwendigerweise, und tun sie es auch, Beziehungen innerhalb ihrer Gruppe als Mitglieder des Unternehmens bilden, um eine gemeinsame Verhaltensweise auszuführen, d. h. eine komplexe und mehrstufige Entwicklung und Verkaufsbetrieb. Die Beklagten koordinieren ihre Bemühungen, um Einzelpersonen in den USA zu rekrutieren, um die Cheating-Software zu vermarkten und zu vertreiben. Die Beklagten bilden Online „Gruppen" oder „Chat Rooms" unter Verwendung der in den USA ansässigen Services und Plattformen, um ihre Verkaufsförderung und den Verkauf der Cheating-Software zu koordinieren. Die Beklagten koordinieren Bemühungen, um konsistenten und justierten „Kunden-Support" und „technischen Support" in den USA und an US-User der Cheating-Software bereitzustellen.

149. Die Beklagten haben das Unternehmen mit einer Langlebigkeit betrieben, die

44

Mitchell Silberberg & Knupp LLP

14793462.1

ihnen ausreicht, um einen gemeinsamen und konsistenten Zweck des Vertriebs und Verkaufs von Werkzeugen zu bilden und zu verfolgen, Werkzeuge, die unzähligen ausgeschlossenen Usern erlauben, in die geschützten Server von Activision einzubrechen. Die Beklagten haben seit mindestens drei Jahren das Unternehmen zusammen operiert und gehandelt und während diesem Zeitraum die Cheating-Software an viele Tausend User verkauft.

150.   Das hierin beschriebene Unternehmen stellt daher ein Unternehmen dar im Sinne von 18 U.S.C. § 1961(4).

151.   Das Unternehmen hat seine Handlungen begangen und seine Handlungen haben sich auf den innerstaatlichen, und sogar ausländischen Handel ausgewirkt. Zu den Beklagten zählen Wiederverkäufer, die sich in an mehreren Orten in den USA befinden, darunter in North Carolina, Florida, New Jersey und Massachusetts. Diese Wiederverkäufer machen sich Zahlungsplattformen zunutze, um tausende von Zahlungstransaktionen über mehrere bundesstaatliche Grenzen abzuwickeln, um die Cheating-Software an User überall in den USA zu vertreiben. Diese in den USA ansässigen Verkäufer, Wiederverkäufer, Marketingunternehmen, Promoter und Bereitsteller von Kunden- und technischem Support koordinieren ihre Verkaufstätigkeit mit ihren Gegenparteien, die unter anderem in Deutschland, Spanien und den Niederlanden ansässig sind.

Handlungsmuster von illegalen Geschäften

152.   Das Unternehmen ist beteiligt an der Führung der Angelegenheiten der Beklagten durch ein fortgesetztes Aktivitätsmuster von illegalen Geschäften. Die Beklagten, wobei jeder von ihnen separate Personen sind, die mit dem Unternehmen assoziiert sind oder von ihm beschäftigt werden, haben wissentlich, vorsätzlich und rechtswidrig die Angelegenheiten des Unternehmens durch diese Aktivitäten von illegalen Geschäften im

45

Mitchell
Silberberg &
Knupp LLP

14793462.1

Sinne von 18 U.S.C. § 1961(1), 1961(5) und 1962(c) durchgeführt oder sind direkt oder indirekt daran beteiligt, und werden dies auch weiterhin tun.

153.   Die illegalen Geschäftshandlungen wurden durch die regelmäßige und wiederholte Verwendung der Ressourcen des Unternehmens durch die Beklagten bewirkt, ausgeführt und/oder möglich gemacht. Zu diesen Ressourcen zählen die Erstellung und der Zugang zu Cheating-Softwarelizenzen für den Vertrieb und den Verkauf, eine allgemeine Wiederverkäufer-„Bewerbung", eine Fundgrube an Marketing- und Verkaufsförderungs-materialien, Group Chat und Message Board Konten, geteilte allgemeine Anweisungen und Lehrmaterialien, die hinreichend sind, um Wiederverkäufern und auch Moderatoren zu ermöglichen, einheitlichen technischen, Kunden- und Zahlungssupport an viele Tausende Käufer der Cheating-Software, sowohl in den USA als auch im Ausland, bereitzustellen. Die Ressourcen des Unternehmens beinhalten auch mehrere in den USA ansässige Server, die von den Mitgliedern des Unternehmens verwendet werden, um auf die oben genannten Dinge zuzugreifen und sie zu vertreiben.

154.   Die illegalen Geschäftshandlungen der Beklagten waren und sind verbunden und fortlaufend. Das Unternehmen ist eine gutkoordinierte mehrstufige Marketingmaschine. Die Beklagten arbeiten zusammen, um die Cheating-Softwarelizenzen fortlaufend zu verkaufen sowie um Wiederverkäufer-Beklagte zu rekrutieren. Ein Netzwerk an Verkäufer und Wiederverkäufer-Beklagten haben dieselben Schritte aufrechterhalten über Tausende Fälle von Marketing, Verkauf, Vertrieb und Support hinsichtlich der Cheating-Software gegenüber zahlreiche separate US-Kunden.

155.   Die Beklagten operieren nach einem gemeinsamen Satz von Normen und Regeln. Die Wiederverkäufer kaufen die Cheating-Softwarelizenzen en gros und proliferieren Cheating-Software Marketing und Verkäufe über ihre eigene Werbung. Nach dem Verkauf

46

ihres Bulkmaterials befolgen die Wiederverkäufer Beklagten dasselbe Muster von Rücküberweisung von Erlösen an das Unternehmen, während sie einen Teil der Erlöse für sich zurückbehalten. Wie oben ausgeführt, führen die Beklagten zahlreiche, und mit Sicherheit mehr als zwei, Fälle von Cheating-Software Vertrieb und Verkäufe mit demselben Zweck und Resultat, Teilnehmern und Provisionsmethoden aus. In der Tat haben sich tausende dieser Fälle in den USA ereignet, und tausende mehr haben sich im Ausland zugetragen.

156.    Das wiederholte Verhalten der Beklagten hat sich während eines Zeitraums zugetragen, der mindestens im Jahre 2019 beginnt, und nach bestem Wissen und Gewissen, bis zum Jahre 2012 zurückgeht, und bis heute andauert. Das Verhalten ist fortbestehend, und es besteht eine fortgesetzte Drohung der Wiederholung dieses Verhaltens.

Vortaten von illegalen Geschäftshandlungen

157.    Das Verhalten der Beklagten stellt Vortaten von illegallen Geschäftshandlungen im Sinne von sträflichen Vergehen nach 18 U.S.C. § 1961(1)(B) dar, so wie dies näher unten ausgeführt wird. Die Beklagten begingen mindestens zwei dieser Handlungen oder halfen bei den Handlungen oder leisteten ihnen Vorschub.

**Computerbetrug, 18 U.S.C. § 1343**

158.    Die Beklagten begingen Handlungen, die sträfliches Vergehen nach 18 U.S.C. § 1343 darstellen. Sie entwickelten einen detaillierten Betrug, um Activision zu hintergehen, indem sie wissentlich und vorsätzlich Zugang zu Activisions Spielservern und Lizenzen erlangten, und dies unter Vorspiegelung falscher und betrügerischer Tatsachen, Dastellungen und Versprechen. Die Beklagten handelten mit der Absicht, durch

47

Mitchell
Silberberg &
Knupp LLP

14793462.1

betrügerische Mittel, eine limitierte Lizenz für die Verwendung von Activisions Spielen zu

erlangen und den Wert der Multiplayer-Spiel Serverplattform von Activision für den eigenen

finanziellen Gewinn der Beklagten (und zum Nachteil und finanziellen Schaden von

Activision) auszubeuten.

159.   Wie hierin behauptet, zählen zu diesen falschen und betrügerischen

vorgespiegelten Tatsachen, Darstellungen und Versprechen die vorsätzliche, wissentliche

und beabsichtigte falsche Darstellung und das falsche Versprechen, dass die Beklagten

machten, als sie die TOU von Activision unterschrieben.

160.   Die TOU beinhalten, dass Activision dem Unterzeichnenden eine

„persönliche, limitierte, nichtausschließliche Lizenz" für die Verwendung seiner Spiele für die

„nichtgewerbliche Verwendung" gewährt, und dies ausdrücklich abhängend von dem

Versprechen und der Angabe durch den Unterzeichnenden, dass er nicht „Cheats,

Automatisierungssoftware (Bots), gemoddete Lobbies, Hacks, Mods oder eine andere nicht

genehmigte Drittsoftware verwenden, entwickeln, hosten oder verteilen wird" in Verbindung

mit Activisions Spielen „oder sich an irgendeiner Form von Cheating, Boosting oder Booting

beteiligen wird".

161.   Nach bestem Wissen und Gewissen unterschrieb jeder der Bekagten die TOU

von Activsion, und dies unter Vorspiegelung falscher Tatsachen, um den Nutzen des

Vertrags zu erlangen, während sie bereits wussten und planten, diese Nutzen zu verwenden,

um Cheats zu verwenden, zu entwickeln, zu hosten und zu verteilen, und sich anderweitig an

Cheats zu beteiligen. Die Beklagten haben das Unternehmen viele Jahre lang betrieben, in

einigen Fällen bis zum Jahre 2012 zurückgehend, und sie haben während diesem Zeitraum

notwendigerweise den TOU von Activision zugestimmt (und den aktualisierten Fassungen

48

Mitchell
Silberberg &
Knupp LLP

14793462.1

davon erneut zugestimmt), um den Zugang zu den COD-Spiel Servern aufrechtzuerhalten. Die Beklagten beabsichtigten auf betrügerischer Weise, die Arbeit des Unternehmens in Abänderung von falschen Versprechen und Falschangaben, die sie bei der Zustimmung zu den TOU machten, fortzusetzen.

162. Die Beklagten beabsichtigten, und taten dies auch, die Darstellungen und Angaben, die in der Computerübertragung der TOU enthalten waren, zu verwenden, um Activision gegenüber vorzugeben, dass sie die ihnen gewährten Lizenzen nicht mißbrauchen würden, und sie verwendeten dananch Computerübertragungen, um diese Lizenzen zu mißbrauchen.

163. Activision wurde, und wird weiterhin, als eine direkte und unmittelbare Folge der Beteiligung der Beklagten an diesem Verhalten geschädigt. Der Mißbrauch der Spiellizenzen durch die Beklagten und die Bereitstellung von gefälschten Zugangsgeräten an ausgeschlossenen User verursachte, dass Activision eine Verminderung an engagierten Spielern und Spielerlösen erlitt und dies auch weiterhin tun wird.

164. Wie hierin behauptet, hat Activision Schaden erlitten und wurde in den USA verletzt. Der Hauptgeschäftssitz von Activision befindet sich in Kalifornien, und die Erlösrealisierung und der Erlöserhalt, die bzw. der durch die starke Zunahme des Mißbrauchs der Spiellizenzen verloren ging, wäre in Kalifornien realisiert worden.

165. Activision wurde auch durch die Verminderung von COD-Spieleraktivität insbesondere in den USA geschädigt, und durch den Verlust an Spielerlösen, der von US-Spielern erlangt worden wäre, hätte es nicht den betrügerischen Lizenzerhalt der Beklagten gegeben, um die COD zu benutzen. Activision hat Schaden erlitten an seinem Unternehmensruf und US-Spielermarktzunahmen, insbesondere in den USA.

49

Mitchell Silberberg & Knupp LLP

14793462.1

**Illegaler Handel von und Verwendung von gefälschten Zugangsgeräten,**

**18 U.S.C. § 1029**

166.    Die Beklagten begingen Handlungen, die schwere Vergehen nach 18 U.S.C. § 1029 darstellen.

167.    In Verletzung von Paragraf 1029(a)(1) haben die Beklagten wissentlich und mit dem Vorsatz Activision zu betrügen, gefälschte Zugangsgeräte produziert, verwendet und illegal damit gehandelt.

168.    Wie hierin behauptet, zählen zu dem EO-Spoofer die Generierung und Bereitstellung von gefälschten HWID PC „Unterschriften", die ID-Nummern sind, Geräte und Instrumenten-ID-Nummern und Mittel zum Kontozugang – und daher „Zugangsgeräte" – im Sinne von Paragraf 1029(e). Vergleichbar mit einer Kreditkarten- oder sonstigen traditionellen Kontonummer oder „Schlüssel"-Karte, können, und tun dies, diese HWID „Unterschriften" gewöhnlicherweise als einen digitalen Schlüssel dienen im heutigen virtuellen Markt, um verschiedene Onlineserver, die durch Bezahlschranken, Mitgliedschaften, usw. begrenzt sind, freizuschalten. Diese HWID „Unterschriften" diktieren oft ob, und in welchem Maße, einzelne Kunden auf Waren, Services oder andere Dinge mit Wert, die von Onlineservern gehostet werden, zugreifen können.

169.    Der von den Beklagten illegal gehandelte EO Spoofer wird verwendet, um die Anti-Cheating Software von Activision zu umgehen und, insbesondere, legitime HWID Nummer Unterschriften mit der Bereitstellung von Fälschungen zu „spoofen" [manipulieren]. Unter Verwendung der gefälschten ID-Nummern (*d. h.* Zugangsgeräte), die von den Beklagten illegal gehandelt werden, können, und tun dies auch, vormals ausgeschlossene Spielerkonten nicht genehmigten (und wertvollen) Zugang zu den COD-Spielservern von

50

Mitchell
Silberberg &
Knupp LLP

14793462.1

Activision erlangen – und damit den nicht genehmigten Nutzen des Spiels und der darin bereitgestellten Unterhaltungsservices.

170.   Der Zugang zu den Services und anderen wertvollen Vorteile, die von Spielservern von Activision gehostet werden, stellen „Waren, Services oder andere Dinge mit Wert" im Sinne von Paragraf 1029(e) dar. Hunderte, wenn nicht gar Tausende von ausgeschlossenen Spielern zahlen jedes Jahr beträchtliche Geldbeträge für die wertvolle Gegenleistung von nicht genehmigten Zugang zu den Spielservern von Activision.

171.   Activision wurde, und wird dies auch weiterhin tun, geschädigt als eine direkte und unmittelbare Folge des illegalen Handels der Beklagten mit, und die Produktion und die Verwendung von gefälschten Zugangsgeräten. Der Missbrauch von Spiellizenzen durch die Beklagten sowie die Bereitstellung von gefälschten Zugangsgeräten an ausgeschlossene User hat eine wesentliche Verminderung von Activision-Spielerlösen verursacht, und wird dies auch weiterhin tun.

172.   Wie hierin behauptet, hat Activision Schaden erlitten und wurde in den USA verletzt. Der Hauptgeschäftssitz von Activision befindet sich in Kalifornien, und die Erlösrealisierung und der Erlöserhalt, die bzw. der durch die starke Zunahme von gefälschten Zugangsgeräten, sowohl weltweit als auch in den USA, verloren ging, wäre in Kalifornien realisiert worden.

173.   Activision wurde auch durch die Verminderung von COD-Spieleraktivität insbesondere in den USA geschädigt, und durch den Verlust an Spielerlösen, der von US-Spielern erlangt worden wäre, hätte es nicht groß angelegten illegalen Handel mit, und Verkauf von gefälschten Zugangsgeräten gegeben. Hunderte, wenn nicht gar Tausende von vormals ausgeschlossenen US-Spielern haben die gefälschten Zugangsgeräte, die von den Beklagten zum Zugang zu COD-Spielservern bereitgestellt wurden, verwendet. Und

Hunderte, wenn nicht gar Tausende von US-Spielern, die nicht schummelten, haben damit aufgehört zu spielen (und In-Game Käufe zu tätigen), weil Spieler, die schummeln, da waren. Activision hat Schaden erlitten an seinem Unternehmensruf und US-Spielermarktzunahmen, insbesondere in den USA.

174.   Activision unterhält in den USA ansässige Spielserver. Auf all diese Server wurde von Spielern mißbräuchlich zugegriffen unter Verwendung von Zugangsgeräten, die von den Beklagten illegal gehandelt und verkauft wurden.

### ANKLAGEPUNKT VII

### BUNDESSTAATLICHES ZIVILRECHTLICHES RICO – Verschwörung

### (18 U.S.C. § 1962(d))

175.   Activision behauptet erneut die in den Punkten 1 bis einschließlich 174 enthaltenen Behauptungen und macht sie durch Bezugnahme zum Bestandteil dieses Punktes, als ob sie in Gänze aufgeführt werden.

176.   In Verletzung von 18 U.S.C § 1962(d), verschwörten sich die Beklagten wissentlich, vorsätzlich und rechtswidrig, und fahren damit fort, um das oben beschriebene Unternehmen zu ermöglichen und auszuführen, was den Betrieb des Unternehmens über ein Handlungsmuster von illegalen Geschäften, wie hierin behauptet, beinhaltet.

177.   Die Verschwörung begann mindestens im Jahre 2019, und in einigen Fällen 2012, und sie ist andauernd.

178.   Der Zweck der Verschwörung der Beklagten war, und ist, die Entwicklung, die Vermarktung, der Verkauf und der Vertrieb der Cheating-Software, die den Usern in Verletzung der TOU von Activision erlaubt, nicht genehmigten Zugang zu den Spielservern von Activision zu erlangen.

179.   Nach bestem Wissen und Gewissen beging jeder Beklagte mindestens einen

Mitchell
Silberberg &
Knupp LLP

14793462.1

offenen Akt zur Förderung der Verschwörung, darunter u. a. die Rekrutierung und die Bereitstellung von Diensten als US-Wiederverkäufer der Cheating-Software, die Bereitstellung von Kunden-, Verkaufs- und technischem Support an US-User der Cheating-Software sowie die Vermarktung und die Verkaufsförderung der Cheating-Software.

180.   Der Zweck der Handlungen der Beklagten war, das allgemeine Objekt der Verschwörung zu fördern, was im Gegenzug die betrügerische Vornahme und Förderung des großangelegten Missbrauchs von Activisions Spiellizenzen sowie der unerlaubte Handel von gefälschten Zugangsgeräten war.

181.   Activision wurde und wird weiterhin geschädigt als eine direkte und unmittelbare Folge der Beteiligung der Beklagten an diesem Verhalten. Der Missbrauch der Spiellizensen durch die Beklagten und die Bereitstellung von gefälschten Zugangsgeräten an ausgeschlossene User verursachte, und tut dies weiterhin, Schaden an dem Geschäftsruf von Activision und eine Verminderung der Spielerlöse von Activision.

182.   Activision wurde auch durch die Verminderung von COD-Spieleraktivität insbesondere in den USA geschädigt, und durch den Verlust an Spielerlösen, der von US-Spielern erlangt worden wäre, hätte es nicht den großangelegten illegalen Handel der Beklagten mit gefälschten Zugangsgeräten, und den Verkauf von gefälschten Zugangsgeräten gegeben. Hunderte, wenn nicht gar Tausende von vormals ausgeschlossenen US-Spielern haben die gefälschten Zugangsgeräte, die von den Beklagten zum Zugang zu COD-Spielservern bereitgestellt wurden, verwendet. Und Hunderte, wenn nicht gar Tausende von US-Spieler, die nicht schummelten, haben damit aufgehört zu spielen (und In-Game Käufe zu tätigen), wegen des Vorhandenseins von

53

Mitchell
Silberberg &
Knupp LLP

14793462.1

Spielern, die schummeln. Activision hat Schaden erlitten an seinem Unternehmensruf und US-Spielermarktzunahmen, insbesondere in den USA.

183. Activision unterhält in den USA ansässige Spielserver. Auf all diese Server wurde mißbräuchlich von Spielern zugegriffen unter Verwendung von Zugangsgeräten, die von den Beklagten illegal gehandelt und verkauft wurden.

## KLAGEANTRAG

DAHER beantragt Activision, dass dieses Gericht zu seinem Gunsten ein Urteil fällt zu jedem Entlastungsanspruch, wie oben ausgeführt, und Zuspruch an ihn von Abhilfe, darunter, nicht beschränkt auf eine Verfügung auf Folgendes:

1. Den Beklagten, ihren Funktionären, Mitarbeitern, Bevollmächtigen, Töchtern, Vertretern, Vertreibern, Händlern, Mitgliedern, verbundenen Unternehmen und allen Personen, die in Übereinstimmung mit den Beklagten handeln oder sich an den Handlungen der Beklagten beteiligen, einstweilig und fortgesetzt Folgendes zu verbieten: (i) rechtswidrig in den USA mit Umgehungsgeräten zu handeln; (iii) vorsätzlich in die Verträge von Activision oder seinen verbundenen Unternehmen mit Spielern in den USA einzugreifen; und (iv) Wettbewerbsverzerrung in den USA zu betreiben.

2. Die Beklagten zu verpflichten, die Cheating-Software, jede demnächst erscheinende Software, die Spielern erlaubt in einem von Activision oder seinen verbundenen Unternehmern herausgegebenem Spiel zu schummeln, und jede fingierte Kopie davon, die auf einer Domaine, an einer Adresse, an einem Ort oder ISP gehostet wird, herunterzufahren und zu schließen.

3. Die Beklagten zu verpflichten, Activision alle Kopien von Material zu geben,

54

Mitchell
Silberberg &
Knupp LLP

14793462.1

1  die ein Recht von Activision beeinträchtigen oder verletzen, wie hierin dargelegt, darunter u.

2  a. den Quellcode für die Cheating-Software.

4      4.    Die Beklagten zu verpflichten, Activision eine Rechnungslegung aller Produkt-

5  oder Dienstverkäufe in den USA zu geben, die ein Recht von Activision oder der

6  verbundenen Unternehmen von Activision beeinträchtigen oder verletzen, wie hierin

7  dargelegt.

8      5.    Activision tatsächlichen Schadenersatz oder den Höchstsatz an gesetzlichem

9  Schadenersatz wegen Verletzung von § 1201 von DCMA, wie angemessen, nach 17 U.S.C.

10  § 1203(c) zuzusprechen.

11      6.    Activision ein übernormal hohes Schadenersatzurteil und Strafschadenersatz

12  gegen die Beklagten zuzusprechen zum Klagegrund von Activision wegen vorsätzlichem

13  Eingriff in vertragliche Beziehungen.

15      7.    Activision die Restitution der unrechtmäßigen Erlöse der Beklagten

16  zuzusprechen, darunter eine Rechnungslegung aller Verkäufe der Cheating-Software in den

17  USA und/oder aller Produkte und Dienste, die ein Recht von Activision, wie hierin

18  ausgeführt, verletzen.

19      8.    Die Verhängung eines gesetzlichen Treuhandverhältnisses über die von den

20  Beklagten unrechtmäßig erhaltenen Erlöse über die Verkäufe der Cheating-Software in den

21  USA und/oder eines Produkts oder eines Dienstes, das/der ein Recht von Activision, wie

22  hierin dargelegt, verletzt.

23      9.    Jeden sonstigen und weiteren Rechtsbehelf zuzusprechen, den dieses

24  Gericht für gerecht und angemessen erachtet.

25

26

27                         55

Mitchell
Silberberg &
Knupp LLP

28

14793462.1



1  DATUM: 16. September 2022          MARC E. MAYER

2                                     MARK C. HUMPHREY
                                      GENEVIEVE L. JAVIDZAD
3                                     MITCHELL SILBERBERG & KNUPP LLP

4                                     Durch: /Unterschrift/ Marc E. Mayer

5                                     _____
                                      Marc E. Mayer (SBN 190969)
6                                     Rechtsbeistand für den Kläger

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                    56

28

Mitchell
Silberberg &
Knupp LLP

14793462.1

**Exhibit A
Page 128**

## FORDERUNG EINES GESCHWORENENPROZESSES

Activision fordert für alle so verhandelbaren Punkte einen Geschworenenprozess.

DATUM: 16. September 2022

MARC E. MAYER
MARK C. HUMPHREY
GENEVIEVE L. JAVIDZAD
MITCHELL SILBERBERG & KNUPP LLP

Durch: /Unterschrift/ Marc E. Mayer

Marc E. Mayer (SBN 190969)
Rechtsbeistand für den Kläger

57

Mitchell
Silberberg &
Knupp LLP

14793462.1